FILED
1/3/2025 5:29 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Elvira Ramirez
Bexar County - 57th District Court

6 CITS PPS/2 SOS SAC 1

CAUSE NO. 2025CI00174

| | | |
|---|---|---|
| STEADFAST ASSET HOLDINGS, INC., Plaintiff, v. RESERVE AT CANYON CREEK TIC 1, LLC; RESERVE AT CANYON CREEK TIC 2, LLC; RESERVE AT CANYON CREEK TIC 3, LLC; RESERVE AT CANYON CREEK TIC 4, LLC; RESERVE AT CANYON CREEK TIC 5, LLC; RESERVE AT CANYON CREEK TIC 6, LLC; CHICAGO TITLE INSURANCE COMPANY; and FIDELITY NATIONAL TITLE INSURANCE COMPANY, Defendants. | § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT<br>_____ JUDICIAL DISTRICT<br>BEXAR COUNTY, TEXAS |

**PLAINTIFF'S ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

**COMES NOW** Plaintiff STEADFAST ASSET HOLDINGS, INC. ("Steadfast"), by and through its undersigned attorneys, and complains of Defendants RESERVE AT CANYON CREEK TIC 1, LLC; RESERVE AT CANYON CREEK TIC 2, LLC; RESERVE AT CANYON CREEK TIC 3, LLC; RESERVE AT CANYON CREEK TIC 4, LLC; RESERVE AT CANYON CREEK TIC 5, LLC; RESERVE AT CANYON CREEK TIC 6, LLC; CHICAGO TITLE INSURANCE COMPANY ("Chicago Title"); and FIDELITY NATIONAL TITLE INSURANCE COMPANY, and respectfully shows the Court:

## I. DISCOVERY CONTROL PLAN AND TEX. R. CIV. P. 47 RECITALS

1. In accordance with Tex. R. Civ. P. 190.3, Steadfast intends to conduct discovery pursuant to Tex. R. Civ. P. 190.4. Steadfast hereby requests that Defendants each produce to Plaintiff the Disclosures allowed under Rule 194 of the Texas Rules of Civil Procedure, and further

produce to Steadfast, at the undersigned counsel's law offices in San Antonio, all documents, electronic information and tangible items that Defendants have in their possession, custody, or control, and may use to support claims or defense of any of the Defendants, within fifty (50) days from service of this pleading on the Defendants.

2. Steadfast seeks monetary damages that are within the jurisdictional limit of this Court. *See* Tex. Gov't Code §24.007.

3. Pursuant to Tex. R. Civ. P. 47, Steadfast seeks monetary relief over $1,000,000.00 as well as non-monetary relief.

## II. INTRODUCTION

4. The parties to this case were involved in various capacities in an anticipated real estate transaction concerning property located in Bexar County, Texas. Steadfast, as the proposed buyer, and the Defendants, respectively, as the seller, the title company, and the escrow agent.

5. Steadfast timely and properly terminated the purchase and sale contract for the property. When Steadfast requested that Chicago Title return the earnest money deposit to Steadfast, as provided under the contract, Chicago Title failed to do so. A month later, the seller asserted that Steadfast had not terminated the contract and was in default. The seller asserted that it, not Steadfast, was entitled to the earnest money deposit. Despite this clear dispute over the proper disposition of the earnest money deposit, Chicago Title transferred the earnest money deposit to the seller. The seller has failed and refused to return the earnest money deposit to Steadfast. As result, Steadfast has been required to resort to filing suit.

## III. PARTIES, SERVICE, VENUE, JURISDICTION

6. Steadfast is a California Corporation with its principal place of business in California. It can be served through its undersigned counsel.

7. Defendants RESERVE AT CANYON CREEK TIC 1, LLC; RESERVE AT CANYON CREEK TIC 2, LLC; RESERVE AT CANYON CREEK TIC 3, LLC; RESERVE AT CANYON CREEK TIC 4, LLC; RESERVE AT CANYON CREEK TIC 5, LLC; RESERVE AT CANYON CREEK TIC 6, LLC (collectively and jointly and severally, "Seller") are each a Delaware limited liability corporation. Each of the Sellers can be served through their registered agent, Cogency Global, Inc. at 1601 Elm Street, Suite 4360, Dallas, TX, 75201.

8. Defendant Chicago Title is a Florida corporation with its principal place of business in Florida. A review of the public records maintained by the Texas Secretary of State indicates that Defendant Chicago Title has not designated a registered agent for service in the State of Texas. Therefore, Defendant Chicago Title may be served through the Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044.

9. Upon information and belief, Defendant Fidelity National Title Insurance Company ("Fidelity") provides managerial services for Chicago Title and is a California corporation with its principal place of business in Florida. A review of the public records maintained by the Texas Secretary of State indicates that Defendant Fidelity has not designated a registered agent for service in the State of Texas. Therefore, Defendant Fidelity may be served through the Secretary of State pursuant to Tex. Civ. Prac. & Rem. Code § 17.044.

10. Venue is mandatory in Bexar County, Texas, pursuant to Tex. Civ. Prac. & Rem. Code § 15.011 because it pertains to the respective rights of the parties under a contract for the purchase and sale of real property located in Bexar County, Texas. In the alternative, venue is proper in Bexar County, Texas, pursuant to Tex. Civ. Prac. & Rem. Code § 15.002(a) because it is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

## IV. FACTUAL BACKGROUND

11. Steadfast is an affiliate of Steadfast Companies, which was formed in 1994. In the last thirty years, Steadfast Companies and its affiliates have developed into an integrated, multifaceted real estate investment management company that today owns and/or operates a diverse portfolio of approximately $1.5 billion across the United States and Mexico.

12. Steadfast Companies is driven by its mission to pursue real estate investment, development, and management opportunities responsibly and with integrity for the benefit of its investors, partners, tenants, associates, and communities.

13. Since 1994, Steadfast Companies has acquired, refurbished, or developed more than 55,000 apartment units. It currently owns and/or operates more than 3,000 units in five states across the United States. It also owns and oversees the management of five senior living communities in the US, as well as three resorts and two commercial projects in Mexico.

14. In 2024, Steadfast began searching for real property that it could purchase in order to effectuate a tax-advantaged exchange, as it has done many times throughout its existence. Steadfast identified a 314-unit apartment complex located at 12235 Vance Jackson Road, San Antonio, Texas 78230, commonly known as Reserve at Canyon Creek Apartments (the "Apartments") as an appropriate property for those purposes.

15. Steadfast entered into negotiations with Seller, and the parties entered into an Agreement of Sale and Purchase, as amended from time to time (collectively, the "Purchase Agreement"). A true and correct copy of the Purchase Agreement, including the First and Second Amendments thereto, is attached hereto as **Exhibit A**. Exhibit A contains certain redactions, where appropriate, to protect confidential and/or personal information that is not material to this action.

16. Chicago Title was selected to facilitate the closing of the anticipated transaction and consented and agreed to Article XIII of the Purchase Agreement. Steadfast made an earnest money deposit in the amount of $1,000,000.00 as required by the Purchase Agreement, which was deposited with Chicago Title.

17. During due diligence, a boundary overlap (designated by the surveyor as "Encroachment B") was discovered. Encroachment B is located on the western boundary of the Apartments, and the detail provided by the surveyor showed the following potential overlap with the boundary of the adjacent property:




WEST LINE DETAIL
NOT TO SCALE

18. On October 28, 2024, Steadfast sent to the Seller and Chicago Title a Supplemental Title Disapproval Notice in accordance with Section 3.3 of the Sale Agreement. A true and correct copy of the Supplemental Title Disapproval Notice is attached hereto as **Exhibit B**. Steadfast

identified its Objections to the Title Commitment's Schedule A on pages 2-3 of the Supplemental Title Disapproval Notice. Steadfast identified the boundary overlap and requested that the as-surveyed legal description for the Apartments be revised, subject to approval by all applicable parties required by applicable law, to omit the overlap; that the revised legal description be recorded so an overlap would not be noted on a further updated survey; and that the revised legal description needed to be insured on the Owner's Policy and Loan Policy. *See* Exhibit B, at 2-3. Further, Steadfast required that the revised legal description be included on the Deed and all other closing documents. *See id.* at 3.

19. Under the terms of the Purchase Agreement, if Steadfast disapproved of the condition of title or the survey, it was required to provide notice of such disapproval in writing. *See* Exhibit A, section 3.3. Any such notice related to encumbrances or defects in a survey were required to be given on or before October 28, 2024. *See* Exhibit A, Second Amendment to Agreement of Sale and Purchase, ¶ 1. The Seller was then required, within five (5) days of receipt of the Title Disapproval Notice, to notify Steadfast of which items, if any, the Seller would attempt to cure. *See* Exhibit A, section 3.3. The Seller had ten (10) days from the date of the applicable Title Disapproval Notice to cure, eliminate, or agree to cure those specific items **and** "to furnish evidence satisfactory to [Steadfast] and the Title Company that all such items have been cured or eliminated or that arrangements have been made with the Title Company and any parties in interest to cure or eliminate the same at or prior to the Closing." *Id.* Steadfast had the "right to elect to terminate [the Purchase Agreement] within five Business Days of receipt of written notice from Seller that Seller cannot or will not cure or eliminate such items, and upon such election, all Earnest Money shall be immediately refunded to Purchaser . . . ." *Id.*

20. On November 1, 2024, four (4) days after the date of the Supplemental Title Disapproval Notice, the Seller responded by stating, in pertinent part, that it believed the overlap was the result of surveyor error, that it was "facilitating a discussion" between the parties' respective surveyors, and that it had requested additional information regarding the adjacent property's legal description. The Seller further stated that "[a]s of the date of this response, Seller has insufficient information to commit to a specific course of action . . . ." A true and correct copy of the November 1, 2024 letter is attached hereto as **Exhibit C**.

21. As of November 2, 2024, five (5) days after receiving the Supplemental Title Disapproval Notice, the Seller had not notified Steadfast of which items, if any, the Seller would attempt to cure as required under section 3.3 of the Purchase Agreement. As of November 7, 2024, ten (10) days after the date of the Supplemental Title Notice, the Seller had not cured, eliminated, or agreed to cure any specific items. Nor had the Seller "furnish[ed] evidence satisfactory to [Steadfast] and the Title Company that all such items have been cured or eliminated or that arrangements have been made with the Title Company and any parties in interest to cure or eliminate the same at or prior to the Closing" as required under section 3.3 of the Purchase Agreement.

22. Specifically, the Seller did not state that it would attempt to cure the boundary overlap issue. And at no time did the Seller furnish satisfactory evidence that the title defect caused by the boundary overlap could or would be cured or eliminated at or prior to closing. Instead, Seller proposed to provide limited title insurance coverage as a "band aid" to avoid actually curing the defect in the manner requested by, and satisfactory to, Steadfast.

23. On November 4, 2024, Steadfast sent Seller and Chicago Title a Termination Notice pursuant to Section 3.3 of the Purchase Agreement, stating that Seller had not timely agreed to

cure or eliminate certain objections noted in the Supplemental Title Disapproval Notice. In this notice, Steadfast also instructed Chicago Title to immediately return the earnest money deposit to Steadfast. A true and correct copy of the Termination Notice is attached hereto as **Exhibit D**.

24. Notwithstanding the Termination Notice, on November 5, 2024, Chicago Title sent without any explanation a "revised owner's pro forma" that contained the following provision, which had not been requested or approved by Steadfast:

> Company insures the Insured against loss, if any, sustained by the insured under the terms of this Policy by reason of a final, non-appealable judgment of a court of competent jurisdiction that divests the Insured of its interest as Insured because of this right, claim, or interest. Company agrees to provide defense to the Insured in accordance with the terms of this Policy if suit is brought against the Insured to divest the Insured of its interests as Insured because of this right, claim, or interest.

*See* Revised Owner's Pro Forma, ¶ 6s. A true and correct copy of the Revised Owner's Pro Forma is attached hereto as **Exhibit E**. This language did not cure or eliminate the boundary overlap issue. Nor was it a promise to cure that issue at or prior to closing.

25. After sending the Termination Notice, Steadfast remained in communication with Seller regarding the boundary overlap. Solely as a display of Steadfast's genuine interest in purchasing the Apartments if the boundary overlap issue could be resolved in a timely manner, Steadfast allowed its earnest money deposit to be held in escrow.

26. On or about November 8, 2024, the Seller sent two emails to Steadfast seeking an "amendment/extension" of the Purchase Agreement that Steadfast had terminated. But Steadfast refused to go back under contract.

27. On November 25, 2024, Steadfast sent Seller and Chicago Title a Supplemental Termination Notice restating the validity of the November 4, 2024 Termination Notice, asserting its right to a refund of its earnest money deposit, and demanding that Chicago Title immediately

release the funds to Steadfast. A true and correct copy of the Supplemental Termination Notice is attached hereto as **Exhibit F**.

28. On November 27, 2024, Steadfast sent an Escrow Instruction, including Steadfast's wiring instructions, to Chicago Title. A true and correct copy of the Escrow Instruction is attached hereto as **Exhibit G**. The Escrow Instruction again demanded immediate release to Steadfast of its earnest money deposit in accordance with the Purchase Agreement, the Termination Notice, and the Supplemental Termination Notice. Chicago Title did not return the earnest money deposit to Steadfast.

29. On December 2, 2024, Phil McGargill of Fidelity, representing himself as the manager for Chicago Title in Ohio, responded to Steadfast's November 27, 2024communication that included the Escrow Instruction. Mr. McGargill, on behalf of Chicago Title and Fidelity, appeared to dispute the validity of Steadfast's Termination Letter and falsely asserted that neither Chicago Title nor Fidelity was in receipt "of any written notice from Seller that it cannot or will not cure or eliminate any issues." He accepted as true, based on post-termination communications, the Seller's assertion that Seller was not taking the position that it could not or would not cure or eliminate any objectionable items (despite the fact that Seller did not timely agree to attempt to cure the boundary overlap and never proposed an acceptable solution to the boundary overlap). Nevertheless, Mr. McGargill represented that Chicago Title and/or Fidelity "would continue to hold the Earnest Monday [sic] until such time as we have *joint authorization* to release." (Emphasis added.) A true and correct copy of the December 2, 2024 email is attached hereto as **Exhibit H**.

30. On December 4, 2024, Seller sent a Notice of Purchaser Default to Steadfast and Chicago Title notwithstanding that Steadfast had already effectively and properly terminated the

Purchase Agreement. Seller purported to declare Steadfast in default under the Purchase Agreement even though Seller had: (a) acknowledged the boundary overlap issue; (b) failed to timely agree to attempt to cure the boundary overlap; and (c) failed to ensure that the defect would be cured at or prior to Closing. Seller demanded an additional "Extension Deposit" of $1,000,000.00 to be delivered to Chicago Title by December 9, 2024, to extend the Closing Date under the Purchase Agreement to a date no later than February 13, 2025. Seller asserted that if the Extension Deposit were not made by December 9, 2024, Seller was entitled to delivery of the earnest money deposit.

31. Steadfast did not make the "Extension Deposit" because it was not required to, inasmuch as the Purchase Agreement had been effectively and properly terminated, Seller had not cured the boundary overlap defect, and the Purchase Agreement had not been reinstated.

32. On December 10, 2024, counsel for Seller sent a Notice to Escrow, demanding the release of the earnest money deposit.

33. At 1:12 PM on the same day, despite having actual knowledge of the dispute over disposition of the earnest money deposit, and contrary to the previous assurance that the funds would not be released until Chicago Title/Fidelity received joint authorization, Mr. McGargill sent an email stating that the earnest money would be released to the Seller that same day "on the advice of counsel."

34. Immediately upon receipt of Mr. McGargill's communication, Steadfast sent an email to Chicago Title and Fidelity reattaching Steadfast's November 27, 2024 Escrow Instruction and reiterating that releasing the earnest money to Seller would be in violation of the Purchase Agreement. A true and correct copy of the December 10, 2024 email is attached hereto as **Exhibit I**. Three (3) hours later, Mr. McGargill sent an email advising that Fidelity would be

dispersing the funds to Seller, failing to acknowledge receipt of Steadfast's November 27, 2024Escrow Instruction or email that morning reattaching same. Within minutes, Steadfast sent a formal demand letter to Chicago Title and Fidelity reminding them of Steadfast's November 27, 2024 Escrow Instruction. Steadfast pointed out that, based on the various communications in November and early-December 2024, it was clear that the parties had a disagreement as to the disposition of the earnest money deposit. In the event of such a dispute, section 13.4(c) of the Purchase Agreement, the Escrow Agent's recourse was to deposit the funds with a court of competent jurisdiction. Steadfast directed Chicago Title/Fidelity not to disburse the funds to any party except Steadfast or, in the alternative, to deposit them with a court of competent jurisdiction. A true and correct copy of the Demand Letter is attached hereto as **Exhibit J**.

35. Despite the clear dispute between Steadfast and the Seller over the earnest money deposit, Chicago Title or Fidelity released and wired the funds to the Seller.

## V. CAUSES OF ACTION

### A. Count I: Breach of Contract (Seller)

36. Paragraphs 1-35 are incorporated by reference as though fully set forth herein.

37. The Purchase Agreement was a valid, enforceable contract.

38. Steadfast performed, tendered performance of, or was excused from performing its contractual obligations. Without limitation, Steadfast: (a) tendered its earnest money deposit; (b) timely notified all parties of its Title Objections; and (c) timely and properly terminated the Purchase Agreement.

39. Seller breached the Purchase Agreement by, among other things, demanding that the Escrow Agent disburse the earnest money deposit to Seller after Steadfast had timely and properly terminated the Purchase Agreement; causing the Escrow Agent to disburse the earnest

money deposit to Seller despite not being entitled to the funds and/or the explicit dispute over disposition of the funds; and asserting dominion and control over the disputed earnest money deposit.

40. Seller's breach caused injury to the Steadfast including, without limitation, the loss of the $1,000,000 earnest money deposit and any accrued interest.

41. As a result of Seller's breach, Steadfast was forced to retain counsel and has incurred attorneys' fees, expenses, and costs of court, all of which are recoverable under the terms of the Purchase Agreement.

**B. Count II: Breach of Contract** (Chicago Title)

42. Paragraphs 1-41 are incorporated by reference as though fully stated herein.

43. The Purchase Agreement was a valid, enforceable contract.

44. Steadfast performed, tendered performance of, or was excused from performing its contractual obligations. Without limitation, Steadfast: (a) tendered its earnest money deposit; (b) timely notified all parties of its Title Objections; and (c) timely and properly terminated the Purchase Agreement.

45. In its capacity as Escrow Agent, Chicago Title was bound by certain provisions of the Purchase Agreement, including, without limitation, Section 13.4(c), which governs the disposition of escrowed funds in the event of a dispute between Steadfast and Seller.

46. Chicago Title was aware of the existence of a dispute between Steadfast and Seller.

47. Chicago Title breached the Purchase Agreement when it disbursed the earnest money deposit to Seller despite the existence of a dispute. The only permissible course of action available to Chicago Title was to deposit the funds into a court of competent jurisdiction, which it failed to do.

48. Chicago Title's breach of the Purchase Agreement was the result of its own negligence because it failed to exercise a reasonable degree of care to ensure that it disbursed funds only to the party entitled to receive them.

49. In the alternative, Chicago Title's breach of the Purchase Agreement was the result of willful misconduct, because it disbursed the earnest money deposit to Seller despite express knowledge of: (a) Steadfast's Termination Notice; (b) Steadfast's prior demands for return of its earnest money deposit; and/or (c) the existence of a dispute regarding entitlement to the earnest money deposit.

50. In the further alternative, Chicago Title's breach of the Purchase Agreement was the result of bad faith because Chicago Title disbursed the earnest money deposit to Seller despite: (a) its prior express promise not to disburse funds while a disagreement over entitlement to the funds persisted; and (b) express knowledge of (i) Steadfast's Termination Notice, (ii) Steadfast's prior demands for return of its earnest money deposit, and/or (iii) the existence of a dispute regarding entitlement to the earnest money deposit.

51. Chicago Title's breach caused injury to the Steadfast including, without limitation, the loss of the $1,000,000 earnest money deposit and any accrued interest.

52. As a result of Chicago Title's breach, Steadfast was forced to retain counsel and has incurred attorneys' fees, expenses, and costs of court, all of which are recoverable under the terms of the Purchase Agreement.

### C. Count III: Tortious Interference with Existing Contract (Fidelity)

53. Paragraphs 1-52 are incorporated by reference as though fully restated herein.

54. Steadfast had a valid contract, namely the Purchase Agreement.

55. Fidelity was aware of the existence and validity of the Purchase Agreement and was further aware of Steadfast's interest in the Purchase Agreement.

56. Fidelity was not a party to the Purchase Agreement.

57. Fidelity interfered with Steadfast's interest in the Purchase Agreement by directing and/or permitting Chicago Title to disburse the earnest money deposit to Seller despite knowledge of: (a) Steadfast's timely and proper Termination Notice; (b) the existence of a dispute over entitlement to the earnest money deposit; and (c) Fidelity's prior promise that the funds would not be disbursed until the dispute was resolved, thereby inducing Chicago Title to breach its obligations to Steadfast under the Purchase Agreement.

58. Fidelity's interference was both willful and intentional. It intended that Chicago Title breach its obligations under the Purchase Agreement, including, without limitation, the obligation not to disburse funds if there was a dispute over which party was entitled to them.

59. Fidelity's interference proximately caused injury to Steadfast, including, without limitation, the loss of its $1,000,000 earnest money deposit and any interest accrued thereon.

60. Fidelity's tortious interference was conducted with gross negligence and/or malice and, therefore, Steadfast is permitted to recover exemplary damages in an amount to be proven at trial.

61. Fidelity was aware of the Termination Notice and the dispute over entitlement to the earnest money deposit. It was grossly negligent when it induced Chicago Title to nevertheless disburse the funds to Seller. Objectively, wiring the funds to Seller presented an extreme degree of risk that Steadfast, the party actually entitled to the return of the funds, would be injured. In the alternative, Fidelity was subjectively aware that Steadfast would be injured if its earnest money

deposit were wrongfully disbursed to Seller and proceeding to instruct or authorize Chicago Title to disburse the funds to Seller with conscious indifference to Steadfast's rights.

62. In the alternative, Fidelity acted with malice when it instructed or authorized Chicago Title to disburse the funds to Seller, because Fidelity intended to deprive Steadfast of the earnest money deposit, to which Steadfast was entitled under the terms of the Purchase Agreement.

### D. Count IV: Promissory Estoppel (Chicago Title/Fidelity)

63. Paragraphs 1-62 are incorporated by reference as though fully restated herein.

64. Chicago Title/Fidelity made a promise to Steadfast, to wit, that Chicago Title/Fidelity would not disburse the earnest money deposit until it received joint authorization.

65. Chicago Title/Fidelity also promised Steadfast, pursuant to Section 13.4(c) of the Purchase Agreement, that in the event of a dispute regarding disposition of escrowed funds, Chicago Title/Fidelity would not disburse such funds, but would only deposit them into a court of competent jurisdiction.

66. Steadfast reasonably and substantially relied on Chicago Title/Fidelity's promises.

67. Steadfast reasonably believe that, because Chicago Title/Fidelity knew or should have known about the dispute between Steadfast and Seller as to the funds, it would not release them to either party without joint authorization.

68. Chicago Title/Fidelity could have, and should have, foreseen that Steadfast would rely on Chicago Title/Fidelity's representation that it would not release the funds. First and foremost, that representation was consistent with Steadfast's prior experience with Chicago Title/Fidelity. Second, that representation comports with the standard of care governing escrow agents. Third, that representation comports with the terms of the Purchase Agreement.

69. As a result of Chicago Title/Fidelity's failure to honor its promise not to disburse the disputed escrow funds, Steadfast has been deprived of its $1,000,000 earnest money deposit, interest accrued thereon, and has incurred additional attorneys' fees, expenses, and costs of court.

70. Injustice can be avoided only by enforcing Chicago Title/Fidelity's promise and awarding Steadfast damages in an amount to be proved at trial.

71. Chicago Title's improper disbursement of the funds in contravention of its prior promise was the result of its own negligence because it failed to exercise a reasonable degree of care to ensure that it disbursed funds only to the party entitled to receive them.

72. In the alternative, Chicago Title's improper disbursement of the funds in contravention of its prior promise was the result of willful misconduct, because it disbursed the earnest money deposit to Seller despite express knowledge of: (a) Steadfast's Termination Notice; (b) Steadfast's prior demands for return of its earnest money deposit; and/or (c) the existence of a dispute regarding entitlement to the earnest money deposit.

73. In the further alternative, Chicago Title's improper disbursement of the funds in was the result of bad faith because Chicago Title disbursed the earnest money deposit to Seller despite: (a) its prior express promise not to disburse funds while a disagreement over entitlement to the funds persisted; and (b) express knowledge of (i) Steadfast's Termination Notice, (ii) Steadfast's prior demands for return of its earnest money deposit, and/or (iii) the existence of a dispute regarding entitlement to the earnest money deposit.

**E. Count V: Money Had and Received (Seller)**

74. Paragraphs 1-73 are incorporated by reference as though fully restated herein.

75. Seller holds money; namely, Steadfast's earnest money deposit and any interest accrued thereon.

76. The money belongs to Steadfast in equity and good conscience. Steadfast timely and properly terminated the Purchase Agreement and demanded the return of its earnest money deposit.

77. While acknowledging the title defects that permitted Steadfast to terminate the Purchase Agreement, Seller nevertheless failed and refused to concede that Steadfast was entitled to a return of its deposit.

78. Instead, Seller fraudulently and maliciously asserted that Steadfast's termination was improper and that Steadfast was in breach of its obligations under the Purchase Agreement.

79. Steadfast is therefore entitled to recover from Seller the earnest money deposit, any interest accrued thereon, and exemplary damages in an amount to be proven at trial.

**F. Count VI: Conversion (All Defendants)**

80. Paragraphs 1-79 are incorporated by reference as though fully restated herein.

81. Steadfast owned, possessed, or had the right to immediate possession of its earnest money deposit. Specifically, but without limitation, Steadfast was entitled to have the earnest money deposit returned to it following the timely and proper termination of the Purchase Agreement.

82. The earnest money deposit was personal property, *i.e.,* cash or cash equivalents.

83. Chicago Title/Fidelity wrongfully exerted control or dominion over the earnest money deposit when it transmitted those funds to Seller despite the existence of a dispute over which party was entitled to the earnest money deposit.

84. Chicago Title/Fidelity's wrongful conduct was the result of its own negligence because it failed to exercise a reasonable degree of care to ensure that it disbursed funds only to the party entitled to receive them.

85. In the alternative, Chicago Title/Fidelity's wrongful conduct was the result of willful misconduct, because it disbursed the earnest money deposit to Seller despite express knowledge of: (a) Steadfast's Termination Notice; (b) Steadfast's prior demands for return of its earnest money deposit; and/or (c) the existence of a dispute regarding entitlement to the earnest money deposit.

86. In the further alternative, Chicago Title/Fidelity's wrongful conduct was the result of bad faith because Chicago Title disbursed the earnest money deposit to Seller despite: (a) its prior express promise not to disburse funds while a disagreement over entitlement to the funds persisted; and (b) express knowledge of (i) Steadfast's Termination Notice, (ii) Steadfast's prior demands for return of its earnest money deposit, and/or (iii) the existence of a dispute regarding entitlement to the earnest money deposit.

87. Seller wrongfully exerted control or dominion over the earnest money deposit when it: (a) caused Chicago Title/Fidelity to distribute the funds to seller dispute the existence of a dispute over which party was entitled to the earnest money deposit: and (b) deposited the funds into its own account.

88. Steadfast suffered injury as a result of the conversion of its property, in an amount to be proven at trial.

**G. Count VII: Breach of Fiduciary Duty (Chicago Title/Fidelity)**

89. Paragraphs 1-88 are incorporated by reference as though fully restated herein.

90. As an escrow agent, Chicago Title/Fidelity owed fiduciary duties to each party to the Purchase Agreement, including Steadfast.

91. Chicago Title/Fidelity's fiduciary duties included, without limitation, the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the escrow funds and pay only those entitled to receive them.

92. Chicago Title/Fidelity breached its fiduciary when it disbursed the earnest money deposit, and any accumulated interest, to Seller despite knowing of the parties' dispute about who was entitled to distribution of the earnest money deposit.

93. Chicago Title/Fidelity's breach proximately caused injury to Steadfast.

94. Chicago Title/Fidelity's breach was caused by fraud, malice, willful misconduct, bad faith, negligence and/or or gross negligence. In particular, Chicago Title/Fidelity knew or should have known of the existence of the dispute regarding distribution of the escrowed funds, promised Steadfast they would not be distributed without joint authorization, and nevertheless distributed the funds to Seller over Steadfast's objection and entitlement to them.

95. Chicago Title/Fidelity's wrongful conduct was the result of its own negligence because it failed to exercise a reasonable degree of care to ensure that it disbursed funds only to the party entitled to receive them.

96. In the alternative, Chicago Title/Fidelity's wrongful conduct was the result of willful misconduct, because it disbursed the earnest money deposit to Seller despite express knowledge of: (a) Steadfast's Termination Notice; (b) Steadfast's prior demands for return of its earnest money deposit; and/or (c) the existence of a dispute regarding entitlement to the earnest money deposit.

97. In the further alternative, Chicago Title/Fidelity's wrongful conduct was the result of bad faith because Chicago Title disbursed the earnest money deposit to Seller despite: (a) its prior express promise not to disburse funds while a disagreement over entitlement to the funds

persisted; and (b) express knowledge of (i) Steadfast's Termination Notice, (ii) Steadfast's prior demands for return of its earnest money deposit, and/or (iii) the existence of a dispute regarding entitlement to the earnest money deposit.

98. Steadfast is entitled to recover damages, including exemplary damages, in an amount to be proven at trial.

**H. Count VIII: Business Disparagement (Seller)**

99. Paragraphs 1-98 are incorporated by reference as though fully restated herein.

100. Seller published disparaging words to third parties about Steadfast's economic interests and business reputation, including, without limitation, asserting that Steadfast concocted a reason to terminate the Purchase Agreement because Steadfast lacked the financial wherewithal to consummate the purchase of the Apartments and stating that Steadfast breached the Purchase Agreement after Steadfast had timely and properly terminated it.

101. Seller's statements regarding Steadfast's ability to close and its reasons for terminating the Purchase Agreement were false and misleading. Seller's statements that Steadfast was in default under the Purchase Agreement was also false and misleading, Steadfast had properly and timely terminated the Purchase Agreement and had substantially performed all of its obligations through the date of termination.

102. Seller published its statements with malice because it: (a) knew the statements were false; (b) made the statements with reckless disregard for whether they were true; and (c) acted with ill will (including, without limitation, trying to shift the blame for the failure of the Purchase Agreement onto Steadfast instead of acknowledging the Seller's inability to convey clear title).

103. Seller had no privilege allowing it to publish the aforementioned statements.

104. Seller's publication resulted in special damages to Steadfast, including without limitation, the loss of the $1,000,000 earnest money deposit that Seller induced Chicago Title/Fidelity to transmit to Seller on the basis that Steadfast (and not Seller) had breached the Purchase Agreement.

105. These special damages are greater than the anticipated attorneys' fees that will be incurred in bringing this claim.

106. Steadfast is entitled to recover damages, including exemplary damages, in an amount to be proven at trial.

### I. Count IX: Declaratory Judgment Pursuant to Texas Civil Practice & Remedies Code Ch. 37 (All Defendants)

107. Paragraphs 1-106 are incorporated by reference as though fully restated herein.

108. A controversy between the Parties exists that would be resolved by a declaratory judgment. There is a dispute over whether Steadfast or the Seller is entitled to the earnest money deposit under the Purchase Agreement and whether, under the terms of the Purchase Agreement, the Escrow Agent could disburse those funds while a dispute over entitlement to them existed.

109. Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Steadfast seeks a declaratory judgment as follows:

a. The Purchase Agreement was a valid and enforceable contract.

b. Steadfast timely and properly terminated the Purchase Agreement.

c. Under the terms of the Purchase Agreement, Steadfast was entitled to the return of its earnest money deposit.

d. Seller breached the Purchase Agreement by causing Chicago Title to disburse the earnest money deposit to it.

e. Chicago Title breached the Purchase Agreement by disbursing the funds to Seller despite Steadfast's timely and proper termination of the Purchase Agreement.

f. Chicago Title further breached the Purchase Agreement by disbursing the funds to Seller despite the fact that Chicago Title knew or should have known that there was a dispute between the parties over entitlement to the earnest money deposit.

110. Steadfast has suffered an injury in fact, i.e., the deprivation of its $1,000,000 earnest money deposit.

111. Further, pursuant to section 37.009, Steadfast is entitled to recover its costs and reasonable and necessary attorney's fees as are equitable and just.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff Steadfast prays that the Court enter judgment in its favor and against Defendants, and award Steadfast:

A. Actual Damages;

B. Exemplary Damages;

C. Attorneys' fees and expenses;

D. Costs of Court;

E. Pre-judgment Interest;

F. Post-judgment interest;

G. All other amounts to which Steadfast may be justly entitled; and

H. Entry of a declaratory judgment that Steadfast timely and properly terminated the Purchase Agreement and was entitled to return of its earnest money deposit.

Respectfully submitted,

**LANGLEY & BANACK, INC.**
Trinity Plaza II, Seventh Floor
745 East Mulberry, Suite 700
San Antonio, Texas 78212
(210) 736-6600 – Telephone
(210) 735-6889 – Telecopier

*/s/ Natalie F. Wilson*
NATALIE F. WILSON
State Bar No. 24076779
nwilson@langleybanack.com

**ATTORNEYS FOR PLAINTIF**

Exhibit A

# AGREEMENT OF SALE AND PURCHASE

THIS AGREEMENT OF SALE AND PURCHASE (this "Agreement") is made as of the 17th day of September, 2024 (the "Effective Date") by and between Steadfast Asset Holdings, Inc., a California corporation ("Purchaser"), and Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), under the following circumstances:

A. Seller is the owner of a 314 unit apartment complex located at 12235 Vance Jackson Road, San Antonio, Texas 78230 and known as Reserve at Canyon Creek Apartments (the "Apartments").

B. Seller desires to sell, and Purchaser desires to purchase, the Apartments pursuant to the terms set forth herein.

NOW THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, and subject to the terms and conditions hereof, Seller and Purchaser hereby covenant and agree as follows:

Seller hereby agrees to sell to Purchaser and Purchaser hereby agrees to purchase from Seller, upon the terms and conditions contained in this Agreement, the "Property" (as such term is defined in Section 1.1 hereof).

## ARTICLE I INCLUSIONS IN SALE

1.1. There shall be included in this sale all of the following (collectively, the "Property"):

1.1.1. The real property described on Exhibit A attached hereto and made a part hereof (the "Land"), together with all rights and appurtenances pertaining thereto, including, without limitation, any and all rights of Seller in and to all oil, gas and other minerals, air and development rights, roads, alleys, easements, streets and ways adjacent to the Land, rights of ingress and egress thereto, any strips and gores within or bounding the Land and in profits or rights or appurtenances pertaining to the Land.

1.1.2. The buildings and all other improvements, structures and fixtures placed, constructed or installed on the Land (collectively, the "Improvements").

1.1.3. All right, title and interest of the landlord in and to all leases, licenses and other occupancy agreements (collectively, the "Leases") covering space situate at or within the Land and Improvements and any claim or right to claim against a tenant or occupant (collectively, the "Tenants") under any Lease and all unapplied security deposits paid or deposited by Tenants in respect of the Leases.

1.1.4. All of Seller's rights in and to all contractual rights with respect to the operation, maintenance, repair and improvement of the Land and Improvements, including service and maintenance agreements, construction, material and labor contracts, utility agreements and other contractual arrangements, all to the extent designated by the provisions of this Agreement (collectively, the "Contracts"); the Contracts shall not include Seller's rights under its master agreement with Century Fire Protection Service (fire protection) or Waste Management, any property management agreement or any contract with an affiliate of Seller, which rights will be terminated as to the Apartments as of the closing.

1.1.5. Excluding personal property owned by Tenants, all equipment, furnishings and other tangible personal property (collectively, the "Personal Property") placed or installed on or about the Land or Improvements now or prior to "Closing" (as such term is defined in Section 7.1 hereof) and used as part of or in connection with the Land and Improvements.

1.1.6. All of Seller's right, title and interest, if any, in and to all of the following items, to the extent assignable and without warranty (the "Intangible Personal Property"): (a) licenses (excluding any and all licenses of software), and permits relating to the operation of the Property, (b) the right to use the name of the Apartments in connection with the Property, the domain name and url for the Apartments website (excluding the website's content) www.reserveatcanyoncreekapts.com, and (c) marketing imagery and other marketing materials, telephone numbers, yellow page listings, all social media connections, logos and designs with respect to the Improvements (excluding any Connor Group, A Real Estate Investment Firm related imagery, copyrights, or trademarks) and (d) if still in effect, guaranties and warranties received by Seller from any unrelated third party, contractor, manufacturer or other person in connection with Improvements to or operation of the Property.

Included in the Property shall be any and all the foregoing items in which any affiliate of Seller has any right, title or interest, to the extent the same is used solely in connection with the Real Property unless otherwise expressly agreed to by Purchaser; it being understood and agreed that Seller shall cause such affiliate to convey the same to Purchaser at Closing.

ARTICLE II. PURCHASE PRICE

2.1. The purchase price (the "Purchase Price") for the Property shall be $[redacted] payable as follows:

2.1.1. The sum of $1,000,000.00 (the "Earnest Money") shall be delivered to Chicago Title Insurance Company, Attn: Michelle Pensyl, Esq., One Dayton Centre, One South Main, Suite 250, Dayton, Ohio 45402, michelle.pensyl@ctt.com (the "Escrow Agent") by Purchaser within two (2) Business Days of the Effective Date. In the event that Purchaser fails to timely deposit the Initial Earnest Money with the Escrow Agent, this Agreement shall be of no force and effect.

2.1.2. The balance of the Purchase Price, subject to adjustments as provided in Article VI or elsewhere in this Agreement, shall be deposited by Purchaser with the Escrow Agent in immediate, same-day federal funds wired for credit into the Escrow Agent's escrow account at a bank reasonably satisfactory to Purchaser and Seller.

ARTICLE III. INSPECTION PERIOD

3.1. For the period (the "Inspection Period") commencing on the date hereof and ending on (a) October 9, 2024 for any and all matters other than updates made to the Existing Survey (the "Inspection Period Expiration Date"), and (b) October 16, 2024 solely for updates made to the Existing Survey (the "Updated Survey Inspection Period Expiration Date"), and thereafter until Closing unless this Agreement has been terminated, Purchaser shall have the right, upon forty-eight (48) hours prior notice to Seller (which may be via electronic mail, but without requirement for concurrent overnight delivery), to have performed (i) a physical, mechanical and environmental inspection of the Property as Purchaser deems necessary to determine the physical condition of the Property, and (ii) an inspection of all books and records and financial information pertaining thereto. Purchaser shall not conduct an invasive testing with Seller's prior written approval (which may be via electronic mail, but without requirement for concurrent overnight delivery), which approval may be granted or withheld in Seller's sole discretion. During the Inspection Period and thereafter until Closing unless this Agreement has been terminated, Seller shall cooperate with Purchaser in its inspection of the Property, including but not limited to, furnishing, to the extent such information is in Seller's possession, to Purchaser such information, materials and documents as Purchaser may reasonably request. If Purchaser, in Purchaser's sole judgment, shall find such inspection to be unsatisfactory for any reason whatsoever or for no reason, Purchaser shall have the right, at its option, to be exercised not later than 5:00 p.m. California time on the Inspection Period Expiration Date, to elect to terminate this Agreement by written notice to Seller and the Escrow Agent, and, upon such election, all Earnest Money shall be immediately refunded to Purchaser without necessity of joint instructions under Section 13.3 hereof (provided that Seller shall not have previously delivered a notice of default under Section 12.3 hereof), and, thereupon, the parties hereto shall have no further liabilities one to the other (other than those that are expressly stated to survive the termination of this Agreement). If Purchaser fails to terminate this Agreement on or before the Inspection Period Expiration Date or the Updated Survey Inspection Period Expiration Date as applicable by written notice to Seller and the Escrow Agent, Purchaser shall be deemed to have waived its right to terminate this Agreement pursuant to this Section 3.1. Purchaser agrees that it shall not unreasonably interfere with Tenants in performing its inspection.

Except to the extent arising out of the negligence or willful misconduct of Seller or Seller's contractors, employees, representatives or agents, Purchaser shall indemnify and hold Seller harmless for any and all actual damage, cost and expense caused by Purchaser's, or its employees', agents' or contractors', activities on the Property pursuant to the inspection rights granted herein, including reasonable attorneys' fees but expressly excluding punitive, special, consequential or incidental damages; provided, however, that Purchaser shall not be responsible for any losses or expenses resulting from the discovery of adverse information regarding the Property.

Purchaser, and its agents, representatives, and management company, shall not, during the term of this Agreement and for two (2) years after the term of this Agreement, solicit Seller's or

its managing agent's personnel for employment, or discuss the terms and provisions of this Agreement with such personnel, without Seller's prior written consent.

Purchaser shall notify Seller in writing on or prior to the expiration of the Inspection Period Expiration Date which, if any, of the Contracts Purchaser desires Seller to terminate at (and effective as of) Closing and Seller will terminate those Contracts specified in Purchaser's notice, except Seller shall have no obligation to terminate Contracts which cannot be terminated by Seller upon thirty (30) days' written notice or less or without the payment of a premium or penalty. Purchaser's failure to timely deliver said notice shall be deemed Purchaser's election to continue and assume all Service Contracts unless Purchaser agrees to pay the same at Closing. Seller shall cooperate with Purchaser, both before and after the Closing, to obtain any approvals or consents required to assign any Contracts to Purchaser, including, without limitation, sending requests for such approvals or consents to the party or parties whose consent or approval is required. Seller's obligations under this paragraph shall survive the Closing for a period of three (3) months. Notwithstanding anything in this Agreement to the contrary, Purchaser shall have no obligation to assume any obligation under any Contract for reimbursement of any amounts paid prior to the Closing Date upon termination of said Contract, and, if Purchaser does assume such obligation, then Seller shall indemnify Purchaser with respect thereto (except to the extent that such termination is due to an affirmative act or omission of Purchaser resulting in a default under said Contract).

3.2. Seller shall make available to Purchaser, to the extent in Seller's (or its affiliates' or property manager's) possession or control, copies of, or access to with the right to copy, the documents described on Exhibit H attached hereto within five (5) days after the Effective Date (the "Property Information") in electronic format to the extent feasible. Except as otherwise expressly provided herein, Seller makes no representations or warranties as to the accuracy or completeness of the Property Information or any other documents and information Seller may provide to Purchaser.

3.3. Purchaser shall obtain a title commitment (the "Title Commitment") and Purchaser shall, if Purchaser desires, have the Existing Survey updated at Purchaser's cost. Purchaser shall have until the Inspection Period Expiration Date or the Updated Survey Inspection Period Expiration Date as applicable to examine the condition of title and the Survey and to approve or disapprove the same. If Purchaser shall disapprove the condition of title or Survey, such disapproval shall be set forth in one or more notices (each, a "Title Disapproval Notice") given to Seller not later than the Inspection Period Expiration Date or the Updated Survey Inspection Period Expiration Date as applicable stating that the condition of title to the Property, any of the terms, provisions or contents of said items and documents or contents of the Survey are disapproved by Purchaser. Notwithstanding the foregoing, Purchaser may deliver one or more additional Title Disapproval Notices after the Inspection Period Expiration Date if, at any time after the Inspection Period Expiration Date, Purchaser receives (i) an amendment to the Title Commitment previously delivered to it by the Title Company (as hereinafter defined) containing any exception not set forth in a Title Commitment previously delivered to it or (ii) a revision of the Survey containing any encumbrances or other defects not included on the previous Survey, provided that any such additional Title Disapproval Notice shall be given, if at all, within five days after Purchaser receives such amendment or revised survey. Seller shall notify Purchaser within five days of receipt of the applicable Title Disapproval Notice as to which, if any, matters Seller will attempt

to cure, and Seller shall have until the date which is ten days after the date of the applicable Title Disapproval Notice (the "Title Cure Expiration Date") in which to cure or eliminate or agree to cure such specified items, and to furnish evidence satisfactory to Purchaser and the Title Company that all such items have been cured or eliminated or that arrangements have been made with the Title Company and any parties in interest to cure or eliminate the same at or prior to the Closing. If such evidence is not received by Purchaser and the Title Company on or before the Title Cure Expiration Date or if at Closing there are any additional exceptions to title of which the Title Company has not theretofore provided to Purchaser (all exceptions to title set forth in any and all Title Disapproval Notices and all such additional exceptions to title are herein called "Non-Permitted Exceptions") and Seller is unable or unwilling to cure or eliminate such items, then Purchaser shall have the right to elect to terminate this Agreement within five Business Days of receipt of written notice from Seller that Seller cannot or will not cure or eliminate such items and upon such election, all Earnest Money shall be immediately refunded to Purchaser, and thereupon the parties hereto shall have no further obligations one to the other under this Agreement (other than those that are expressly stated to survive the termination of this Agreement). Seller shall have no obligation to cure any title matters except (i) financing liens of an ascertainable amount created by, under or through Seller, which liens Seller shall cause to be released at or prior to Closing (with Seller having the right to apply the Purchase Price or a portion thereof for such purpose), and Seller shall deliver the Property free and clear of any such financing liens, and (ii) any exceptions or encumbrances to title which are created by, under or through Seller after the date of the Title Commitment without Purchaser's consent. "Permitted Exceptions" shall mean the specific exceptions in the Title Commitment approved or deemed approved by Purchaser; other exceptions to which Purchaser has not raised an objection as provided herein or has subsequently waived such objection in writing or been deemed to have waived such objection as provided above; real estate taxes not yet due and payable; rights of tenants (as tenants only) under the Leases; and any matters approved by Purchaser or arising by, through or under Purchaser or its or Purchaser's contractors, employees, representatives, proposed lenders, or agents. In no event shall any Seller cure period hereunder extend beyond the date that is four (4) business days prior to the Closing Date.

3.4 Except for the representations, warranties, covenants and agreements of Seller expressly set forth in this Agreement and any document delivered by Seller at Closing, Purchaser agrees (i) that it is purchasing the Property on an "AS-IS, WHERE-IS" and "WITH ALL FAULTS" basis and based exclusively on its own investigation and examination of the Property, (ii) that neither Seller nor its employees, officers, directors, trustees, principals, agents, consultants, affiliates, parents, brokers, property managers, attorneys, contractors, and their respective successors and assigns (collectively, "Representatives") have made, and Seller and its Representatives do not make and specifically negate and disclaim any warranty, representation, covenant, agreement or guarantee of any kind or character whether express, implied or statutory, written or oral, past, present or future, of, as to, concerning or with respect to any matter pertaining to the Property including without limitation: (a) the value of Property; (b) any income to be derived from the Property; (c) the suitability of the Property for any and all activities and uses which Purchaser may conduct thereon, including the possibilities for future development of the Property; (d) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property; (e) the manner, quality, state of repair or lack of repair on the Property; (f) the nature, quality or condition of the Property, including, without limitation, water, water rights, soil, or geological conditions; (g) the compliance of or by the Seller, the Property, or its operation with

any codes, laws, rules, ordinances, regulations of any applicable governmental authority or body, including, without limitation, any applicable zoning or building requirements; (h) the nature, manner or quality of the construction or materials incorporated into the Property, including, without limitation, any latent or patent defects; (i) the design of the Property, including, without limitation, the specification of any materials or products incorporated into or used in connection with the construction of the Property; (j) compliance with any environmental, health, safety or land use laws, rules, regulations, orders, codes or requirements, including, but not limited to, the Americans with Disabilities Act of 1990, the Federal Water Pollution Control Act, the Federal Resource Conservation and Recovery Act, the U.S. Environmental Protection Agency Regulations at 40 CFR Part 261, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), the Resource Conservation and Recovery Act of 1976, the Clean Water Act, the Safe Drinking Water Act, the Hazardous Materials Transportation Act, the Toxic Substance Control Act, and regulations promulgated under any of the foregoing as well as any and all other laws, ordinances, rules and/or regulations created or imposed by any governmental authority having jurisdiction over the Property, whether local, state or federal, pertaining to environmental regulation, contamination, clean-up or disclosure, as now existing and/or as hereafter amended. (collectively, "Environmental Laws"); (k) the presence or absence of "hazardous materials" (as defined below) at, on, or under the Property or any property near or adjacent to the Property; (l) the presence or absence of any underground storage tanks on the Property or on property adjacent to or near the Property; (m) the content, completeness or accuracy of any of the Property Information (and any other documents and information given to or reviewed by Purchaser), the offering, if any, prepared by Seller's broker, or any other materials related to Purchaser's inspection of the Property, or any preliminary reports, title commitments, or other reports or documents regarding title to the Property; (n) the tenant occupancy level at the Property; (o) deficiency of any undershoring; (p) deficiency of any drainage; (q) the fact that all or a portion of the Property may be located in or near any flood area or zone or wetlands; (r) the existence of vested land use, zoning or building entitlements affecting the Property (Purchaser is solely responsible for obtaining any certification of occupancy or any other approval or permit necessary for transfer or occupancy of the Property); (s) the square footage of the Land or the conformity of the Improvements to any plans or specifications for the property, including any plans and specifications that may have been provided to Purchaser; and (t) any other matter relating to the Property or to the development or operation of the Property. As used herein, the term "hazardous materials" shall mean any hazardous or toxic materials, substances or wastes that are or become regulated by any federal, state or local governmental authority, including, without limitation, (i) substances defined as "hazardous substances," "hazardous materials" or "toxic substances" in any environmental laws; (ii) any materials, substances or wastes which are toxic, ignitable, radioactive, corrosive or reactive and which are regulated by any state or local governmental authority or any agency of the United States of America; (iii) asbestos, mold, fungi, petroleum and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls (pcbs), and freon and other chlorofluorocarbons; and (iv) those substances defined as any of the foregoing in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws. Purchaser acknowledges that the Purchase Price reflects the "AS-IS," "WHERE-IS" nature of this sale and any faults, liabilities, defects or other adverse matters that may be associated with the Property and Purchaser's agreement to purchase the Property "AS-IS" is a material inducement to Seller to agree to sell the Property at the Purchase Price provided herein.

Without limiting the foregoing and subject solely to Seller's representations, warranties, covenants and agreements expressly set forth in this Agreement and any document delivered by Seller at Closing, upon Closing, Purchaser , for itself and its agents, parents, affiliates, successors and assigns, waives its right to recover from and releases and forever discharges Seller, and its Representatives from any and all claims, demands, liabilities, losses, damages, penalties, fines, liens, judgments, costs or expenses (including without limitation attorney fees and disbursements) whatsoever (collectively "claims") whether at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical (including without limitation, design and construction defects), environmental, health, safety, economic or legal condition of the Property, including, without limitation, all claims in tort or contract and any claim for indemnification or contribution arising under any environmental laws or any similar federal, state or local statute, rule or regulation (including any subsequent amendment or addition thereto and judicial interpretations thereof). Subject solely to Seller's representations, warranties, covenants and agreements expressly set forth in this Agreement and any document delivered by Seller at Closing, Purchaser, for itself and its agents, affiliates, parents, successors and assigns upon Closing, shall be deemed to have waived, relinquished and released Seller, and its Representatives from and against any and all matters affecting the Property. The agreement of Purchaser set forth in this Section 3.4 shall be deemed to be affirmed as of the Closing and the provisions of this Section 3.4 shall survive indefinitely the Closing or earlier termination of this Agreement and shall not be merged into the deeds or other closing documents.

ARTICLE IV. REPRESENTATIONS AND WARRANTIES

4.1. Except, in all cases, for any fact, information or condition disclosed in the Title Commitment, the Permitted Exceptions, the Contracts, or the Property Information, or which is otherwise actually known to Purchaser prior to Closing, Seller represents to Purchaser the following (collectively, the "Seller's Representations") as of the Effective Date and the Closing Date:

4.1.1. To Seller's knowledge, any Rent Roll provided or to be provided to Purchaser for the Property are or will be true, correct and complete in all material respects as of the dates thereof. To Seller's knowledge, there are no persons leasing, using or occupying the Real Property or any part thereof except the tenants under the Leases or parties exercising their rights under the Permitted Exceptions or Contracts. The Property Information was prepared by or for Seller in the ordinary course of its business and are the documents used and relied upon by Seller in connection with its operation of the Property; however Seller does not and will not represent or warrant that Purchaser will be able to, or that Purchaser should be able to, operate the Property in a manner which will produce results which are the same as or similar to those reflected in the Property Information.

4.1.2. Except for that certain litigation matter entitled XXX, Plaintiff v. Moises Salomon Zeledon-Solis, et al., Case No. 2024CI13611, pending in the District Court of Bexar County, Texas (225th Judicial District) (the "Litigation Matter"), there is no litigation, arbitration or other legal or administrative suit, action, proceeding or investigation pending or, to the best of Seller's knowledge, threatened against or involving Seller or the Property.

4.1.3. All of the Contracts which affect the Property are set forth on Exhibit C attached hereto and made a part hereof. To the best of Seller's knowledge, each of the Contracts referred to on Exhibit C are valid and in full force and effect, and no party thereto is in default thereunder.

4.1.4. Seller is not a "foreign person" as such term is defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

4.1.5. Seller has not received any notice of any pending or threatened condemnation or similar proceeding or pending public improvements in or adjoining the Property which will in any manner affect the Property.

4.1.6. Seller is duly organized, validly existing and in good standing under the laws of the State of its formation. Seller has taken all limited liability company action necessary to authorize the execution and delivery of this Agreement and the performance by Seller of its obligations under this Agreement. This Agreement has been duly executed and delivered by Seller and constitutes a valid, binding and enforceable obligation of Seller, subject to bankruptcy and other debtor relief laws and principles of equity. Each person executing and delivering this Agreement and all documents to be executed and delivered by Seller at the Closing represents and warrants to Purchaser that he has due and proper authority to execute and deliver same. Seller has the full right, power and authority to enter into this Agreement, to sell and convey the Property to Purchaser as provided herein and to carry out its obligations hereunder, and all required consents have been obtained. The entry into this Agreement by Seller, the performance of Seller's obligations hereunder, and the consummation by Seller of the transaction which is the subject of this Agreement will not conflict with or result in a breach of any of the terms of the organizational documents of Seller, any agreement or instrument to which Seller is a party or by which Seller is bound or any governmental or court order or ruling applicable to Seller or constitute a default thereunder. No other party has any right to purchase the Property, or any part thereof.

4.1.7. The schedule of Personal Property attached hereto and made a part hereof as Exhibit D contains a correct and complete list of all Personal Property and fixtures owned by Seller and located at or used in connection with the operation of the Property. All Personal Property is, and as of the Closing will be, owned by Seller free from encumbrances or liens. The Personal Property to be conveyed is subject to depletions, replacements and additions in the ordinary course of Seller's business.

4.1.8 To Seller's knowledge, there are no uncured violations of any laws, statutes, rules, regulations or ordinances applicable to the Property or any Permitted Exceptions. Seller has received no written notice, citation or other claim alleging any violation of any law, statute, rule, regulation, ordinance or Permitted Exception that was not provided to Purchaser as part of the Property Information.

Definition of Seller's Knowledge. Any representations made "to Seller's knowledge" shall not be deemed to imply any duty of inquiry. For purposes of this Agreement, the term "to Seller's knowledge" shall mean and refer only to actual knowledge of the Designated Representative of Seller and shall not be construed to refer to the knowledge of any other partner, officer, director,

agent, employee or representative of Seller, or any affiliate or parent of Seller, or to impose upon such Designated Representative any duty to investigate the matter to which such actual knowledge or the absence thereof pertains, or to impose upon such Designated Representative any individual personal liability. As used herein, the term Designated Representative shall refer to Kristina Flowers, District Manager of Seller's property manager having responsibility for the Property.

Except as specifically set forth in this Article IV or any document delivered by Seller at Closing, Seller has not made, or has not authorized anyone to make, any warranty or representation as to the Leases, the Contracts, any written materials delivered to Purchaser, the persons preparing such materials, the present or future physical condition, development potential, zoning, building or land use law or compliance therewith, the operation, income generated by, or any other matter or thing affecting or relating to the Property.

4.2. In order to induce Seller to enter into this Agreement, Purchaser represents and warrants to Seller that, as of the Effective Date and the Closing Date:

4.2.1 Purchaser is duly organized and validly existing under the laws of the state of its formation.

4.2.2 Purchaser has the authority to enter into this Agreement and to perform its obligations under this Agreement. Purchaser has taken all corporate action necessary to authorize the execution and delivery of this Agreement and the performance by Purchaser of its obligations under this Agreement. This Agreement has been duly executed and delivered by Purchaser and constitutes a valid, binding and enforceable obligation of Purchaser, subject to bankruptcy and other debtor relief laws and principles of equity. The entry into this Agreement by Purchaser, and the performance of Purchaser's obligations hereunder does not violate the organizational documents of Purchaser or any agreement to which it is a party or any governmental or court order or ruling applicable to Purchaser.

4.2.3 Purchaser is a sophisticated and experienced purchaser of multifamily apartment projects, and has participated in and is familiar with the acquisition, ownership, management, and operation of real estate projects similar to the Property. Purchaser has or will have under the terms of this Agreement adequate opportunity to complete all physical, financial, legal, environmental and regulatory investigations and examinations relating to the Property that it deems necessary, and, except for the representations, warranties, covenants and agreements of Seller expressly set forth in this Agreement and any document delivered by Seller at Closing, will acquire the same solely on the basis of such investigations and examinations and the title insurance protection afforded by the Title Policy and not on the basis of any information provided or to be provided by Seller or any Seller's Representatives.

ARTICLE V. <u>OPERATIONS PRIOR TO CLOSING/CONDITIONS TO CLOSING</u>

5.1. Seller agrees that between the Effective Date and the Closing Date, Seller shall:

5.1.1. Continue to lease, advertise, operate and maintain the Property in accordance with Seller's customary practices.

5.1.2. Pay, in the normal course of business, and, in any event, prior to Closing, sums due for work, materials or services furnished or otherwise incurred in the ownership and operation of the Property up to the Closing.

5.1.3. Enter into new and renewal Leases in accordance with Seller's customary practice; provided however that under no circumstance may Seller enter into any new lease for a term of less than 6 months or more than 15 months.

5.1.4. Not permit any alteration, structural modification or additions to the Property, except in the nature of ordinary maintenance.

5.1.5. Not enter into any new service contract that is not terminable upon 30 days or less notice without the payment of any penalty or premium.

5.1.6 Promptly (i) notify Purchaser in writing of any litigation, arbitration, condemnation or administrative hearing before any court or governmental agency concerning Seller or the Property that is instituted after the Effective Date, other than eviction or unlawful detainer actions that will be completed prior to Closing, (ii) provide to Purchaser copies of any Leases or Contracts entered into after the Effective Date in accordance with the terms of this Agreement, all default and other material notices given or received by Seller under the Leases (exclusive of customary delinquency notices given to tenants), the Contracts or the Permitted Exceptions, any notices of violation of or material matters concerning the Permitted Exceptions or any covenants, conditions, restrictions, laws, statutes, rules, regulations or ordinances applicable to the Property, any written communications received by Seller from or given by Seller to any person concerning any hazardous materials, and any documents or materials received by Seller from and after the Effective Date that would have been included in Property Information if received prior to such date, and (iii) within three (3) Business Days after Seller's receipt of request therefor, provide to Purchaser an updated Rent Roll with all information concerning the Leases updated through the date that is one (1) Business Day before the date that the updated Rent Roll is delivered to Purchaser.

5.1.7 Keep in force its current property insurance covering all buildings, structures, improvements, machinery, fixtures and equipment included in the Property.

5.2 Purchaser's obligation to close under this Agreement shall be subject to and conditioned upon the fulfillment of each and all of the following conditions precedent:

(i) All of the documents required to be delivered by Seller to Purchaser at the Closing pursuant to the terms and conditions hereof shall have been delivered;

(ii) Each of representations of Seller set forth in Section 4.1 and 15.17 shall be true in all material respects as of the Closing Date;

(iii) The Title Company is irrevocably committed to issue, upon only the condition of the payment of its scheduled premiums, the Title Policy (which shall be a Texas T-1

owner's policy of title insurance together with a T19.1 endorsement) in the amount of the Purchase Price, subject only to the Permitted Exceptions;

(iv) Purchaser has not elected to terminate this Agreement pursuant to Article III or any other provision of this Agreement that expressly permits Purchaser to terminate.

5.3 Without limiting any of the rights of Seller elsewhere provided for in this Agreement, Seller's obligation to close with respect to conveyance of the Property under this Agreement shall be subject to and conditioned upon the fulfillment of each and all of the following conditions precedent:

(i) All of the documents and funds required to be delivered by Purchaser to Seller at the Closing pursuant to the terms and conditions hereof shall have been delivered; and

(ii) Each of the representations of Purchaser set forth in Section 4.2 shall be true in all material respects as of the Closing Date.

5.4 In the event any of the conditions set forth in Sections 5.2 or 5.3 are not fulfilled or waived, the party benefited by such conditions may, by written notice to the other party, terminate this Agreement, whereupon all rights and obligations hereunder of each party shall terminate except those that expressly survive any termination. Either party may, at its election, at any time or times on or before the date specified for the satisfaction of the condition, waive in writing the benefit of any of the conditions set forth in Sections 5.2 or 5.3. In the event this Agreement is terminated as a result of any condition set forth in Section 5.2, Purchaser, as its sole and exclusive remedy, shall be entitled to a refund of the Earnest Money. In any event, each party's consent to the close of escrow pursuant to this Agreement shall waive any remaining unfulfilled conditions, and any liability on the part of the other party for breaches of covenants, representations and warranties of which the first party had knowledge as of the Closing.

ARTICLE VI. CLOSING ADJUSTMENTS

6.1. The following are to be prorated or adjusted (as appropriate), if feasible, at the Closing, as of 11:59 P.M. on the day immediately preceding the Closing (the "Adjustment Date"):

6.1.1. All collected rent and other collected income (and any applicable state or local tax on rent) under Leases in effect on the Closing Date or otherwise from the Property or any portion thereof shall be prorated. Seller shall be charged with any rent and other income collected by Seller before Closing but applicable to any period of time after Closing. Uncollected rent and other income shall not be prorated. Purchaser shall apply rent and other income from tenants that are collected after the Closing first to the obligations then owing to Purchaser for its period of ownership and to costs of collection, remitting the balance, if any, to Seller. Any prepaid rents for the period following the Closing Date shall be paid over by Seller or otherwise credited to Purchaser. Purchaser will make reasonable efforts, without suit, to collect any rents applicable to the period before the Closing Date. Seller may pursue collection as to any rent not collected by Purchaser within 6 months following the Closing Date provided that Seller shall have no

right to pursue collection efforts against any tenant while in occupancy of an apartment at the Property. In the event that any tenant pays its rent via an ACH or other automatic debit system, Seller shall cancel such automatic payments at Closing; provided, however, in the event that an automatic rent payment is erroneously forwarded to Seller after Closing, Seller, shall remit such payment to Purchaser in accordance with Section 6.2. For purposes of this Section 6.1.1, the terms "rent" and "income" excludes application fees, administrative fees, non-refundable deposits, non-sufficient funds fees, late fees, resident property damage fees to the extent repairs have been completed, credit-card/online payment fees, clubhouse rental (for usage prior to Closing) or other non-rental related Tenant charges related to periods prior to Closing and not customarily prorated in similar transactions; provided however that Tenant utility reimbursements shall be treated as income, and amounts received after Closing to be applied to amounts due to Seller for any unpaid period prior to Closing (not to exceed 60 days).

6.1.2. Real estate taxes and assessments ("Taxes"), including penalties and interest, shall be prorated as follows: Seller shall pay all Taxes which became due and payable prior to the Closing and a prorata share of the Taxes becoming due and payable after the Closing based on the Taxes which are a lien for the year of the Closing, even if such Taxes and assessments are not yet due and payable. All prorations shall be based upon the most recent available tax rates, assessments and valuations.

6.1.3. Electric, gas, water and sewer charges on the basis of the most recent bills available, but if there are meters on the Property, Seller, to the extent the same is obtainable, shall furnish a reading effective as of the Adjustment Date, or if not so obtainable, to a date not more than 15 days prior to the Adjustment Date, and the unfixed meter charges based thereon for the intervening period shall be apportioned on the basis of such last reading. Upon the taking of a subsequent actual reading, such apportionment shall be readjusted and Seller or Purchaser, as the case may be, will promptly deliver to the other the amount determined to be so due upon such readjustment. If Seller is unable to furnish such prior reading, any reading subsequent to the Closing will be apportioned on a per diem basis from the date of such reading immediately prior thereto and Seller shall pay the proportionate charges due up to the date of Closing.

6.1.4. Amounts paid or payable in respect of any Contracts assigned to Purchaser pursuant to the "Bill of Sale and Assignment" (as such term is defined in Section 8.1.2 hereof).

6.1.5. Purchaser shall receive a credit against the cash portion of the Purchase Price in an amount equal to all unapplied Tenant security deposits and accrued interest which Seller has received from Tenants.

6.1.6. Any leasing commissions with respect to the Leases shall be the sole responsibility of Seller, and shall be paid or discharged fully at or prior to Closing.

6.1.7. Seller shall make all units at the Apartments which are vacant seven (7) days prior to the Closing Date ready for occupancy by incoming tenants, consistent with Seller's past practices (the "Rent Ready Condition"). If any such vacant unit is not in Rent

Ready Condition prior to the Closing Date, Purchaser shall receive a credit at Closing in an amount equal to $750.00 per unit that is not in Rent Ready Condition. Purchaser is required to inspect any such vacant unit at least two (2) Business Days prior to the Closing Date.

Except as set forth in this Agreement, the customs of the county in which the Property is located shall govern prorations. The provisions of this Section 6.1 shall survive the Closing.

6.2. If final prorations cannot be made at Closing for any item being prorated under Section 6.1, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as invoices or bills are available, with final adjustment to be made as soon as reasonably possible after the Closing, but no later than 120 days after the Closing, to the effect that income and expenses are received and paid by the parties on an accrual basis with respect to their period of ownership. Payments in connection with the final adjustment shall be due within 30 days of written notice. Upon request, Seller shall be provided reasonably satisfactory documentation (such as invoices or receipts) to confirm the final prorations.

ARTICLE VII. CLOSING

7.1. The closing of the transaction which is the subject of this Agreement (the "Closing") shall occur by 12:00 p.m. Eastern on November 15, 2024 (the "Closing Date"). The Closing shall occur on the Closing Date, unless the Closing Date falls on a Monday and in which case the Closing shall occur on the next Business Day, through the usual form of deed and money escrow, which the parties shall establish with Escrow Agent.

7.2. Purchaser shall have a one-time option to extend the initially scheduled Closing Date to a date that is no later than December 16, 2024 by (a) giving written notice of such extension and the new Closing Date to Seller no later than November 5, 2024, and (b) within two (2) business days of such notice delivering the sum of $500,000.00 (the "Extension Deposit") to Escrow Agent. The Extension Deposit shall be added to and be deemed part of the Earnest Money for all purposes under this Agreement.

7.3 Seller shall have the option to extend the Closing Date to January 9, 2025 by giving written notice of such extension to Purchaser no later than October 18, 2024.

ARTICLE VIII. CLOSING DOCUMENTS

8.1. At the Closing, Seller shall cause to be delivered to Purchaser the following documents and instruments, and any other items specified in this Agreement, duly executed and acknowledged, in recordable form where applicable, and dated as of the Closing Date:

8.1.1. A special or limited warranty deed (the "Deed") in the form of Exhibit E attached hereto and made a part hereof.

8.1.2. A bill of sale and assignment of leases and contracts (the "Bill of Sale and Assignment ") in the form of Exhibit F attached hereto and made a part hereof.

8.1.3. A certificate in the form of Exhibit G attached hereto and made a part hereof (the "FIRPTA Certificate").

8.1.4. All keys and combinations to all locks on the Improvements which are in Seller's possession.

8.1.5. To the extent in Seller's possession, all plans, specifications, mechanical, electrical and plumbing layouts, operating manuals, purchase orders, brochures, marketing materials, advertisements, Tenant lease files, and other files and records in the possession of Seller and its managing agent and utilized in connection with the operation and maintenance of the Land and Improvements.

8.1.6. Affidavits and certificates as to facts within the knowledge of Seller relevant to the determination by the Title Company as to the condition of title or the due performance by Seller of its obligations under this Agreement, and in all events to the extent required by the Title Company for it to issue the Title Policy without taking exception to the so-called "gap" exclusion or any mechanics liens and with the T-19.1 endorsement.

8.1.7. A Seller's Closing Statement to be prepared by the Escrow Agent and agreed upon by Seller.

8.1.8. An updated Rent Roll, in the same form and with the same categories of information as on the initial Rent Roll, with all information concerning the Leases updated through the Adjustment Date.

8.1.9. Notices to the tenants under all Leases of the occurrence of the sale of the Property in the form of attached Exhibit I, as may be modified at the reasonable request of Purchaser to conform to the requirements of applicable law.

8.1.10. Any other instruments specifically referred to in this Agreement.

8.2. At the Closing, Purchaser or its assignee shall cause to be delivered to the Escrow Agent the following documents and instruments:

8.2.1. Funds payable to the Escrow Agent representing the cash payment due in accordance with Section 2.1.2 hereof and any other sums payable by Purchaser at the Closing under any provisions of this Agreement (subject to the credits, prorations and other adjustments required under this Agreement).

8.2.2. Purchaser's counterpart to the Bill of Sale and Assignment.

8.2.3. Evidence reasonably acceptable to the Title Company authorizing the consummation by Purchaser of the transaction which is the subject of this Agreement and the execution and delivery of documents on behalf of Purchaser.

8.2.4. A Purchaser's Closing Statement to be prepared by the Escrow Agent and agreed upon by Purchaser.

8.2.5. Any other instruments specifically referred to in this Agreement.

8.3. At the Closing, Seller and Purchaser shall cause to be delivered such other instruments and documents as may be required by law in order to complete the Closing of the transaction which is the subject of this Agreement.

8.4. As a simultaneous condition to Purchaser's obligations at the Closing, possession of the Property, in accordance with this Agreement, shall be delivered to Purchaser.

8.5. Upon written request by Seller and for good cause shown by Seller, Purchaser shall act in good faith to provide Seller with copies of files and records, in its possession, with respect to pre-closing information. Unless Purchaser's costs are de minimis, Seller shall reimburse Purchaser for providing Seller with copies of files and records.

ARTICLE IX. COSTS

Seller shall pay the cost of (i) all transfer taxes, stamp taxes, deed taxes or similar impositions payable in connection with the transaction which is the subject of this Agreement, (ii) all expenses charged by the Escrow Agent for sending wire transfers with respect to sums to be paid by Seller pursuant to this Agreement and/or at the request of Seller, (iii) the base cost of the Title Policy, and (iv) one-half of the Escrow Agent's fees as escrow agent. Purchaser shall pay the cost of (i) the Title Commitment, the cost of all endorsements to the Title Policy (including the T 19.1 endorsement) and the Survey, (ii) all expenses charged by the Escrow Agent for sending wire transfers with respect to sums to be paid by Purchaser pursuant to this Agreement and/or at the request of Purchaser, and (iii) one-half of the Escrow Agent's fees as escrow agent. All other escrow and closing costs shall be allocated to and paid by Seller and Purchaser in accordance with the manner in which such costs are customarily borne by such parties in sales of similar property in the county in which the Property is located; provided, however, that each party shall pay its own attorneys' fees.

ARTICLE X. COMMISSIONS

Seller shall pay the brokerage commission due to CBRE ("Broker") in accordance with the terms of a separate agreement, and Seller shall indemnify and hold Purchaser harmless from any and all real estate commissions, claims for such commissions or similar fees, including attorneys' fees incurred in any lawsuit regarding such commissions or fees (collectively, "Claims") arising out of contracts executed by or activities engaged in by Seller. The provisions of this paragraph shall survive the Closing or the earlier termination of this Agreement. Purchaser shall indemnify and hold Seller harmless from any and all Claims arising out of contracts executed by or activities engaged in by Purchaser, except for any commissions payable to or Claims made by the Broker which shall be paid by Seller. The provisions of this paragraph shall survive the Closing or the earlier termination of this Agreement.

ARTICLE XI. RISK OF LOSS

11.1. The risk of loss or damage to the Property by fire, earthquake, or other casualty shall be borne by Seller. If damage, loss or destruction of the Property or any part thereof, by fire, earthquake, or other casualty, occurs prior to the Closing, Seller shall promptly notify Purchaser of such damage, loss or destruction.

11.2. If the Property is damaged by fire, earthquake, or other casualty, and the damage, loss or destruction shall cost less than $750,000.00 to repair, based upon the determination of a contractor acceptable to Seller and Purchaser, which shall not be unreasonably withheld or delayed ("Acceptable Contractor"), then Purchaser shall close the purchase of the Property with a credit against the cash portion of the Purchase Price in an amount equal to the cost of repairing such damage as so determined together with an assignment of Seller's rights to payments with respect to rents due subsequent to the Closing Date under any rental insurance policy or policies with respect to the Property; provided, however, Purchaser shall have the right to elect to terminate this Agreement if, as a result of such damage by fire, earthquake, or other casualty, (i) the Property may not, as a matter of applicable law, be rebuilt as it currently exists, or (ii) access to the Property from a publicly dedicated street is prevented, and if Purchaser so elects, the Earnest Money shall be immediately refunded to Purchaser, and thereupon, this Agreement shall be terminated and the parties hereto shall be relieved of all further obligations and liability under this Agreement, other than those that are expressly stated to survive the termination of this Agreement.

11.3. If the Property is damaged by fire, earthquake, or other casualty and the damage, loss or destruction shall cost $750,000.00 or more to repair, based upon the determination of an Acceptable Contractor, then Seller shall, promptly after Purchaser's request therefor, deliver to Purchaser a copy of each of the applicable insurance policies covering such fire, earthquake, or other casualty, and Purchaser shall, at its option, elect one of the following:

11.3.1. To terminate this Agreement, in which event, the Earnest Money shall be immediately refunded to Purchaser, and thereupon, this Agreement shall be terminated, and the parties hereto shall be relieved of all further obligations and liability under this Agreement (other than those that are expressly stated to survive the termination of this Agreement); or

11.3.2. To proceed with the Closing and receive (i) a credit against the cash balance of the Purchase Price payable at Closing to the extent of payments received by or on behalf of Seller prior to the Closing Date under any applicable insurance policy or policies in effect with respect to the Property, (ii) an assignment of Seller's rights to any payments which may be payable subsequent to the Closing Date under any applicable insurance policy or policies in effect with respect to the Property, (iii) an assignment of Seller's rights to payments with respect to rents due subsequent to the Closing Date under any rental insurance policy or policies with respect to the Property, and (iv) a credit against the cash balance of the Purchase Price payable at the Closing in an amount equal to the aggregate amount of the deductibles with respect to all such insurance policies.

If Purchaser elects to exercise the option set forth in Section 11.3.2 hereof, then pending the Closing, Purchaser and Seller shall cooperate to adjust, compromise and settle with the insurance company(s) with respect to the insurance policies.

11.4. If, prior to Closing, any governmental authority or other entity having condemnation authority shall institute an eminent domain proceeding or take any steps preliminary thereto (including the giving of any direct or indirect notice of intent to institute such proceedings) with regard to all or any portion of the Property, Seller shall promptly notify. If such action shall affect a material portion of the Land or Improvements, and the same is not dismissed in a final determination for which all appeal periods have passed on or before ten (10) days prior to the Closing Date set forth in this Agreement, then Purchaser shall be entitled to terminate this Agreement in which event, the provisions of Section 11.3.1 hereof shall be applicable. For purposes of this Section 11.4, "material" shall mean the value of the Property to be taken is more than $750,000.00, or such taking would materially affect access to the Property or the legal conforming status of the Property with applicable zoning laws (including as to parking).

ARTICLE XII. REMEDIES FOR DEFAULT

12.1. Seller's covenants, indemnities, warranties and representations contained in this Agreement and in any document executed by Seller pursuant to this Agreement shall survive Purchaser's purchase of the Property only for a period commencing on the Closing Date and ending one year after the Closing Date (the "Limitation Period"). Seller's liability for breach of any such covenant, indemnity, representation or warranty shall be limited to claims in excess of an aggregate amount of $10,000, and Seller shall be liable only to the extent that such aggregate amount exceeds such figure. Seller's aggregate liability for claims arising out of such covenants, indemnities, representations and warranties shall not exceed $1,000,000. Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be liable for consequential, punitive and/or exemplary damages of any nature whatsoever except due to fraud or gross negligence, or for any matters actually known by Purchaser prior to the Closing. Purchaser shall provide written notice to Seller of any alleged breach of such covenants, indemnities, warranties or representations and shall allow Seller 30 days within which to cure such breach, or, if such breach cannot reasonably be cured within 30 days, an additional 30 days (for a total of 60 days), so long as such cure has been commenced within such 30 days and is being diligently pursued. If Seller fails to cure such breach after written notice and within such cure period, Purchaser's sole remedy shall be an action at law for actual damages as a consequence thereof, provided that any claim or action at law for actual damages brought after Closing based upon a misrepresentation or a breach of a covenant, indemnity, warranty or representation under this Agreement shall be actionable or enforceable if and only if notice of such claim is given to Seller within 60 days following the expiration of the Limitation Period. The Limitation Period referred to herein shall apply to known as well as unknown breaches of such covenants, indemnities, warranties or representations. Purchaser specifically acknowledges that such termination of liability represents a material element of the consideration to Seller. The limitation as to Seller's liability in this Section 12.1(a) does not apply to Seller's liability with respect to prorations and adjustments under Article VI. The provision of this Section 12.1(a) shall survive indefinitely the Closing or earlier termination of this Agreement and shall not be merged into the Deed or other closing documents.

12.2 If Seller defaults in its obligation to sell and convey the Property to Purchaser pursuant to this Agreement or otherwise materially breaches its covenants, indemnities, warranties and representations contained in this Agreement (and such breach is actually known to Purchaser prior to Closing), and such default or material breach shall continue uncured following the fifth day after written notice thereof is given to Seller by Purchaser (except that no notice or cure period shall apply to Seller's obligation to deliver the documents required under Section 8.1 on or prior to the scheduled Closing Date or otherwise authorize Closing upon satisfaction of the conditions in Section 5.3), Purchaser's sole and exclusive remedy shall be to elect one of the following: (a) to terminate this Agreement, in which event Purchaser shall be entitled to (i) the return by the Escrow Agent to Purchaser of the Earnest Money, and (ii) recovery from Seller of Purchaser's actual and reasonable out-of-pocket costs and expenses incurred in connection with entering into this Agreement and attempting to purchase the Property, including without limitation, due diligence inspections performed by Purchaser and its consultants, up to a maximum amount of $75,000.00 in the aggregate plus, if and only if such default is the result of Seller's intentional breach of this Agreement, any actual non-refundable rate lock, spread lock or similar deposit or purchase price of any rate cap or swap made by Purchaser not earlier than five (5) Business Days prior to the then scheduled Closing Date (but only if the breach or other default occurs or is first discovered by Purchaser after Purchaser has posted any such deposit or purchased such cap/swap); and after Purchaser has recovered all the foregoing neither party shall have any further rights or obligations except for Purchaser's indemnity obligations hereunder, or (b) to bring a suit for specific performance provided that any suit for specific performance must be brought within 90 days of Seller's default, to the extent permitted by law, Purchaser waiving the right to bring suit at any later date; provided however, that if the equitable remedy of specific performance is not available due to any intentional action or inaction by or on behalf of Seller or any agent or affiliate thereof, Purchaser may seek any other right or remedy available at law or in equity; provided, however, that in no event shall Seller's liability exceed $1,000,000.00. Purchaser waives any other rights or remedies with respect to any breach or default actually known to Purchaser prior to Closing. Purchaser agrees not to file a *lis pendens* or other similar notice against the Property except in connection with the filing of a suit for specific performance.

12.3. Purchaser recognizes that if the purchase and sale which is the subject of this Agreement is not consummated because of Purchaser's default, Seller shall be entitled to compensation as a result thereof. Seller and Purchaser acknowledge that it is extremely difficult and impractical to ascertain the extent of the detriment, and to avoid this problem, Seller and Purchaser agree that if the purchase and sale which is the subject of this Agreement is not consummated solely as a result of Purchaser's default under this Agreement, which default continues uncured following the fifth day after written notice thereof is given to Purchaser by Seller (except that no notice or cure period shall apply to Purchaser's obligation to deliver the documents and amounts required under Section 8.2 on or prior to the scheduled Closing Date or otherwise authorize Closing upon satisfaction of the conditions in Section 5.2), Seller shall recover from the Escrow Agent the Earnest Money as liquidated damages, which amount represents a bona fide good faith estimate of damages that Seller would suffer in such event. Upon Seller's receipt of the Earnest Money, this Agreement shall be terminated and thereupon the parties shall have no further obligations one to the other under this Agreement. In the event of Seller's election to recover the Earnest Money, the parties agree that the sum stated above as liquidated damages shall be the sole and exclusive relief to which Seller might otherwise be entitled, as a result of Purchaser's default under this Agreement, Seller hereby specifically waiving any and all rights

which it may have to damages or specific performance as a result of Purchaser's default under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be liable for consequential, punitive and/or exemplary damages of any nature whatsoever except due to fraud or gross negligence.

12.4 As a material part of the consideration for this Agreement, Seller agrees to indemnify, defend and hold harmless Purchaser and its partners, officers, directors, members, managers, employee and agents of, from and against any and all costs, losses, claims, defenses, demands, damages, liabilities, expenses and other obligations (including, without limitation, reasonable attorneys' fees and court costs) arising from, out of or in connection with, or otherwise relating to, the Litigation Matter. Notwithstanding anything in this Agreement to the contrary, Seller hereby agrees and acknowledges that the limitation of liability provided in Section 12.1 shall not apply to any liability for costs and expenses related to the Litigation Matter, and no such costs shall be applied to such limitation of liability. The provisions of this Section 12.4 shall survive the Closing.

ARTICLE XIII. ESCROW

13.1. The parties hereto have mutually requested that the Escrow Agent act as escrow agent for the purpose of holding the Earnest Money in accordance with the terms of this Agreement.

13.2. The Earnest Money shall be deposited by the Escrow Agent in an interest bearing account approved by Purchaser.

13.3. The Earnest Money shall be released or delivered to the party entitled thereto pursuant to this Agreement with reasonable promptness after the Escrow Agent shall have received notice from Seller and Purchaser (except as provided in Section 3.1 above) authorizing release of the Earnest Money or the occurrence of the Closing, at which time the Earnest Money shall be paid to Seller and applied to the Purchase Price.

13.4. (a) The Escrow Agent is to be considered as a depository only, shall not be deemed to be a party to any document other than this Agreement, and shall not be responsible or liable in any manner whatsoever for the sufficiency, manner of execution, or validity of any written instructions, certificates or any other documents received by it, nor as to the identity, authority or rights of any persons executing the same. The Escrow Agent shall be entitled to rely at all times on instructions given by Seller and/or Purchaser, as the case may be and as required hereunder, without any necessity of verifying the authority therefor.

(b) The Escrow Agent shall not at any time be held liable for actions taken or omitted to be taken in good faith and without negligence. Seller and Purchaser agree to save and hold the Escrow Agent harmless and indemnify the Escrow Agent from any loss and from any claims or demands arising out of its actions hereunder other than any claims or demands arising from the Escrow Agent's negligence or willful misconduct.

(c) It is further understood by Seller and Purchaser that if, as a result of any disagreement between them or adverse demands and claims being made by any of them upon the

Escrow Agent, or if the Escrow Agent otherwise shall become involved in litigation with respect to this Agreement, the Escrow Agent may deposit the Earnest Money with a court of competent jurisdiction and/or in accordance with the order of a court of competent jurisdiction and in any such event, Seller and Purchaser agree that they, jointly and severally, are and shall be liable to the Escrow Agent and shall reimburse the Escrow Agent on demand for all costs, expenses and reasonable counsel fees it shall incur or be compelled to pay by reason of any such litigation. Seller and Purchaser agree between themselves that each shall be responsible to advance one-half of all amounts due the Escrow Agent pursuant to this Section 13.4, provided that any such advance by Seller or Purchaser as a result of any dispute or litigation between them shall be without prejudice to its right to recover such amount as damages from the breaching party.

(d) In taking or omitting to take any action whatsoever hereunder, the Escrow Agent shall be protected in relying upon any notice, paper, or other document believed by it to be genuine, or upon evidence deemed by it to be sufficient, and in no event shall the Escrow Agent be liable hereunder for any act performed or omitted to be performed by it hereunder in the absence of negligence or bad faith. The Escrow Agent may consult with counsel in connection with its duties hereunder and shall be fully protected in any act taken, suffered or permitted by it in good faith and without negligence in accordance with the advice of such counsel.

13.5. Upon the satisfaction of the mutual obligations of the parties hereunder, the Escrow Agent shall promptly submit for recording or filing, as applicable, all appropriate instruments delivered to it at the Closing.

13.6. The Escrow Agent shall have no right or obligation to approve any amendment to this Agreement unless such amendment purports to affect the Escrow Agent's rights or obligations hereunder.

13.7. The Escrow Agent hereby agrees to serve as the "real estate reporting person" (as such term is defined in Section 6045(e) of the Code). This Agreement shall constitute a designation agreement, the name and address of the transferor and transferee of the transaction contemplated hereby as well as the name and address of the Escrow Agent appear in Section 14.1 hereof, and Seller, Purchaser and the Escrow Agent agree to retain a copy of this Agreement for a period of four years following the end of the calendar year in which the Closing occurs. The provisions of this Section shall survive the Closing.

ARTICLE XIV. NOTICES

14.1. Except as otherwise provided in this Agreement, any and all notices, elections, demands, requests and responses thereto permitted or required to be given under this Agreement shall be in writing, signed by the party giving the same or by its attorneys, and shall be deemed to have been properly given and shall be deemed effective upon being (i) personally delivered, or (ii) delivered to an overnight delivery service with receipt for delivery, or (iii) deposited in the United States mail, postage prepaid, certified with return receipt requested, or (iv) transmitted by facsimile or email, provided that such facsimile or email transmission is confirmed within one Business Day thereafter in the manner set forth in either clause (i), (ii) or (iii) of this sentence, to the other party at the address of such other party set forth below or at such other address within the continental United States as such other party may designate by notice specifically designated

as a notice of change of address and given in accordance herewith; provided, however, that the time period in which a response to any such notice, election, demand or request must be given shall commence on the date of receipt thereof. Personal delivery to a party or to any officer, partner, member, agent or employee of such party at said address shall constitute receipt. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt. Any such notice, election, demand, request or response shall be addressed as follows:

IF TO PURCHASER:

Steadfast Asset Holdings, Inc.
18100 Von Karman Ave., Suite 500
Irvine, CA 92612
Attn: Bill Stoll
E-mail: Bill.Stoll@steadfastco.com
Telephone No.: (949) 518-2070

with a copy to be given simultaneously to:

Steadfast Asset Holdings, Inc.
18100 Von Karman Ave., Suite 500
Irvine, CA 92612
Attn: Ana Marie del Rio, Esq.
E-mail: AnaMarie.delRio@steadfastco.com
Telephone No.: (949) 623-7716

with a copy to be given simultaneously to:

BCLP LLP
120 Broadway, Suite 300
Santa Monica, CA 90401
Attn: Vanessa Sunshine
Phone No.: (949) 842-6238
Email: vanessa.sunshine@bclplaw.com

IF TO SELLER:

Reserve at Canyon Creek TIC 1, LLC
10510 Springboro Pike
Miamisburg, Ohio 45342
Attn: Brock Wright and Kevin Hyland
Phone No.: 937-424-3095

Email: bwright@connorgroup.com and
khyland@connorgroup.com

IF TO THE ESCROW AGENT OR THE TITLE COMPANY:

Chicago Title Insurance Company
One Dayton Centre

One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com
Phone No.: 937-223-8378

ARTICLE XV. MISCELLANEOUS

15.1. This Agreement and the Exhibits attached hereto contain the entire agreement between the parties with respect to the subject matter hereof, and no promise, representation, warranty or covenant not included in this Agreement or such Exhibits has been or is relied upon by either party. This Agreement is intended by the parties hereto to be the final expression of their agreement with respect to the matters herein contained and is the complete and exclusive statement of the terms thereof, notwithstanding any representation or statement to the contrary heretofore made.

15.2. This Agreement cannot be changed, modified, discharged or terminated by any oral agreement or any other agreement and there cannot be any waiver of the warranties, representations and covenants expressly contained in this Agreement unless the same is in writing and signed by the party against whom enforcement of the change, modification, discharge, termination or waiver is sought.

15.3. The Article and Exhibit headings herein are for convenience only, and are not to be used in determining the meaning of this Agreement or any part hereof.

15.4. This Agreement shall be binding on, and the benefits hereof shall inure to, the successors and assigns of the parties hereto.

15.5. If any term or provision of this Agreement, or any part of such term or provision, or the application thereof to any person or circumstance shall to any extent be held invalid or unenforceable, the remainder of this Agreement or the application of such term or provision or remainder thereof to persons or circumstances other than those as to which it is held invalid and unenforceable shall not be affected thereby and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

15.6. All Exhibits which are attached to this Agreement are part of this Agreement and are incorporated herein by reference.

15.7. The provisions of this Agreement are for the sole benefit of the parties to this Agreement and their successors and assigns and shall not give rise to any rights by or on behalf of anyone other than such parties.

15.8. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

15.9. This Agreement may be executed in any number of counterparts, each of which shall, when executed, be deemed to be an original and all of which shall be deemed to be one and the same instrument. Electronic, digital, photocopy and facsimile copies of signatures may be used in place and stead of original signatures with the same force and effect as originals.

15.10. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NEITHER PARTY SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH OF THE PARTIES ACKNOWLEDGES THAT IT HAS RECEIVED THE ADVICE OF COUNSEL WITH RESPECT TO THIS WAIVER.

15.11. If any litigation arises under this Agreement, the prevailing party (which term shall mean the party which obtains substantially all of the relief sought by such party) shall be entitled to recover, as a part of its judgment, reasonable attorneys' and paralegals' fees, court costs and expert witness fees. The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

15.12. Purchaser shall have the right to assign this Agreement to an entity controlling, controlled by or under common control with Purchaser or Steadfast Apartment REIT III, Inc. In the event of any such assignment, Seller agrees to execute any documents specified by Purchaser to or in the name of Purchaser's assignee and agrees that all surviving representations and warranties of Seller hereunder shall be deemed to run in favor of, and be enforceable by said assignee as if it were the Purchaser hereunder. The provisions of this Section shall survive the Closing.

15.13. The submission of a draft, or a marked up draft, of this Agreement by one party to another is not intended by either Seller or Purchaser to be an offer to enter into a legally binding contract with respect to the purchase and sale of the Property. Seller and Purchaser shall be legally bound with respect to the purchase and sale of the Property pursuant to the provisions of this Agreement or otherwise only if and when Seller and Purchaser have negotiated all of the provisions of this Agreement in a manner acceptable to Seller and Purchaser in their respective sole discretion, including, without limitation, all of the Exhibits hereto, and each of Seller and Purchaser have fully executed and delivered to each other a counterpart of this Agreement signed by it.

15.14. Seller will, whenever and as often as it shall be reasonably requested so to do by Purchaser, and Purchaser will, whenever and as often as it shall be reasonably requested so to do by Seller, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments, correction instruments and all other instruments and documents as may be reasonably necessary in order to complete the transaction which is the subject of this Agreement and to carry out the intent and purposes of this Agreement. All such instruments and documents shall be satisfactory to the respective attorneys for Purchaser and Seller. The provisions of this Section shall survive the Closing.

15.15. If the date for performance of any act pursuant to this Agreement is not a Business Day, then such act shall be performed on the next succeeding Business Day. The term "Business Days" shall mean all days, except Saturdays, Sundays and all days observed by the Federal Government as legal holidays.

15.16. Seller hereunder desires to exchange, for other property of like kind and qualifying use within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended and the Regulations promulgated thereunder ("1031 Exchange"), fee title in the Property. Seller expressly reserves the right to assign its rights, but not its obligations, hereunder to a Qualified Intermediary as provided in IRC Reg. 1.1031(k)-1(g)(4) on or before the scheduled Closing Date. Purchaser hereby agrees to reasonably cooperate with Seller in the 1031 Exchange without any cost, expense or liability to Purchaser and without reduction or alteration of the rights of Purchaser under this Agreement and with respect to Seller; provided, however that Purchaser shall not be required to undertake any liability or obligation and provided further that such 1031 Exchange does not extend the Closing Date or be a condition to Closing. As part of such 1031 Exchange, Seller shall convey the Property directly to Purchaser and Purchaser shall not be obligated to acquire any other property or interests as part of such 1031 Exchange. Seller shall indemnify and hold Purchaser harmless and defend Purchaser from any and all claims, demands, causes of action, liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees and expenses and court costs) of any kind and nature in connection with such 1031 Exchange for benefit of Seller or Purchaser's cooperation with Seller to accomplish such 1031 Exchange. Nothing herein shall release Seller of any of the obligations or liabilities under this Agreement. The terms of this Section shall survive Closing or any earlier termination of this Agreement indefinitely.

15.17. Seller and Purchaser (each, a "Representing Party") each represents and warrants to the other (i) that neither the Representing Party nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is a person or entity (each, a "Prohibited Person") with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 (the "Executive Order") signed on September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action, (ii) that the Representing Party's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the term of this Agreement the Representing Party shall comply with the Executive Order and with the Money Laundering Act.

15.18 If Seller consists of more than one party, each shall be jointly and severally liable to perform the obligations of Seller under this Agreement.

ARTICLE XVI. CONFIDENTIALITY

The Property Information and all other information, other than matters of public record or matters generally known or available to the public, furnished to, or obtained through inspection of the Property by, Purchaser, its affiliates, lenders, employees, attorneys, accountants and other

professionals or agents relating to the Property, will be treated by Purchaser, its affiliates, lenders, employees and agents as confidential prior to Closing, and will not be disclosed to anyone prior to Closing other than on a need-to-know basis and to Purchaser's consultants who agree to maintain the confidentiality of such information, and will be returned to Seller or destroyed by Purchaser if the Closing does not occur. Purchaser and Seller, for themselves and their respective affiliates, lenders, employees and agents agree not to disclose the terms of this Agreement to any third party except as provided in the previous sentence, provided, however, that upon Closing Seller or Purchaser may disclose such details as are of public record as a result of the sale of the Property. The confidentiality and other provisions of this Article shall not apply to any disclosures made as required by law, by court order, or in connection with any subpoena served upon Purchaser or any other person. Notwithstanding anything herein to the contrary, Seller hereby acknowledges and agrees that Purchaser and Purchaser's representatives or lenders may communicate with any governmental authority or quasi-governmental authority for the purpose of gathering information in connection with the Property or the Seller, or the transaction contemplated by this Agreement. Provided, however, Purchaser will not request for any governmental authority or quasi-governmental authority to inspect the Property. Furthermore, if Purchaser believes that there is a violation at the Property, Purchaser will allow the Seller the opportunity to address the violation and will not inform any government authority or quasi-governmental authority of said violation.

ARTICLE XVII. RECORD ACCESS AND RETENTION.

Seller shall promptly provide to Purchaser (at Purchaser's sole cost and expense) copies of, or shall provide Purchaser reasonable access to, such factual information and historical financial statements for the Property, including (without limitation) income and balance sheet data for the Property and operating statements (provided that such income and balance sheet data and operating statements shall only be provided by Seller directly to Purchaser's auditors, Ernst and Young, pursuant to an obligation not to disclose to Purchaser or to any other third-party), as may be reasonably requested by Purchaser, and in the possession or control of Seller, or its property manager or accountants, to enable Purchaser's auditor to conduct an audit, in accordance with Rule 3-14 of Securities and Exchange Commission Regulation S-X, of the income statements of the Property for the year to date of the year in which Closing occurs plus the two (2) immediately preceding calendar years. Purchaser shall be responsible for all out-of-pocket costs, including Seller's costs, associated with this audit. Seller shall reasonably cooperate (at no cost to Seller) with Purchaser's auditor in the conduct of such audit. Without limiting the foregoing, Seller shall furnish to Purchaser such financial and other information as may be reasonably required by Purchaser or any affiliate of Purchaser to make any required filings with the Securities and Exchange Commission or other governmental authority. Seller's obligation to maintain its records for use under this Section shall be an on-going condition to Purchaser's obligation to Close, and Seller shall maintain its records for use under this Section for a period of not less than two (2) years after the Closing Date.

[Signatures on following page.]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date set forth above.

PURCHASER:

STEADFAST ASSET HOLDINGS, INC., a California corporation

By: ______________________
Name: RODNEY F. EMERY
Title: CEO

SELLER:

**RESERVE AT CANYON CREEK TIC 1, LLC**
**RESERVE AT CANYON CREEK TIC 2, LLC**
**RESERVE AT CANYON CREEK TIC 3, LLC**
**RESERVE AT CANYON CREEK TIC 4, LLC**
**RESERVE AT CANYON CREEK TIC 5, LLC**
**RESERVE AT CANYON CREEK TIC 6, LLC,**
each a Delaware limited liability company

By: ______________________
Brock Wright, Vice President

By: ______________________
Kevin Hyland, Vice President

With Respect Only to Article XIII -
Consented and Agreed to:
Chicago Title Insurance Company

By: Ruth E. Perry
Name: Ruth E. Perry
Title: Commercial Escrow Officer

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date set forth above.

PURCHASER:

STEADFAST ASSET HOLDINGS, INC., a California corporation

By: ______________________________
Name: ______________________________
Title: ______________________________

SELLER:

**RESERVE AT CANYON CREEK TIC 1, LLC**
**RESERVE AT CANYON CREEK TIC 2, LLC**
**RESERVE AT CANYON CREEK TIC 3, LLC**
**RESERVE AT CANYON CREEK TIC 4, LLC**
**RESERVE AT CANYON CREEK TIC 5, LLC**
**RESERVE AT CANYON CREEK TIC 6, LLC,**
each a Delaware limited liability company

By: [signature]
Brock Wright, Vice President

By: [signature]
Kevin Hyland, Vice President

With Respect Only to Article XIII - Consented and Agreed to:
Chicago Title Insurance Company

By: [signature]
Name: Ruth E. Perry
Title: Commercial Escrow Officer

# EXHIBIT A

## LEGAL DESCRIPTION

Tract 1:
Lot 10, Block 1, New City Block 16093, HAVERHILL II, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas.

Tract 2:
Lot 9, Block 1, New City Block 16093, WOODLAND HILLS, UNIT 4, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas.

EXHIBIT B

**[Rent Roll]**

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ; **details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

The Connor Group - Reserve at Canyon Creek

# RENT ROLL DETAIL

As of 09/14/2024



**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

[redacted]

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| unit | Unit/Lease | Move-In | Lease | Lease | Market | Trans | Lease | Other Charges/ | Total | Dep | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

# RENT ROLL DETAIL

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**details**

| Unit | Floorplan | unit designation | SQFT | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ | Total Billing | Dep On Hand | balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | | | | | | | |

* indicates amounts not included in detail totals

**The Connor Group - Reserve at Canyon Creek**

## RENT ROLL DETAIL

As of 09/14/2024

**Parameters**: Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**Amt / SQFT: Market = 323,238 SQFT; Leased = 305,002 SQFT;**

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market + Addl. | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|
| [redacted] | | | | | | | | | |

**occupancy and rents summary for current date**

| unit status | Market + Addl. | # units | potential rent |
|---|---|---|---|
| [redacted] | | | |

**The Connor Group - Reserve at Canyon Creek**

**RENT ROLL DETAIL**

As of 09/14/2024

**Parameters:** Properties ALL;Show All Unit Designations or Filter by ALL;Subjournals ALL;Exclude Formers? Yes;Sort by Unit;Report Type Details + Summary;Show Unit Rent as Market + Addl ;

**summary billing by transaction code for current date**

| code | amount |
| --- | --- |
| [redacted] | |

EXHIBIT C

**[Schedule of Contracts]**

**Master Agreements:**

[redacted]

**Contracts**:

[redacted]

**Month to Month or Services not under contract:**

[redacted]

EXHIBIT D

**Property Manager Office**

[redacted]

**Assistant Manager Office**

[redacted]

**Work Room**

[redacted]

[redacted]

**Leasing Center**

[redacted]

**Clubroom**

[redacted]

**Kitchen**

[redacted]

**Business Center/Cyber Café**

[redacted]

[redacted]

**Game Room**

[redacted]

**Fitness Center**

[redacted]

[redacted]

**Pool**

[redacted]

**Maintenance Shop**

[redacted]

EXHIBIT E

**SPECIAL WARRANTY DEED**

NOTICE OF CONFIDENTIALITY RIGHTS:

IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER AND DRIVER'S LICENSE NUMBER.

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS THAT: |
| COUNTY OF BEXAR | § | |

THAT Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company as Tenants-in-Common (collectively "Grantor"), each whose address is 10510 Springboro Pike, Miamisburg, Ohio 45342, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) paid to Grantor and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, delivery by ____________________________, a ________________ ("Grantee"), whose address is ________________________ and Grantor by these presents does Grant, Sell and Convey, unto Grantee, that certain property located in Bexar County, Texas and being more particularly described on Exhibit A attached hereto and incorporated herein by reference, together with all improvements located on the land (the "Property").

For the same consideration, Grantor hereby GRANTS, SELLS, and CONVEYS unto Grantee, without covenant or warranty express or implied, Grantor's right title and interest, if any, in any street or road abutting the land to the center lines thereof, and all easements, hereditaments and appurtenances belonging to or inuring to the benefit of Grantor and pertaining to the land.

This conveyance is made and accepted subject to all matters set out on Exhibit B attached hereto and incorporated herein by reference.

TO HAVE AND TO HOLD the Property, together with all rights and appurtenances pertaining thereto, unto Grantee and Grantee's successors, heir, and assigns forever; and Grantor does hereby bind itself and its successors and assigns to warrant and forever defend the Property unto Grantee and Grantee's successors, heirs, and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise.

*[Signature Page Follows]*

EXECUTED as of this __ day of ______________, 2024.

**RESERVE AT CANYON CREEK TIC 1, LLC**
**RESERVE AT CANYON CREEK TIC 2, LLC**
**RESERVE AT CANYON CREEK TIC 3, LLC**
**RESERVE AT CANYON CREEK TIC 4, LLC**
**RESERVE AT CANYON CREEK TIC 5, LLC**
**RESERVE AT CANYON CREEK TIC 6, LLC,**
each a Delaware limited liability company

By: ______________________________
Kevin M. Hyland, Vice President

STATE OF OHIO )
)SS:
COUNTY OF MONTGOMERY )

The foregoing instrument was acknowledged before me this _____ day of __________, 2024, by Kevin M. Hyland, in the capacities indicated above for Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company. He is personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacities, and that by his signatures on the instrument the person, or the entities upon behalf of which the person acted, executed the instrument.

______________________________
Notary Public

AFTER RECORDING RETURN TO:

[NAME]

[ADDRESS]

[CITY], [STATE] [ZIP CODE]

EXHIBIT F

**BILL OF SALE AND ASSIGNMENT OF LEASES AND CONTRACTS**

This instrument is executed and delivered as of the ____ day of _________, 2024 pursuant to that certain Agreement of Sale and Purchase dated ____________, 2024 (the "Agreement"), by and between ____________________, a ____________________ ("Seller"), and ____________________, a ______________________ ("Purchaser"), covering the real property described in Exhibit A attached hereto ("Property").

1. Sale of Personalty. For good and valuable consideration, Seller hereby sells, transfers, sets over and conveys to Purchaser the following (the "Personal Property"):

(a) Tangible Personalty. All of Seller's right, title and interest in and to all fixtures, furniture, equipment, and other tangible personal property, if any, owned by Seller presently located on such property, including without limitation all of the furniture, equipment and other tangible personal property listed on Exhibit B-1 attached hereto and incorporated herein by reference, but expressly excluding all computer equipment, computer networking equipment, check scanners, facsimile machines, photocopiers, any and all licenses and software in connection with any of the foregoing exclusions, project signage bearing any name, logo or trademark of Seller or any of its affiliates, golf carts and other motorized vehicles and any items of personal property owned by tenants, any managing agent or others (the "Tangible Personalty").

(b) Intangible Personalty. All the right, title and interest of Seller in and to the following, to the extent assignable: (i) licenses, and permits relating to the operation of the Property, (ii) the right to use the name of the Real Property (if any) in connection with the Property, (iii) all telephone numbers and listing identifiable with the Property, and (iv) if still in effect, guaranties and warranties received by Seller from any unrelated third party, contractor, manufacturer or other person in connection with the construction or operation of the Property.

2. Assignment of Leases and Contracts. For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Purchaser, and Purchaser hereby accepts such assignment of, the following (the "Assigned Property"):

(a) Leases. All of Seller's right, title and interest in and to the tenant leases covering the Property and tenant security deposits which are specifically listed on Exhibit B-2 attached hereto and incorporated herein by reference ("Leases and Deposits"), and Purchaser hereby assumes all of Seller's obligations under the Leases and Deposits arising from and after the date of this instrument;

(b) Service Contracts. All of Seller's right, title and interest in and to the service contracts described in Exhibit B-3 attached hereto and incorporated herein by reference (the "Service Contracts").

3. Assumption. Purchaser, for itself and its successors or assigns, hereby assumes the obligations of Seller under the Leases and Deposits and Service Contracts arising from and after the date of this instrument and shall defend, indemnify and hold harmless Seller from and against any liability, damages, causes of action, expenses, and attorneys' fees incurred by Seller by reason of Purchaser's breach or default of its obligations with respect to the Leases and Deposits arising on and after the date of this instrument. Seller shall defend, indemnify and hold harmless Purchaser from and against any liability, damages, causes of action, expenses, and attorneys' fees incurred by Purchaser by reason of Seller's breach or default of its obligations with respect to the Leases and Deposits arising before the date of this instrument.

4. Agreement Applies. The covenants, agreements, representations, warranties, releases, indemnities and limitations provided in the Agreement with respect to the property conveyed hereunder (including, without limitation, the limitations of liability provided in the Agreement), are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Purchaser and Seller and their respective successors and assigns.

5. Disclaimer. Except as expressly set forth in the Agreement, which provisions are hereby incorporated by this reference as if herein set out in full, the Personal Property and Assigned Property are conveyed by Seller and accepted by Purchaser AS IS, WHERE IS, AND WITHOUT ANY REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, EXPRESS OR IMPLIED, IT BEING THE INTENTION OF SELLER AND PURCHASER EXPRESSLY TO NEGATE AND EXCLUDE ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY CONVEYED HEREUNDER, AND ALL OTHER REPRESENTATIONS AND WARRANTIES WHATSOEVER CONTAINED IN OR CREATED BY THE UNIFORM COMMERCIAL CODE OF THE STATE OR STATES WHERE THE PROPERTY IS LOCATED.

6. Counterparts. This instrument may be executed in multiple counterparts, each of which shall constitute an original and all of which when taken together shall constitute one instrument. Electronic, digital, photocopy and facsimile copies of signatures may be used in place and stead of original signatures with the same force and effect as originals.

[Signatures on following page.]

IN WITNESS WHEREOF, the undersigned have caused this Bill of Sale and Assignment of Leases and Contracts to be executed as of the date written above.

SELLER:

______________________________________,
a ____________________________________

By:___________________________________
Name:_________________________________
Title:________________________________

PURCHASER:

______________________________________
a ____________________________________

By:___________________________________
Name:_________________________________
Title:________________________________

# Exhibit A

## Legal Description

Exhibit B-1

List of Personal Property

Exhibit B-2

Leases and Security Deposits

Exhibit B-3

Service Contracts

EXHIBIT G

STATE OF OHIO )
)SS
COUNTY OF MONTGOMERY )

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by the undersigned, the undersigned hereby certifies the following:

1. ______________________________ (the "undersigned") is an Ohio __________________ and is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. The undersigned is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3. The undersigned's U.S. employer identification number is ___________; and

4. The undersigned's office address is 10510 Springboro Pike, Miamisburg, Ohio 45342.

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf the undersigned.

________________________________
**[Name and Title]**

Sworn to and subscribed before me
this ___ day of _________, 201_.

______________________________
Notary Public

Exhibit H

| | | Delivered (Date) | Not applicable to Property | Not available to Seller |
|---|---|---|---|---|
| | **CONSTRUCTION / REHABILITATION** | | | |
| **1** | Plans & Specifications: Site plan and most current civil, landscape, architectural, structural mechanical, electrical and fire protection plans, including elevations | | | |
| **2** | Construction contracts, if any, including for all work completed in past 3 years | | | X |
| **3** | Current capital improvements with schedule (past 3 years) and Capital expenditure budget for next 3 years | | | |
| **4** | Detailed unit-by-unit list of upgraded vs. non-upgraded units (if applicable) | | | |
| **5** | Warranties in effect, if any (construction, roof, mechanical equipment, etc.) | | X | |
| **6** | All licenses, permits, and governmental approvals, including business license (with expiration date & annual costs), fictitious business name statements and building permits (showing placed in service/completion dates) | | X | |
| **7** | Certificate(s) of Occupancy for all buildings | | | |
| **8** | List and description of tenant or common area work in progress, if any | | X | |
| **9** | Copies of all governmental correspondence or notices pertaining to the property, including but not limited to building code, health code, zoning and fire code | | X | |
| **10** | Maintenance records/work orders, including water intrusion log, for past 12 months | | | |
| **11** | Operation & Maintenance (O&M) Manuals, if any, for maintenance of equipment or hazardous materials | | X | |
| | **FINANCIAL** | | | |
| **1** | Financial/Operating Statements: Trailing-12, YTD & 3-yr historical; 3-yrs | | | |
| **2** | General Ledger, prior year, most recent quarter-end & YTD (in Excel format) | | | |
| **3** | Tax bills: Real Property and Personal Property bills and Assessment notices, current and past 3 years, with proof of payment (including special assessments or districts and all documentation concerning appeals) | | | |
| **4** | Accounts Payable Aging Detail, prior year, most recent quarter-end & YTD | | | |
| **5** | Aged Delinquency Report (showing total rent outstanding) with status of any files placed for eviction or collection | | | |
| **6** | Utility bills for any master-metered utility expenses and any resident unit utilities paid by the Property, monthly Trailing 12(access to utility billing site is preferred, if applicable) | | | |
| **7** | List of meters, account numbers and any required deposits (typically for gas, electric, water or phone) | | | |
| | **MANAGEMENT/LEASING/OPERATIONS** | | | |
| **1** | Monthly rent rolls, prior year and YTD, in Excel (with all lease charges broken out, to include monthly rent, security deposits, financial | | | |

| | | Delivered (Date) | Not applicable to Property | Not available to Seller |
|---|---|---|---|---|
| | concessions, other concessions, lease term, extension options, defaults (financial or otherwise), unit square footage and such other information as Buyer may require) Rent Rolls will be provided as formatted currently in Seller's reporting system. | | | |
| **2** | Current leases for all tenants with all available tenant correspondence files, including amendments/letters/agreements/default notices given or received, with all historical litigation pleadings, if any (access to electronic lease files is preferred, if applicable) | | | |
| **3** | Current form of lease with all addenda | | | |
| **4** | List of leases under negotiation or currently out for signature | | | |
| **5** | Market Rent Survey | | | X |
| **6** | Occupancy history, monthly for past 3 years and current YTD | | | |
| **7** | Amenity Report (listing amenities per unit type, with any adjustment in rent) – current | | | X |
| **8** | Resident Demographics Report - current | | | X |
| **9** | List of all **active** (within last 6 mos) vendors utilized at the property, including name, function, contact information | | | |
| **10** | All operating and management service contracts, including but not limited to: | | | |
| | a. Advertising (including any apt. locator services & pay-per-lease agreements) | | | |
| | b. Alarm monitoring (including any firm alarm & security cameras) | | | |
| | c. Cable/TV (including any revenue sharing programs); if none, please indicate so in writing | | | |
| | d. Elevator | | X | |
| | e. Equipment leases (such as copier, postage machines, key control systems) | | | |
| | f. Fire extinguisher (including any fire sprinkler systems) | | | |
| | g. Furniture rental | | X | |
| | h. HVAC | | X | |
| | i. Internet (including any leased equipment such as modems and firewalls | | | |
| | j. Janitorial services (including any uniform cleaning services) | | X | |
| | k. Landscaping (including any pond/lake maintenance and snow removal) | | | |
| | l. Laundry | | | |
| | m. Pest control (including any termite contracts) | | | |
| | n. Phone (landlines, cell phones, pagers, answering service) | | | |
| | o. Pool (maintenance, emergency phone, etc.) | | | |
| | q. Security (including any on-site courtesy officer arrangements) | | | |
| | r. Trash (including recycling programs); Also a copy of the most recent invoice | | | |
| | s. Revenue Sharing (such as vending machines, pay phones) | | | |
| | t. Collection Recovery | | X | |
| | u. Credit/application verification | | | |
| | w. Software (including any property management software such as | | | |

| | | Delivered (Date) | Not applicable to Property | Not available to Seller |
|---|---|---|---|---|
| | OneSite, Yardi, etc.) | | | |
| | x. Common Area Services (such as office cleaning, dog waste removal, etc.) | | | |
| | y. Utility Billing by Third Party | | | X |
| | z. Gate/Access Systems (including software for programming access cards/remotes) | | | |
| | aa. Towing/Parking Services | | X | |
| | bb. Website Domain (including any website hosting) | | | |
| | cc. Boiler Maintenance and Water Treatment | | X | |
| | Copies of all default and other material notices given or received under any service contracts | | | X |
| | **PHYSICAL ITEMS** | | | |
| 1 | Marketing photos, including aerial photos if available | | | |
| 2 | List of fire safety equipment, such as smoke sensors, suppression devices, etc. (including system type, rating, map of locations, etc.) | | | |
| 3 | Fire/Life Safety Inspection Report (current) with proof of completion of any required work | | | |
| 4 | Insurance loss run history, past 3 years and YTD (property & general liability) | | | |
| 5 | Any existing third party reports, including but not limited to: | | | |
| | a. Certified, as-built ALTA Survey | | | |
| | b. Asbestos, Lead-Based Paint, or Mold Reports and/or Operations & Maintenance (O&M) Plans | | X | |
| | c. Engineering study or inspection (structural or otherwise) | | X | |
| | d. Phase I Environmental, with any Radon Testing Results | | | |
| | e. Property Condition Report | | X | |
| | f. Soils/Geotechnical and, if new construction, concrete | | X | |
| | g. Termite | | | |
| | **TITLE AND AGREEMENTS** | | | |
| 1 | Existing Owner's Title Insurance Policy and current Title Insurance Commitment with copies of all recorded documents referenced therein | | | |
| 2 | Zoning: any reports, compliance letters, maps, ordinances, amendments, CC&R's, special use permits, etc. | | | |
| 3 | Pending litigation summary and copies of all pleadings, if applicable | | | |
| 4 | Governmental Agreements: Any city or county development agreements, bonds, tax increment financing agreements, municipal utility agreements, etc. | | | X |
| 5 | Condo / Association documents, if applicable (articles of incorporation, bylaws, CC&R's, Declaration of Horizontal Regime, budgets, material notices, rules and regulations, names of officers/directors, contact information, etc.) | | | X |
| 6 | IF PROPERTY IS SUBJECT TO CONDO, HOA OR OTHER ASSOCATION, PLEASE ALSO INDICATE WHETHER SELLER CONTROLS THE ASSOCIATION OR HAS ELECTED/APPOINTED ANY OFFICERS/DIRECTORS, in which event we also need: all contracts to which the association is a party (including | | | X |

| | | Delivered (Date) | Not applicable to Property | Not available to Seller |
|---|---|---|---|---|
| | management agreement and service contracts, bank statements, list of members, status of dues/delinquency report and other books and records | | | |
| 7 | Access Agreements: Any agreements for shared roadways, driveways or other access | | X | |
| 8 | Amenities Agreements: Any reciprocal easement agreements or shared used agreements for any amenities | | X | |
| 9 | Any other agreements that will be binding on the property after closing or that provide any material benefit to or obligation on the property, including any specific plan associated with subdivision | | X | |
| 10 | All default and other material notices given or received relating to any violation of or material matters concerning any governmental approvals, any covenants, conditions, restrictions, encumbrances, affecting the Property, or any laws, statutes, rules, regulations or ordinances applicable to the Property | | X | |
| | **REIT 3-14 AUDIT ITEMS (if applicable)** | | | |
| 1 | Cash Disbursement Journal or Check Register (prior year, most recent quarter-end and YTD) | | | X |
| 2 | Trial Balance, prior year, most recent quarter-end and YTD (in Excel format) | | | X |
| 3 | Bank Statements and Reconciliations, prior year, most recent quarter-end and YTD (monthly) | | | X |
| 4 | Tax bills (Real Property & Personal Property) - Proof of payment for past full calendar year and YTD | | | |
| 5 | Rent and expense selections, prior year, most recent quarter-end and YTD (25 respective selections to be made by Buyer's independent REIT 3-14 auditors based upon items received for #13-17 above) | | | |
| 6 | Current or former lease selections, as the case may be, with copies of back-up for rents received (for both resident and any housing authority portion paid, as applicable), prior year and YTD (25 selections to be made by Buyer's independent REIT 3-14 auditors) | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT I

**Form of Tenant Notice**

[**DATE**]

TO: All Valued Residents of ________________

Re: Notice of Lease Assignment and Transfer of Security Deposit

This letter is to notify you that the property commonly known as ________________, [**ADDRESS**] ("**Property**") has this date been sold and the ownership transferred.

In connection with this sale, all of the interest of the lessor under your lease of space in the Property, together with your security deposit, have been transferred to the new owner. You are hereby notified that, from and after the date hereof and until further notice, all future payments under your lease should be made payable to [**COMMUNITY NAME**] and mailed to [**COMMUNITY LEASING OFFICE ADDRESS**]. In addition, all questions or other matters regarding your lease should be directed to the property manager at [**COMMUNITY LEASING OFFICE PHONE NUMBER**].

Thank you for your cooperation.

______________________, a
________________

By:____________________________
Name: _________________________
Its: ____________________________

______________________, a Delaware limited liability company

# FIRST AMENDMENT TO AGREEMENT OF SALE AND PURCHASE

THIS FIRST AMENDMENT TO AGREEMENT OF SALE AND PURCHASE ("**Amendment**"), is entered into on or as of this 9th day of October, 2024 (the "**Effective Date**"), by and between **CANYON CREEK TIC 1, LLC, CANYON CREEK TIC 2, LLC, CANYON CREEK TIC 3, LLC, CANYON CREEK TIC 4, LLC, CANYON CREEK TIC 5, LLC**, and **CANYON CREEK TIC 6, LLC** each, a Delaware limited liability company (collectively and jointly and severally, "**Seller**"), and **STEADFAST ASSET HOLDINGS, INC.**, a California corporation ("**Purchaser**").

## WITNESSETH

**WHEREAS,** Seller and Purchaser are parties to that certain Agreement of Sale and Purchase dated September 17, 2024 (the "**Agreement**"), wherein Seller agreed to sell, and Purchaser agreed to purchase, certain real property (the "**Property**"), as more particularly described therein (capitalized terms used herein and not otherwise defined are used as defined in the Agreement); and

**WHEREAS,** Seller and Purchaser have mutually agreed to amend the Agreement as further set forth herein.

**NOW, THEREFORE,** for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the parties hereby agree as follows:

1. Amendment. Section 7.2 of the Agreement is hereby deleted in its entirety and replaced with the following:

> 7.2 Purchaser shall have a one-time option to extend the initially scheduled Closing Date to a date that is no later than February 13, 2025, by (a) giving written notice of such extension and the new Closing Date to Seller no later than November 5, 2024, and (b) within two (2) business days of such notice, delivering the sum of $1,000,000.00 (the "Extension Deposit") to Escrow Agent. The Extension Deposit shall have added to and be deemed part of the Earnest Money for all purposes under this Agreement. In the event Purchaser elects to extend the Closing Date pursuant to the terms and conditions of this Section 7.2, then from and after November 5, 2024 through the Closing Date, the parties shall meet on a weekly basis via a Teams videoconference on a day and time mutually acceptable the parties, to discuss Seller's leasing practices for such period, including, without limitation current rental rates and rental concessions.

2. Miscellaneous. Except as specifically set forth herein, all terms and conditions of the Agreement shall remain unaltered and in full force and effect and the parties expressly ratify and confirm the Agreement as modified and amended herein. The Agreement, as modified and amended by this Amendment, embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. The Agreement may be further amended or supplemented only by an instrument in writing executed by both parties. If there is a contradiction between the terms of the Agreement and this Amendment, then the terms of this Amendment shall control.

3. Governing Law. This Amendment shall be governed by the laws of the State in which the Property is located.

4. Counterparts; Electronic Execution and Delivery. This Amendment may be executed in separate counterparts, each of which shall be deemed an original and all of which, collectively, shall comprise one and the same instrument. Furthermore, this Amendment may be executed and delivered by electronic transmission. The parties intend that electronic (e.g. pdf. Format) signatures constitute original signatures and that an electronic copy or counterparts of this Amendment containing signatures (original or electronic) of a party is binding upon that party.

5. Successors and Assigns. This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors, successors-in-title and assigns as provided in the Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto as of Effective Date.

**PURCHASER**:

**STEADFAST ASSET HOLDINGS, INC.,**
a California corporation

By:______________________________
Name: Rodney F. Emery
Title: CEO

**SELLER**:

**RESERVE AT CANYON CREEK TIC 1, LLC**
**RESERVE AT CANYON CREEK TIC 2, LLC**
**RESERVE AT CANYON CREEK TIC 3, LLC**
**RESERVE AT CANYON CREEK TIC 4, LLC**
**RESERVE AT CANYON CREEK TIC 5, LLC**
**RESERVE AT CANYON CREEK TIC 6, LLC,**
each a Delaware limited liability company

By: ______________________________
Brock Wright, Vice President

By: ______________________________
Kevin Hyland, Vice President

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto as of Effective Date.

**PURCHASER**:

**STEADFAST ASSET HOLDINGS, INC.,**
a California corporation

By: ______________________________
Name: ______________________________
Title: ______________________________

**SELLER**:

**RESERVE AT CANYON CREEK TIC 1, LLC**
**RESERVE AT CANYON CREEK TIC 2, LLC**
**RESERVE AT CANYON CREEK TIC 3, LLC**
**RESERVE AT CANYON CREEK TIC 4, LLC**
**RESERVE AT CANYON CREEK TIC 5, LLC**
**RESERVE AT CANYON CREEK TIC 6, LLC,**
each a Delaware limited liability company

By: ______________________________
Brock Wright, Vice President

By: ______________________________
Kevin Hyland, Vice President

# SECOND AMENDMENT TO AGREEMENT OF SALE AND PURCHASE

THIS SECOND AMENDMENT TO AGREEMENT OF SALE AND PURCHASE ("**Amendment**"), is entered into on or as of this 16th day of October, 2024 (the "**Effective Date**"), by and between **CANYON CREEK TIC 1, LLC, CANYON CREEK TIC 2, LLC, CANYON CREEK TIC 3, LLC, CANYON CREEK TIC 4, LLC, CANYON CREEK TIC 5, LLC**, and **CANYON CREEK TIC 6, LLC** each, a Delaware limited liability company (collectively and jointly and severally, "**Seller**"), and **STEADFAST ASSET HOLDINGS, INC.**, a California corporation ("**Purchaser**").

## WITNESSETH

**WHEREAS,** Seller and Purchaser are parties to that certain Agreement of Sale and Purchase dated September 17, 2024, as amended by that certain First Amendment to Agreement of Sale and Purchase by and between Seller and Purchaser dated October 9, 2024 (collectively, the "**Agreement**"), wherein Seller agreed to sell, and Purchaser agreed to purchase, certain real property (the "**Property**"), as more particularly described therein (capitalized terms used herein and not otherwise defined are used as defined in the Agreement); and

**WHEREAS,** Seller and Purchaser have mutually agreed to amend the Agreement as further set forth herein.

**NOW, THEREFORE,** for and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the parties hereby agree as follows:

1. Title and Survey Review Extension. The parties acknowledge and agree that Purchaser's update to the Existing Survey revealed additional due diligence to be performed by the surveyor (the "**Surveyor**") to confirm the Western lot line of the Property (the "**Lot Line Inspection**"). In order to provide Purchaser with sufficient time to conduct the Lot Line Inspection and approve its examination of the condition of title and the Survey, Seller and Purchaser have agreed to extend the date by which Purchaser must approve or disapprove the condition of title and the Survey and submit a supplemental Title Disapproval Notice. Accordingly, notwithstanding anything to the contrary set forth in the Agreement, Seller and Purchaser hereby acknowledge and agree that Purchaser shall have until 5pm PT on October 28, 2024, by which to examine the condition of title and Survey and to submit a supplemental Title Disapproval Notice in connection therewith pursuant to Section 3.3 of the Agreement.

2. Survey Inspections. In connection with the Lot Line Inspection, Surveyor will be performing physical inspections of the Property which involve removing up to three (3) panels of the fence along the Western lot line of the Property. Purchaser (or Surveyor) shall restore the Property and improvements to substantially the condition in which the same were found prior to any such entry upon the Property and inspection or examination was undertaken, if and to the extent that such restoration is required as the direct result of actions taken by Purchaser or Surveyor (but Purchaser shall not be responsible for the discovery of any existing conditions at the Property). Seller, by its execution hereof, hereby authorizes Surveyor to access the Property to perform the Lot Line Inspection and consents to Surveyor performing such inspections (it being acknowledged and agreed that the foregoing shall constitute the notice and written approval required pursuant to Section 3.1 of the Agreement).

3. Miscellaneous. Except as specifically set forth herein, all terms and conditions of the Agreement shall remain unaltered and in full force and effect and the parties expressly ratify and confirm the Agreement as modified and amended herein. The Agreement, as modified and amended by this Amendment, embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the subject matter hereof. The Agreement may be further amended or supplemented only by an instrument in writing executed by both parties. If there is a contradiction between the terms of the Agreement and this Amendment, then the terms of this Amendment shall control.

4. Governing Law. This Amendment shall be governed by the laws of the State in which the Property is located.

5. Counterparts; Electronic Execution and Delivery. This Amendment may be executed in separate counterparts, each of which shall be deemed an original and all of which, collectively, shall comprise one and the same instrument. Furthermore, this Amendment may be executed and delivered by electronic transmission. The parties intend that electronic (e.g. pdf. Format) signatures constitute original signatures and that an electronic copy or counterparts of this Amendment containing signatures (original or electronic) of a party is binding upon that party.

6. Successors and Assigns. This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors, successors-in-title and assigns as provided in the Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, this Amendment has been executed by the parties hereto as of Effective Date.

**PURCHASER:**

**STEADFAST ASSET HOLDINGS, INC.,**
a California corporation

By: ______________________
Name: Dinesh Davar
Title: CFO

**SELLER:**

**RESERVE AT CANYON CREEK TIC 1, LLC**
**RESERVE AT CANYON CREEK TIC 2, LLC**
**RESERVE AT CANYON CREEK TIC 3, LLC**
**RESERVE AT CANYON CREEK TIC 4, LLC**
**RESERVE AT CANYON CREEK TIC 5, LLC**
**RESERVE AT CANYON CREEK TIC 6, LLC,**
each a Delaware limited liability company

By: ______________________
Brock Wright, Vice President

By: ______________________
Kevin Hyland, Vice President

Exhibit B

BCLP
Bryan Cave Leighton Paisner

BRYAN CAVE LEIGHTON PAISNER LLP
120 Broadway Suite 300
Santa Monica CA 90401 2386
T: +1 310 576 2100
F: +1 310 576 2200
bclplaw.com

Vanessa Sunshine
Direct: (310) 576-2181
vanessa.sunshine@bclplaw.com

October 28, 2024

**VIA ELECTRONIC MAIL**
**AND FEDERAL EXPRESS**

Reserve at Canyon Creek TIC 1, LLC
10510 Springboro Pike
Miamisburg, Ohio 45342
Attn: Brock Wright and Kevin Hyland
Email: bwright@connorgroup.com
Email: khyland@connorgroup.com

Chicago Title Insurance Company
One Dayton Centre
One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com

**SUPPLEMENTAL TITLE DISAPPROVAL NOTICE**

Re: Agreement of Sale and Purchase dated September 17, 2024 (the "Original PSA"), executed by and between Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), and STEADFAST ASSET HOLDINGS, INC., a California corporation ("Purchaser"), as amended by that certain First Amendment to Agreement of Sale and Purchase dated as of October 9, 2024 ("First Amendment"), and that certain Second Amendment to Agreement of Sale and Purchase dated as of October 16, 2024 ("Second Amendment", and collectively with the Original PSA and the First Amendment, the "Purchase Agreement"), for the contemplated sale and purchase of all Seller's right, title and interest in and to that certain land located at 12235 Vance Jackson Road, San Antonio, Texas 78230 (the "Property") together with all improvements located on the Property.

To Whom It May Concern:

In connection with the above-referenced transaction, we are in receipt of the enclosed (i) Commitment for Title Insurance T-7 provided by Chicago Title Insurance Company (the "Title Company"), Order No. CTD-13-470013240131-AM, having an effective date of September 10, 2024 (the "Title Commitment"), attached hereto as Exhibit A, together with the exception documents referenced therein (except as otherwise described herein), and (ii) preliminary ALTA survey prepared by David M. Henderson of Benchmark Group of Texas, Inc. dated XX/XX/XX noting fieldwork completed on October 23, 2024 (the "Updated Survey"), attached hereto as Exhibit B.

BCLP
Bryan Cave Leighton Paisner

As you know, this law firm represents Purchaser with respect to the Purchase Agreement. This objection notice (the "Supplemental Title Disapproval Notice") is being delivered to supplement the initial Title Disapproval Notice delivered on October 9, 2024 (the "Initial Title Disapproval Notice") in accordance with Section 3.3 of the Purchase Agreement and Section 1 of the Second Amendment, and shall constitute Purchaser's written notice to Seller of Purchaser's objections (the "Objections") to certain exceptions and conditions contained in the Title Commitment. Please be advised that Purchaser is in receipt of Seller's response to the Initial Title Disapproval Notice dated October 14, 2024 ("Seller's Initial Response").

All capitalized terms shall have the meanings ascribed to such terms in the Purchase Agreement unless otherwise expressly defined herein.

On behalf of the Purchaser, we respectfully notify each of you of the following Objections to the Title Commitment:

(a) Schedule A:

(1) Property Address: The address of the Property, 12235 Vance Jackson Road, San Antonio, Texas 78230 should be added as a reference.

(2) Issuing Office Information: Please add the issuing office information.

(3) Effective Date: The "Effective Date" of the policy will be the date and time of the Closing. Please insert "TBD" for now.

(4) Owner's Policy Proposed Insured: Vesting of the Property will be in the name of the assignee under the Purchase Agreement. Please insert "TBD" for now.

(5) Owner's Policy Amount: The "Policy Amount" will be the purchase price of the Property as set forth in the Purchase Agreement. With respect to the Proposed Policy Amount, please insert "$64,250,000.00" for now, subject to change prior to Closing.

(6) Loan Policy Proposed Amount and Insured: Purchaser will be closing upon a loan simultaneously with the closing of the transaction. Please insert "TBD" for now.

(7) Legal description of land:

a) REVISE as follows: Please add the Tax Parcel Identification numbers.

b) REVISE: As identified on the Updated Survey, Encroachment B identifies monuments that do not match the bearings and distances platted, such that there is an overlap of approximately 1-foot between the adjacent parcel's property line and the Property's property line along the western boundary. A new as-surveyed legal description for the Property will need to be written and approved by all appliable parties required by applicable law

(including, without limitation, adjacent parcel owners and their respective lenders, and any applicable governmental authorities) to omit the overlap, which revised legal description will need to be (i) recorded so that the overlap is fully omitted on a further Updated Survey, and (ii) insured on the Owner's Policy and Loan Policy. The Deed and all other closing documents being delivered to Purchaser by Seller at Closing will need to reflect said revised legal description.

(b) Schedule B – Exceptions from Coverage:

(2) DELETE. The Updated Survey is being provided.

(3) DELETE. This does not apply to this transaction.

(4) DELETE. This exception does not affect the Property.

(5) CONDITIONAL APPROVAL. Exception 5 is conditionally approved upon (i) all other taxes and assessments being current and prorated as of the Closing Date as provided in the Purchase Agreement, as agreed to by Seller in Seller's Initial Response, and (ii) the Title Company including the language "none due at Date of Policy" to such Exception.

(6) DELETE. Exception 6 should be deleted. Seller shall provide the Deed in the form referenced in Section 8.1.1 and attached as Exhibit E to the Purchase Agreement, as agreed to by Seller in Seller's Initial Response.

(7 and 8) DELETE. Exceptions 7 and 8 do not apply to this transaction. Seller must provide the Title Company with all affidavits, certificates, reconveyances, lien releases and other documents and instruments to remove such exceptions pursuant to Section 8.1.6 of the Purchase Agreement to remove Exceptions 7 and 8, as agreed to by Seller in Seller's Initial Response..

(9) DELETE. This does not apply to this transaction.

(10a) – REVISE. Please revise this exception to read as follows: "Rights of tenants, as residential tenants only, under unrecorded leases and/or agreements, with no options to purchase, rights of first refusal, or rights of first offer." Seller must provide the Title Company with all affidavits, certificates, reconveyances, lien releases and other documents and instruments to so revise such exception pursuant to Section 8.1.6 of the Purchase Agreement, as agreed to by Seller in Seller's Initial Response.

(10b) – DELETE. The Updated Survey is being provided.

(10c) – CONDITIONAL APPROVAL. Purchaser's approval of this exception is conditioned upon Title Company issuing a T-19.2 Endorsement referenced below.

(10d) – DELETE. This Exception is duplicative of Exception 10(a) above.

(10e) – CONDITIONAL APPROVAL. Purchaser's approval of the exception is conditioned upon (i) the Title Company issuing a T-19.1 Endorsement to Purchaser, and (ii) Purchaser's receipt, review, and approval of a zoning report.

(10 f, and g) - CONDITIONAL APPROVAL. Purchaser's approval of the exception is conditioned upon the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10h) – CONDITIONAL APPROVAL. Purchaser's approval of the exception is conditioned upon the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10i) - CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the last sentence being updated to read: As affected by the terms and conditions of that Consent and Indemnity Agreement executed August 2, 2000, recorded August 7, 2000 in Volume 8521, Page 1042, Real Property Records, Bexar County, Texas (Tract 2), and (ii) the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10j) - CONDITIONAL APPROVAL AND REVISE. Purchaser's approval of the exception is conditioned upon the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10k) - CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Easement executed August 30, 1974, recorded October 11, 1974 in Volume 7459, Page 314, Real Property Records and shown on the plat recorded in Volume 9452, Page 102, Deed and Plat Records, Bexar County, Texas (Tract 2), and (ii) the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10l) – CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Electric and Gas Lines Right-of-Way Agreement executed September 7, 1999, recorded October 20, 1999 in Volume 8174, Page 1612, Real Property Records, Bexar County, Texas. (Tracts 1 and 2), (ii) the Title Company issuing a T-19.1 Endorsement to Purchaser, and (iii) Seller obtaining the written agreement of the applicable gas and/or electric utility company consenting to the encroachment of Garage PS 4 located adjacent to Building #6 over and onto the subject easement area.

(10m) - CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Electric Line Right-of-Way Agreement executed December 3, 2002, recorded December 9, 2002 in Volume 9715, Page 831, Real Property Records, Bexar County, Texas (Tract 2), and (ii) the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10n) - CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Coinmach Corporation Memorandum of Lease executed December 9, 1999, recorded January 31, 2000 in Volume 8290, Page 1023 Real Property Records, Bexar County, Texas. (Tract 1), and (ii) the Title Company issuing a T-19.1 Endorsement to Purchaser.

(10o) - CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Memorandum of Agreement executed August 18, 2011, recorded October 18, 2012 in Volume 15751, Page 2069 Real Property Records, Bexar County, Texas. (Tracts 1 and 2), (ii) confirmation from Seller that the Service and Marketing Agreement is still in full force and effect and if not in full force and effect, Seller must provide the Title Company with all affidavits, certificates, reconveyances, lien releases and other documents and instruments sufficient to so remove such exception, (iii) Seller providing a copy of the Service and Marketing Agreement Purchaser, and (iv) the Title Company issuing a T-19.1 Endorsement to Purchaser. Seller agreed in Seller's Initial Response to (i) "advise, and provide sufficient documentation," and (ii) to the extent that Seller is in control of such documentation, to provide Purchaser with a copy of the Agreement.

(10p) CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Application and Agreement for Service Effective September 16, 1999, recorded October 20, 1999 in Volume 8174, Page 2029 Real Property Records, Bexar County, Texas. (Tract 1), (ii) confirmation from Seller that the Service and Marketing Agreement is still in full force and effect and if not in full force and effect, Seller must provide the Title Company with all affidavits, certificates, reconveyances, lien releases and other documents and instruments sufficient to so remove such exception, (iii) Seller providing a copy of the Service and Marketing Agreement Purchaser, and (iv) the Title Company issuing a T-19.1 Endorsement to Purchaser. Seller agreed in Seller's Initial Response to (i) "advise, and provide sufficient documentation," and (ii) to the extent that Seller is in control of such documentation, to provide Purchaser with a copy of the Agreement.

(10q) CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that Memorandum of Contract executed October 1, 1999, recorded November 8, 1999 in Volume 8197, Page 1421 2029 Real Property Records, Bexar County, Texas. (Tract 1), (ii) confirmation from Seller that the Contract is still in full force and effect and if not in full force and effect, Seller must provide the Title Company with all affidavits, certificates, reconveyances, lien releases and other documents and instruments sufficient to so remove such exception, and (iii) Seller providing a copy of the Contract, (iv) the Title Company issuing a T-19.1 Endorsement to Purchaser. Seller agreed in Seller's Initial Response to (i) "advise, and provide sufficient documentation," and (ii) to the extent that Seller is in control of such documentation, to provide Purchaser with a copy of the Contract.

(10r) CONDITIONAL APPROVAL AND REVISE. Purchaser's approval is conditioned on (i) the revision of the exception to read: Terms and conditions of that License Agreement and to include which tracts are affected by the exception, and (ii) the Title Company issuing a T-19.1 Endorsement to Purchaser.

(c) Schedule C – Requirements:

(1) Purchaser requires that Seller satisfy the requirements and release of record those items set forth in Schedule C that are applicable to Seller, including, without limitation, items 1, 2, 4, 5, 6, 7, and 8, which Seller is required to properly dispose of pursuant to Section 3.3 and

Section 8.1.6 of the Agreement, by providing to the Title Company all Title Affidavits and any other necessary affidavits, lien releases, organizational documents, and other documents and instruments and/or depositing with the Title Company to hold in escrow any funds required by the Title Company to satisfy such requirements, as agreed to by Seller in Seller's Initial Response.

(d) Endorsements:

Please provide the following pro forma endorsements, the cost of each endorsement, and any requirements therefor, for our review and comment, so that Purchaser can determine which, if any, it will elect to purchase:

(1) TLTA Form 19.1 Endorsement (Restrictions, Encroachments, Minerals Endorsement);

(2) TLTA Form 19.2 Endorsement (Minerals and Surface Damage);

(3) TLTA Form 23 Endorsement (Access);

(4) TLTA Form 25.1 Endorsement (Contiguity)

(5) TLTA Form 36 Endorsement (Environmental Protection Lien Endorsement)

(6) Deletion of the Arbitration Section of the T-1 Extended Coverage Owner's Policy;

(7) Lack of Signature Endorsement, if available.

(e) Survey: The Updated Survey identifies (i) several encroachments of the Improvements into the setbacks (see various reference to Encroachment A), and (ii) building heights for buildings 2-10, 13-14, 16-17 and 20 (up to 42.5 feet) in excess of 35 feet as permitted under applicable law. Seller to provide written documentation from the applicable governmental authority(ies) permitting such encroachments and/or height variances.

Ms. Pensyl, please prepare and forward as soon as possible a proforma Texas T-1 Extended Coverage Owner's Policy of Title Insurance in accordance with the Title Commitment and this Supplemental Title Disapproval Notice. Please also send an updated title commitment in accordance with this Supplemental Title Disapproval Notice at your earliest convenience. We reserve rights to provide further Objections upon receipt of the updated commitment reflecting the revised legal description.

Please be advised that nothing in this Supplemental Title Disapproval Notice shall be deemed to waive any rights of Purchaser or obligations of the Seller as otherwise set forth in the Purchase Agreement it being understood and required by Purchaser that Seller will remove those items set forth in Section 3.3 of the Purchase Agreement. Specifically, Purchaser hereby reserves its rights under Section 3.3 of the Purchase Agreement to terminate the Purchase Agreement and receive a

BCLP
Bryan Cave Leighton Paisner

refund of the Earnest Money in accordance with the terms and conditions of the Purchase Agreement.

Very truly yours,

Vanessa A. Sunshine

cc: Bill Stoll (via email Bill.Stoll@steadfastco.com)
Ana Marie del Rio (via email AnaMarie.delRio@steadfastco.com)
Taylor Thornburgh (via email Taylor.Thornburch@bclplaw.com)
Talia Housik (via email Talia.Housik@bclplaw.com)
Sherrie Courtney (via email Sherrie.Courtney@bclplaw.com)

# **Exhibit A**

## **Title Commitment**

See attached.

# COMMITMENT FOR TITLE INSURANCE (T-7)

Issued By:

**Chicago Title Insurance Company**

Commitment Number:

**470013240131**

THE FOLLOWING COMMITMENT FOR TITLE INSURANCE IS NOT VALID UNLESS YOUR NAME AND THE POLICY AMOUNT ARE SHOWN IN **SCHEDULE A**, AND OUR AUTHORIZED REPRESENTATIVE HAS COUNTERSIGNED BELOW.

We (Chicago Title Insurance Company, a Florida corporation) will issue our title insurance policy or policies (the Policy) to You (the proposed insured) upon payment of the premium and other charges due, and compliance with the requirements in Schedule C. Our Policy will be in the form approved by the Texas Department of Insurance at the date of issuance, and will insure your interest in the land described in Schedule A. The estimated premium for our Policy and applicable endorsements is shown on Schedule D. There may be additional charges such as recording fees, and expedited delivery expenses.

This Commitment ends ninety (90) days from the effective date, unless the Policy is issued sooner, or failure to issue the Policy is our fault. Our liability and obligations to you are under the express terms of this Commitment and end when this Commitment expires.

**Chicago Title Insurance Company**
By:

Michael J. Nolan, President

**Issued By:**

**Chicago Title Insurance Company**

Alicia Morales

CHICAGO TITLE INSURANCE COMPANY CORPORATE SEAL

Attest:

Marjorie Nemzura, Secretary

## CONDITIONS AND STIPULATIONS

1. If you have actual knowledge of any matter which may affect the title or mortgage covered by this Commitment that is not shown in Schedule B you must notify us in writing. If you do not notify us in writing, our liability to you is ended or reduced to the extent that your failure to notify us affects our liability. If you do notify us, or we learn of such matter, we may amend Schedule B, but we will not be relieved of liability already incurred.
2. Our liability is only to you, and others who are included in the definition of Insured in the Policy to be issued. Our liability is only for actual loss incurred in your reliance on this Commitment to comply with its requirements, or to acquire the interest in the land. Our liability is limited to the amount shown in Schedule A of this Commitment and will be subject to the following terms of the Policy: Insuring Provisions, Conditions and Stipulations, and Exclusions.

## SCHEDULE A

Effective Date: September 10, 2024 at 8:00 AM
Commitment No.: 470013240131

GF No.: CTD-13-470013240131-AM
Issued: September 23, 2024 at 8:00 AM

1. The policy or policies to be issued are:

   a. OWNER'S POLICY OF TITLE INSURANCE (Form T-1)
   (Not applicable for improved one-to-four family residential real estate)

   Policy Amount: $64,250,000.00
   PROPOSED INSURED: Steadfast Asset Holdings, INC., a California corporation

   b. TEXAS RESIDENTIAL OWNER'S POLICY OF TITLE INSURANCE
   ONE-TO-FOUR FAMILY RESIDENCES (Form T-1R)

   Policy Amount:
   PROPOSED INSURED:

   c. LOAN POLICY OF TITLE INSURANCE (Form T-2)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   d. TEXAS SHORT FORM RESIDENTIAL LOAN POLICY OF TITLE INSURANCE (Form T-2R)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   e. LOAN TITLE POLICY BINDER ON INTERIM CONSTRUCTION LOAN (Form T-13)

   Policy Amount:
   PROPOSED INSURED:
   Proposed Borrower:

   f. OTHER

   Policy Amount:
   PROPOSED INSURED:

2. The interest in the land covered by this Commitment is:

   Fee Simple

3. Record title to the land on the Effective Date appears to be vested in:

   Reserve at Canyon Creek TIC 1, LLC a Delaware limited liability company and Reserve at Canyon Creek TIC 2, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 3, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 4, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 5, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 6, LLC, a Delaware limited liability company, as tenants-in-common

## SCHEDULE A
(continued)

4. Legal description of land:

   Tract 1:

   Lot 10, Block 1, New City Block 16093, HAVERHILL II, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas.

   Tract 2:

   Lot 9, Block 1, New City Block 16093, WOODLAND HILLS, UNIT 4, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas.

**END OF SCHEDULE A**

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Commitment No.: 470013240131 GF No.: CTD-13-470013240131-AM

In addition to the Exclusions and Conditions and Stipulations, your Policy will not cover loss, costs, attorney's fees, and expenses resulting from:

1. Item 1, Schedule B is hereby deleted in its entirety.

2. Any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements.

3. Homestead or community property or survivorship rights, if any of any spouse of any insured. (Applies to the Owner Policy only.)

4. Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

   a. to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

   b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

   c. to filled-in lands, or artificial islands, or

   d. to statutory water rights, including riparian rights, or

   e. to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

   (Applies to the Owner Policy only.)

5. Standby fees, taxes and assessments by any taxing authority for the year 2024 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years.

6. The terms and conditions of the documents creating your interest in the land.

7. Materials furnished or labor performed in connection with planned construction before signing and delivering the lien document described in Schedule A, if the land is part of the homestead of the owner. (Applies to the Loan Title Policy Binder on Interim Construction Loan only, and may be deleted if satisfactory evidence is furnished to us before a binder is issued.)

8. Liens and leases that affect the title to the land, but that are subordinate to the lien of the insured mortgage. (Applies to Loan Policy (T-2) only.)

9. The Exceptions from Coverage and Express Insurance in Schedule B of the Texas Short Form Residential Loan Policy of Title Insurance (T-2R). (Applies to Texas Short Form Residential Loan Policy of Title Insurance (T-2R) only. Separate exceptions 1 through 8 of this Schedule B do not apply to the Texas Short Form Residential Loan Policy of Title Insurance (T-2R).

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

10. The following matters and all terms of the documents creating or offering evidence of the matters (We must insert matters or delete this exception):

a. Rights of parties in possession.

b. Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the land.

Note: Upon receipt of a survey acceptable to the Title Company, this exception will be deleted. The Company reserves the right to except additional items and/or make additional requirements after reviewing said survey

c. All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

d. Rights of tenants in possession, as tenants only, under unrecorded lease agreements.

e. 25 foot building setback line as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas. (Tract 1)

f. 14 foot electric, gas, telephone and cable television easement as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas. (Tract 1)

g. Variable width drainage easement as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas. (Tract 1)

h. 25 foot building setback line as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. (Tract 2)

i. 14 foot electric, gas, telephone and cable television easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. Being affected by Consent and Indemnity Agreement recorded in Volume 8521, Page 1042, Real Property Records, Bexar County, Texas. (Tract 2)

j. Variable width drainage easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. (Tract 2)

k. 16 foot sanitary sewer easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas and recorded in Volume 7459, Page 314, Deed Records, Bexar County, Texas. (Tract 2)

l. Easement(s), as provided therein, recorded in Volume 8174, Page 1612, Real Property Records, Bexar County, Texas. (Tracts 1 and 2)

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

m. Easement(s), as provided therein, recorded in Volume 9715, Page 831, Real Property Records, Bexar County, Texas. (Tract 2)

n. Coinmach Corporation Memorandum of Lease recorded in Volume 8290, Page 1023, Real Property Records, Bexar County, Texas. (Tract 1)

o. Easement(s), as provided therein, recorded in Volume 15751, Page 2069, Real Property Records, Bexar County, Texas. (Tracts 1 and 2)

p. Easement(s), as provided therein, recorded in Volume 8174, Page 2029, Real Property Records, Bexar County, Texas. (Tracts 1 and 2)

q. Easement(s), as provided therein, recorded in Volume 8197, Page 1421, Real Property Records, Bexar County, Texas. (Tract 1)

r. Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to: Spectrum Gulf Coast, LLC
Purpose: telecommunications
Recording Date: September 15, 2021
Recording No: 20210257224, Official Public Records of Bexar County, Texas.

# SCHEDULE C

Commitment No.: 470013240131 GF No.: CTD-13-470013240131-AM

Your Policy will not cover loss, costs, attorneys' fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued:

1. Documents creating your title or interest must be approved by us and must be signed, notarized and filed for record.

2. Satisfactory evidence must be provided that:

   a. no person occupying the land claims any interest in that land against the persons named in paragraph 3 of Schedule A,

   b. all standby fees, taxes, assessments and charges against the property have been paid,

   c. all improvements or repairs to the property are completed and accepted by the owner, and that all contractors, sub-contractors, laborers and suppliers have been fully paid, and that no mechanic's, laborer's or materialmen's liens have attached to the property,

   d. there is legal right of access to and from the land,

   e. (on a Loan Policy only) restrictions have not been and will not be violated that affect the validity and priority of the insured mortgage.

3. You must pay the seller or borrower the agreed amount for your property or interest.

4. Any defect, lien or other matter that may affect title to the land or interest insured, that arises or is filed after the effective date of this Commitment.

5. A deed of trust to secure an indebtedness in the amount shown below,

   Amount: $41,450,000.00
   Dated: May 13, 2021
   Trustor/Grantor: Reserve at Canyon Creek TIC 1, LLC a Delaware limited liability company and Reserve at Canyon Creek TIC 2, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 3, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 4, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 5, LLC, a Delaware limited liability company and Reserve at Canyon Creek TIC 6, LLC, a Delaware limited liability company
   Trustee: David A. Miller, Esq.
   Beneficiary: Associated Bank, National Association
   Recording Date: May 13, 2021
   Recording No: Document No. 20210129620, Official Public Records of Bexar County, Texas.

   Assignment of Leases and Rents recorded May 13, 2021, under Document No. 20210129621, Official Public Records of Bexar County, Texas.

6. A claim of mechanic's lien or materialman's lien:

   Claimant: Malena's Painting & Cleaning
   Amount: $2,430.00
   Recording Date: June 3, 2024
   Recording No: Document No. 20240099980, Official Public Records of Bexar County, Texas.

## SCHEDULE C
(continued)

7. Title Company requires an Affidavit as to Debts, Liens and Possession (or acceptable owner affidavit form) executed by record owner prior to or at closing. The final draft of said Affidavit must be submitted for Company's underwriting review prior to execution of said Affidavit.

8. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entities named below:

Limited Liability Companies:

1. Reserve at Canyon Creek TIC 1, LLC, a Delaware limited liability company;
2. Reserve at Canyon Creek TIC 2, LLC, a Delaware limited liability company;
3. Reserve at Canyon Creek TIC 3, LLC, a Delaware limited liability company;
4. Reserve at Canyon Creek TIC 4, LLC, a Delaware limited liability company;
5. Reserve at Canyon Creek TIC 5, LLC, a Delaware limited liability company; and
6. Reserve at Canyon Creek TIC 6, LLC, a Delaware limited liability company

a) A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member

b) If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps

c) If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member

d) A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

9. Note: The name(s) of the proposed insured(s) furnished with this application for title insurance is/are:

Name(s) furnished: Steadfast Asset Holdings, Inc., a California corporation

If these name(s) are incorrect, incomplete or misspelled, please notify the Company.

10. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance by the corporation named below:

Name of Corporation: Steadfast Asset Holdings, Inc., a California corporation

a) A Copy of the corporation By-laws and Articles of Incorporation

b) An original or certified copy of a resolution authorizing the transaction contemplated herein

c) If the Articles and/or By-laws require approval by a 'parent' organization, a copy of the Articles and By-laws of the parent

## SCHEDULE C

(continued)

d) A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

11. The following note is for informational purposes only:

    The following deed(s) affecting said land were recorded within twenty-four (24) months of the date of this report:

    None found of record.

    The last Deed found of record affecting the Land was recorded May 13, 2021, in Document No. 20210129619, Official Public Records of Bexar County, Texas, wherein the grantee acquired the subject property.

12. Prior approval from Regional Underwriting must be obtained if the subject transaction involves the proposed issuance of (i) an Owner's Policy to a person or entity who purchased the subject property at a foreclosure sale, or (ii) a Loan Policy insuring a lien granted by such person or entity on the subject property.

13. If any portion of the proposed loan and/or the Owner's Title Policy coverage amount includes funds for immediately contemplated improvements, the following exceptions will appear in Schedule B of any policy issued as indicated:

    Owner's and Loan Policy(ies): Any and all liens arising by reason of unpaid bills or claims for work performed or materials furnished in connection with improvements placed, or to be placed, upon the subject land. However, the Company does insure the insured against loss, if any, sustained by the Insured under this policy if such liens have been filed with the County Clerk of Bexar County, Texas, prior to the date hereof.

    Owner's Policy(ies) Only: Liability hereunder at the date hereof is limited to $ 1,000,000.00. Liability shall increase as contemplated improvements are made, so that any loss payable hereunder shall be limited to said sum plus the amount actually expended by the insured in improvements at the time the loss occurs. Any expenditures made for improvements, subsequent to the date of this policy, will be deemed made as of the date of this policy. In no event shall the liability of the Company hereunder exceed the face amount of this policy. Nothing contained in this paragraph shall be construed as limiting any exception or any printed provision of this policy.

    Loan Policy(ies) Only: Pending disbursement of the full proceeds of the loan secured by the lien instrument set forth under Schedule A hereof, this policy insures only to the extent of the amount actually disbursed, but increase as each disbursement is made in good faith and without knowledge of any defect in, or objections to, the title up to the face amount of the policy. Nothing contained in this paragraph shall be construed as limiting any exception under Schedule B, or any printed provision of this policy.

14. The transaction contemplated in connection with this Report is subject to the review and approval of the Company's Corporate Underwriting Department. The Company reserves the right to add additional items or make further requirements after such review.

15. The Company and its policy issuing agents are required by Federal law to collect additional information about certain transactions in specified geographic areas in accordance with the Bank Secrecy Act. If this transaction is required to be reported under a Geographic Targeting Order issued by FinCEN, the Company or its policy issuing agent must be supplied with a completed ALTA Information Collection Form ("ICF") prior to closing the transaction contemplated herein.

# SCHEDULE D

Commitment No.: 470013240131 GF No.: CTD-13-470013240131-AM

Pursuant to the requirements of Rule P-21, Basic Manual of Rules, Rates and Forms for the writing of Title Insurance in the State of Texas, the following disclosures are made:

1. The issuing Title Insurance Company, **Chicago Title Insurance Company**, is a corporation whose shareholders owning or controlling, directly or indirectly, 10% of said corporation, directors and officers are listed below:

   **Shareholders**: Fidelity National Title Group, Inc., which is owned 100% by FNTG Holdings, LLC, which is owned 100% by Fidelity National Financial, Inc., a publicly held company.

   **Directors**: Edson N. Burton Jr., Roger S. Jewkes, Marjorie Nemzura, Michael J. Nolan, Anthony J. Park

   **Officers**: Michael J. Nolan (President, Chief Executive Officer, and Chairman of the Board), Anthony J. Park (Treasurer, Chief Financial Officer, and Executive Vice President), Marjorie Nemzura (Corporate Secretary and Vice President)

2. The following disclosures are made by the Title Insurance Agent issuing this Commitment:

   **Chicago Title Insurance Company, in its capacity as a licensed Texas Direct Operation**

   (a) A listing of each shareholder, owner, partner, or other person having, owning or controlling one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

   **Owners**: Fidelity National Title Group, Inc.

   (b) A listing of each shareholder, owner, partner, or other person having, owning or controlling 10 percent (10%) or more of an entity that has, owns or controls one percent (1%) or more of the Title Insurance Agent that will receive a portion of the premium.

   **Owners**: FNTG Holdings, LLC

   (c) If the Agent is a corporation: (i) the name of each director of the Title Insurance Agent, and (ii) the names of the President, the Executive or Senior Vice-President, the Secretary and the Treasurer of the Title Insurance Agent.

   **Directors**: Edson N. Burton, Jr., Roger S. Jewkes, Marjorie Nemzura, Michael J. Nolan, Anthony John Park

   **Officers**: Michael J. Nolan (President, Chief Executive Officer, and Chairman of the Board), Anthony John Park (Treasurer, Chief Financial Officer, and Executive Vice President), Marjorie Nemzura (Corporate Secretary and Vice President), Thomas Garner (Vice President), Clark Pulliam (Vice President)

   (d) The name of any person who is not a full-time employee of the Title Insurance Agent and who receives any portion of the title insurance premium for services performed on behalf of the Title Insurance Agent in connection with the issuance of a title insurance form; and, the amount of premium that any such person shall receive. NONE.

   (e) For purposes of this paragraph 2, "having, owning or controlling" includes the right to receipt of a percentage of net income, gross income, or cash flow of the Agent or entity in the percentage stated in subparagraphs (a) or (b).

3. You are entitled to receive advance disclosure of settlement charges in connection with the proposed transaction to which this commitment relates. Upon your request, such disclosure will be made to you. Additionally, the name of any person, firm or corporation receiving a portion of the premium from the settlement of this transaction will be disclosed on the closing or settlement statement.

   You are further advised that the estimated title premium* is:

| | | | |
|---|---|---|---|
| **Owner's Policy** | | **$** | **141,660.00** |
| | **Total** | **$** | **141,660.00** |

   Of this total amount: 15% will be paid to the policy issuing Title Insurance Company; 85% will be retained by the issuing Title Insurance Agent; and the remainder of the estimated premium will be paid to other parties as follows:

| Percent/Amount | To Whom | For Services |
|---|---|---|

   *The estimated premium is based upon information furnished to us as of the date of this Commitment for Title Insurance. Final determination of the amount of the premium will be made at closing in accordance with the Rules and Regulations adopted by the Commissioner of Insurance.

# TEXAS TITLE INSURANCE INFORMATION

| |
|---|
| Title insurance insures you against loss resulting from certain risks to your title.<br><br>The commitment for Title Insurance is the title insurance company's promise to issue the title insurance policy. The commitment is a legal document. You should review it carefully to completely understand it before your closing date. |
| El seguro de título le asegura en relación a perdidas resultantes de ciertos riesgos que pueden afectar el título de su propriedad.<br><br>El Compromiso para Seguro de Título es la promesa de la compañía aseguradora de títulos de emitir la póliza de seguro de título. El Compromiso es un documento legal. Usted debe leerlo cuidadosamente y endenterlo complemente antes de la fecha para finalizar su transacción. |

Your Commitment for Title insurance is a legal contract between you and us. The Commitment is not an opinion or report of your title. It is a contract to issue you a policy subject to the Commitment's terms and requirements.

Before issuing a Commitment for Title Insurance (the Commitment) or a Title Insurance Policy (the Policy), the Title Insurance Company (the Company) determines whether the title is insurable. This determination has already been made. Part of that determination involves the Company's decision to insure the title except for certain risks that will not be covered by the Policy. Some of these risks are listed in Schedule B of the attached Commitment as Exceptions. Other risks are stated in the Policy as Exclusions. These risks will not be covered by the Policy. The Policy is not an abstract of title nor does a Company have an obligation to determine the ownership of any mineral interest.

**--MINERALS AND MINERAL RIGHTS** may not be covered by the Policy. The Company may be unwilling to insure title unless there is an exclusion or an exception as to Minerals and Mineral Rights in the Policy. Optional endorsements insuring certain risks involving minerals, and the use of improvements (excluding lawns, shrubbery and trees) and permanent buildings may be available for purchase. If the title insurer issues the title policy with an exclusion or exception to the minerals and mineral rights, neither this Policy, nor the optional endorsements, insure that the purchaser has title to the mineral rights related to the surface estate.

Another part of the determination involves whether the promise to insure is conditioned upon certain requirements being met. Schedule C of the Commitment lists these requirements that must be satisfied or the Company will refuse to cover them. You may want to discuss any matters shown in Schedules B and C of the Commitment with an attorney. These matters will affect your title and your use of the land.

When your Policy is issued, the coverage will be limited by the Policy's Exceptions, Exclusions and Conditions, defined below.

**---EXCEPTIONS** are title risks that a Policy generally covers but does not cover in a particular instance. Exceptions are shown on Schedule B or discussed in Schedule C of the Commitment. They can also be added if you do not comply with the Conditions section of the Commitment. When the Policy is issued, all Exceptions will be on Schedule B of the Policy.

**---EXCLUSIONS** are title risks that a Policy generally does not cover. Exclusions are contained in the Policy but not shown or discussed in the Commitment.

**---CONDITIONS** are additional provisions that qualify or limit your coverage. Conditions include your responsibilities and those of the Company. They are contained in the Policy but not shown or discussed in the Commitment. The Policy Conditions are not the same as the Commitment Conditions.

# TEXAS TITLE INSURANCE INFORMATION
(Continued)

You can get a copy of the policy form approved by the Texas Department of Insurance by calling the Title Insurance Company at 1-800-442-7067 or by calling the title insurance agent that issued the Commitment. The Texas Department of Insurance may revise the policy form from time to time.

You can also get a brochure that explains the policy from the Texas Department of Insurance by calling 1-800-252-3439.

Before the Policy is issued, you may request changes in the policy. Some of the changes to consider are:

---Request amendment of the "area and boundary" exception (Schedule B, paragraph 2). To get this amendment, you must furnish a survey and comply with other requirements of the Company. On the Owner's Policy, you must pay an additional premium for the amendment. If the survey is acceptable to the Company and if the Company's other requirements are met, your Policy will insure you against loss because of discrepancies or conflicts in boundary lines, encroachments or protrusions, or overlapping of improvements. The Company may then decide not to insure against specific boundary or survey problems by making special exceptions in the Policy. Whether or not you request amendment of the "area and boundary" exception, you should determine whether you want to purchase and review a survey if a survey is not being provided to you.

---Allow the Company to add an exception to "rights of parties in possession." If you refuse this exception, the Company or the title insurance agent may inspect the property. The Company may except to and not insure you against the rights of specific persons, such as renters, adverse owners or easement holders who occupy the land. The Company may charge you for the inspection. If you want to make your own inspection, you must sign a Waiver of Inspection form and allow the Company to add this exception to your Policy.

The entire premium for a Policy must be paid when the Policy is issued. You will not owe any additional premiums unless you want to increase your coverage at a later date and the Company agrees to add an Increased Value Endorsement.

# DELETION OF ARBITRATION PROVISION

(Not applicable to the Texas Residential Owner's Policy)

ARBITRATION is a common form of alternative dispute resolution. It can be a quicker and cheaper means to settle a dispute with your Title Insurance Company. However, if you agree to arbitrate, you give up your right to take the Title Insurance Company to court and your rights to discovery of evidence may be limited in the arbitration process. In addition, you cannot usually appeal an arbitrator's award.

**Your policy contains an arbitration provision (shown below). It allows you or the Company to require arbitration if the amount of insurance is $2,000,000 or less. If you want to retain your right to sue the Company in case of a dispute over a claim, you must request deletion of the arbitration provision before the policy is issued. You can do this by signing this form and returning it to the Company at or before the closing of your real estate transaction or by writing to the Company.**

The arbitration provision in the Policy is as follows:

> "Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction."

______________________________ Signature

______________________________ Date

# FIDELITY NATIONAL FINANCIAL
# PRIVACY NOTICE

Effective July 1, 2024

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**

FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.* loan or bank account information);
- biometric data (*e.g.* fingerprints, retina or iris scans, voiceprints, or other unique biological characteristics, and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**

FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**

FNF uses Personal Information for these main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To prevent and detect fraud;
- To maintain the security of our systems, tools, accounts, and applications;
- To verify and authenticate identities and credentials;
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.
- To provide reviews and testimonials about our services, with your consent.

**When Information Is Disclosed**

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

**Security of Your Information**

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

**Choices With Your Information**

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Connecticut Residents: For additional information about your Connecticut consumer privacy rights, or to make a consumer privacy request, or to appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

For Colorado Residents: For additional information about your Colorado consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

For Nevada Residents: We are providing this notice pursuant to state law. You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. For further information concerning Nevada's telephone solicitation law, you may contact: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginquiries@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes. For additional information about your Oregon consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710

We may disclose the categories of Personal Information and Browsing information listed above to the following categories of third parties:

- FNF affiliates and subsidiaries;
- Non-affiliated third parties, with your consent;
- Business in connection with the sale or other disposition of all or part of the FNF business and/or assets;
- Service providers;
- Law endorsement or authorities in connection with an investigation, or in response to a subpoena or court order.

For Texas Residents: For additional information about your Texas consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

We may disclose the categories of Personal Information and Browsing information listed above to the following categories of third parties:

- FNF affiliates and subsidiaries;
- Non-affiliated third parties, with your consent;
- Business in connection with the sale or other disposition of all or part of the FNF business and/or assets;
- Service providers;
- Law endorsement or authorities in connection with an investigation, or in response to a subpoena or court order.

For Utah Residents: For additional information about your Utah consumer privacy rights, or to make a consumer privacy request, please call (888) 714-2710.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

For Virginia Residents: For additional information about your Virginia consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710.

**Information From Children**

The FNF Websites are not intended or designed to attract persons under the age of eighteen (18). We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

**International Users**

FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the

mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**

If you have questions or would like to correct your Personal Information, visit FNF's Privacy Inquiry Website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

**<u>Exhibit B</u>**

**Updated Survey**

See attached.

## TITLE REPORT INFORMATION

THE PROPERTY HEREON DESCRIBED IS THE SAME AS THE PERTINENT PROPERTY AS DESCRIBED IN CHICAGO TITLE INSURANCE COMPANY REPORT, COMMITMENT G.F. NO. CTD-13-4700132400131-AM, WITH AN EFFECTIVE DATE OF September 10, 2024.

## LEGAL DESCRIPTION

Tract 1: Lot 10, Block 1, New City Block 18083, HAVERHILL 1, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas.

Tract 2: Lot 8, Block 1, New City Block 18083, WOODLAND HILLS, UNIT 4, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas.

## SCHEDULE "B" ITEMS

The following matters and all terms of the documents creating or offering evidence of the matters:

- 10e: 25 foot building setback line as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas. (Tract 1) AFFECTS, SHOWN HEREON
- 10f: 14 foot electric, gas, telephone and cable television easement as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas. (Tract 1) AFFECTS, SHOWN HEREON
- 10g: Variable width drainage easement as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas. (Tract 1) AFFECTS, SHOWN HEREON
- 10h: 25 foot building setback line as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. (Tract 2) AFFECTS, SHOWN HEREON
- 10i: 14 foot electric, gas, telephone and cable television easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. Being affected by Consent and Indemnity Agreement recorded in Volume 3821, Page 1042, Real Property Records, Bexar County, Texas. (Tract 2) AFFECTS, SHOWN HEREON
- 10j: Variable width drainage easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. (Tract 2) AFFECTS, SHOWN HEREON
- 10k: 16 foot sanitary sewer easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas and recorded in Volume 7488, Page 314, Deed Records, Bexar County, Texas. (Tract 2) AFFECTS, SHOWN HEREON
- 10l: Easement(s), as provided therein, recorded in Volume 8174, Page 1812, Real Property Records, Bexar County, Texas. (Tracts 1 and 2) AFFECTS, SHOWN HEREON
- 10m: Easement(s), as provided therein, recorded in Volume 8718, Page 631, Real Property Records, Bexar County, Texas. (Tract 2) AFFECTS, SHOWN HEREON
- 10n: Coleman Corporation Memorandum of Lease recorded in Volume 8290, Page 1033, Real Property Records, Bexar County, Texas. (Tract 1) AFFECTS, BLANKET IN NATURE
- 10o: Easement(s), as provided therein, recorded in Volume 15731, Page 2089, Real Property Records, Bexar County, Texas. (Tracts 1 and 2) AFFECTS, BLANKET IN NATURE
- 10p: Easement(s), as provided therein, recorded in Volume 8174, Page 2028, Real Property Records, Bexar County, Texas. (Tracts 1 and 2) AFFECTS, TRACT 1 BLANKET IN NATURE
- 10q: Easement(s), as provided therein, recorded in Volume 8187, Page 1421, Real Property Records, Bexar County, Texas. (Tract 1) AFFECTS, BLANKET IN NATURE
- 10r: Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document: Granted to: Spectrum Gulf Coast, LLC; Purpose: telecommunications; Recording Date: September 15, 2021; Recording No: [illegible], Official Public Records of Bexar County, Texas. AFFECTS, BLANKET IN NATURE

## BUILDING DETAILS NOT TO SCALE



| BUILDING INFORMATION | | | | |
|---|---|---|---|---|
| BUILDING TYPE | BUILDING #'S | SQUARE FOOTAGE | STORIES | GROSS SQUARE FOOTAGE |
| A | 1, 10, 12 | [illegible] | 2 | [illegible] |
| B | 5, 6, 8, 16, 17 | [illegible] | 3 | [illegible] |
| C | 2, 6, 13 | [illegible] | 3 | [illegible] |
| D | 3, 4 | [illegible] | 3 | [illegible] |
| E | 12, 18 | [illegible] | 2 | [illegible] |
| F | 7, 11, 14, 15 | [illegible] | 3 | [illegible] |




WEST LINE DETAIL NOT TO SCALE

## VICINITY MAP

NOT TO SCALE




SHEET 1 OF 2

PROJECT NO.

LAND AREA

PARKING

## FLOOD INFORMATION

## GENERAL NOTES

## ALTA/NSPS LAND TITLE SURVEY

RESERVE AT CANYON CREEK – SAN ANTONIO
12235 VANCE JACKSON ROAD
SAN ANTONIO, BEXAR COUNTY, TEXAS

## BEARING BASIS

## SITE PICTURES



## SURVEYOR'S CERTIFICATE

TO: [illegible] Chicago Title Insurance Company and Consolidated Consulting Group, LLC

THIS IS TO CERTIFY THAT THIS MAP OR PLAT AND THE SURVEY ON WHICH IT IS BASED WERE MADE IN ACCORDANCE WITH THE 2021 MINIMUM STANDARD DETAIL REQUIREMENTS FOR ALTA/NSPS LAND TITLE SURVEYS, JOINTLY ESTABLISHED AND ADOPTED BY ALTA AND NSPS, AND INCLUDES ITEMS 1, 2, 3, 4, 6a, 6b, 7a, 7b1, 7c, 8, 9, 10, 11(a), 13, 14, 16, 17, 18, & 19 OF TABLE A THEREOF.

THE FIELDWORK WAS COMPLETED ON 10/23/2024

DATE OF PLAT OR MAP: 10/10/2024

PRELIMINARY
THIS SURVEY IS FOR REVIEW PURPOSES ONLY.

ZONING DATA

1" = 80'

TR/BD/WP

MC

STATEMENT OF ENCROACHMENTS

A BUILDING OVER ZONING SETBACK
B SEE DETAIL

Benchmark Group of Texas, Inc.

LAND SURVEYORS


SHEET 2 OF 2
VANCE JACKSON ROAD
(CALLED 86' PUBLIC RIGHT-OF-WAY)
S 05°32'08"E 246.10'
(S 05°32'33"E 246.12')
WOODSTONE DRIVE
N 00°09'30"W 669.58'
N 00°30'25"E 526.82'
N 00°04'14"W 657.45'
ALTA/NSPS LAND TITLE SURVEY
Benchmark Group of Texas, Inc.
STATEMENT OF ENCROACHMENTS
LEGEND

Exhibit C

Dinsmore

*Legal Counsel.*

DINSMORE & SHOHL LLP
255 East Fifth Street ^ Suite 1900
Cincinnati, OH 45202
www.dinsmore.com

Natalie H Rauf
(513) 977-8685 (direct) ^ (513) 977-8141 (fax)
natalie.rauf@dinsmore.com

Steadfast Asset Holdings, Inc.
18100 Von Karman Ave., Suite 500
Irvine, CA 92612
Attn: Bill Stoll and Ana Marie del Rio, Esq.
Email: Bill.Stoll@steadfastco.com
Email: AnaMarie.delRio@steadfastco.com

BCLP LLP
120 Broadway, Suite 300
Santa Monica, CA 90401
Attn: Vanessa Sunshine
Email: vanessa.sunshine@bclplaw.com

Re: Supplemental Title Disapproval Notice
Agreement of Sale and Purchase dated September 17, 2024, as amended (the "Purchase Agreement").
12235 Vance Jackson Road, San Antonio, TX (the "Property")

Dear Mr. Stoll and Ms. Del Rio

As you may know, we are outside counsel with respect to the Seller. On behalf of Seller, we are in receipt of the Supplemental Title Disapproval Notice, dated October 28, 2024 (the "Supplemental Notice"), which supplements Purchaser's Title Disapproval Notice dated October 9, 2024 (the "Original Notice").

Reference is made to: (a) Chicago Title Insurance Company's Commitment for Title Insurance No. CTD-13-470013240131-AM dated September 10, 2024 (the "Title Commitment"); and (b) preliminary ALTA survey prepared by David Henderson of Benchmark Group of Texas, Inc. noting fieldwork completed on October 23, 2024 ("the "Updated Survey").

We are providing Seller's response to the Supplemental Title Disapproval Notice, as follows:

**SCHEDULE A- OBJECTIONS**

| No. | Description | Action/Required Information | Seller Response |
|---|---|---|---|
| A1 | Property Address | REFERENCE:<br>12235 Vance Jackson Road, San Antonio, Texas 78230 | No action is required from Seller; this is a Title Company item |
| A2 | Issuing Office Information | ADD:<br>Please add issuing office information. | No action is required from Seller; this is a Title Company item |
| A3 | Effective Date | ADD:<br>Please insert TBD | No action is required from Seller; this is a Title Company item |
| A4 | Owner's Policy Proposed Insured | ADD:<br>Please insert TBD | No action is required from Seller; this is a Title Company item |

| | | | |
|---|---|---|---|
| A5 | Owner's Policy Amount | ADD: Insert $64250,000.00 | No action is required from Seller; this is a Title Company item |
| A6 | Loan Policy Proposed Amount & Insured | ADD: TBD | No action is required from Seller; this is a Title Company item |
| A7 | Legal Description | a) Add Tax Parcel Id<br>b) Legal description. | a) Title Company item<br>**b) Please see detailed response below.** |

**With respect to Purchase's Schedule A(7)(b) assertions regarding the potential overlap, Seller believes that Purchaser's surveyor may have made an error. As Purchaser is aware, Seller is facilitating a discussion between Purchaser's surveyor and Seller's surveyor. Seller has also requested information from the Title Company pertaining to the neighboring owners' legal descriptions. As of the date of this response, Seller has insufficient information to commit to a specific course of action, but Seller is working with the Title Company to confirm Purchaser will be able to obtain an Owner's policy of title insurance insuring the Property as described in the Title Commitment.**

**SCHEDULE B- EXCEPTIONS**

| No. | Recording | Action | Seller Response |
|---|---|---|---|
| B2 | None | DELETE. | No action is required from Seller; this is a Title Company item. |
| B3 | None | DELETE. | No action is required from Seller; this is a Title Company item |
| B4 | None | DELETE. | No action is required from Seller; this is a Title Company item |
| B5 | None. | CONDITIONAL APPROVAL:<br>a) All taxes current/prorated as of Closing Date, as provided in Agreement of Sale and Purchase.<br>b) Title Company include "none dude at date of policy" | a) Seller will prorate taxes as provided in the Purchase Agreement.<br>b) No action is required from Seller; this is a Title Company item. |
| B6 | None. | DELETE. | Seller will provide a Deed in the form prescribed in the Purchase Agreement. Deletion from exceptions is a Title Company item. |
| B7 & 8 | None. | DELETE. | Seller will cause documentation to be delivered to Title Company sufficient to release/remove Exceptions 7 & 8. |
| B9 | None | DELETE. | No action is required from Seller; this is a Title Company item. |
| B10a | None | REVISE:<br>a) Revise exception language. | a) Title Company Item. |

| | | | |
|---|---|---|---|
| | | b) Seller must provide Title Company documents to revise exception pursuant to Section 8.1.6 of the Agreement of Purchase and Sale. | b) Seller will comply with 8.1.6 of the Purchase Agreement, and deliver required documents to Title Company. |
| B10b | None | DELETE. | No Seller response required. |
| B10c | None | CONDITIONAL APPROVAL. | No Seller response required. |
| B10d | None | DELETE. | No action is required from Seller; this is a Title Company item |
| B10e | None | CONDITIONAL APPROVAL. | (i) No action is required from Seller; this is a Title Company item<br>(ii) Purchaser has received its zoning report. |
| B10f& g | None | CONDITIONAL APPROVAL. | No action is required from Seller; this is a Title Company item |
| B10h | None | CONDITIONAL APPROVAL. | No action is required from Seller; this is a Title Company item. |
| B10i | 8521/1042 | CONDITIONAL APPROVAL/REVISE. | No action is required from Seller; this is a Title Company item |
| B10j | None | CONDITIONAL APPROVAL/REVISE. | No action is required from Seller; this is a Title Company item. |
| B10k | 7459/314<br>9452/102 | CONDITIONAL APPROVAL/REVISE. | No action is required from Seller; this is a Title Company item. |
| B10l | 8174/1612 | CONDITIONAL APPROVAL/REVISE. | (i) and (ii) No action is required from Seller; this is a Title Company item;<br><br>**(iii) The Updated Survey does not reflect any encroachment by Garage PS 4 into the easement area. Seller will take no action with respect to this item.** |
| B10m | 9715/831 | CONDITIONAL APPROVAL/REVISE. | No action is required from Seller; this is a Title Company item. |
| B10n | 8290/1023 | CONDITIONAL APPROVAL/REVISE. | No action is required from Seller; this is a Title Company item. |
| B10o | 15751/2069<br>15751/2069 | CONDITIONAL APPROVAL/REVISE. | (ii) The Time Warner agreement referenced in 10(o) is no longer in effect and has been superseded and replaced with the agreement referenced in the License Agreement with Spectrum listed as 10(r). Seller will provide such documentation as needed to either |

| | | | |
|---|---|---|---|
| | | | remove exception 10(o) and/or combine it with exception 10(r). |
| B10p | 8174/2029 | CONDITIONAL APPROVAL/REVISE. | Seller has provided Purchaser with all service agreements in its records pertaining to the Property. To Seller's knowledge, this item is no longer in effect. |
| B10q | 8197/1421, 2029 | CONDITIONAL APPROVAL/REVISE.<br>ii) Provide confirmation that Contract is still in effect, and to the extent not in effect, provide Title Company with evidence for the removal of the exception.<br>iii) Seller provide copy of Contract. | Seller has provided Purchaser with all service agreements in its records pertaining to the Property. To Seller's knowledge, the Contract referenced in this item is no longer in effect. |
| B10r | None. | CONDITIONAL APPROVAL/REVISE. | No action is required from Seller; this is a Title Company item. |

**SCHEDULE C- REQUIREMENTS**

| | | | |
|---|---|---|---|
| C1 | None. | Purchaser requires that Seller satisfy the requirements and release of record those items set forth in Schedule C that are applicable to Seller. | Seller will provide Title Company with documents, funds/affidavits sufficient to satisfy Schedule C, so long as satisfaction of the requirement, releases and the expectation of their delivery are applicable to Seller and do not increase Seller's obligations beyond what was agreed in the Purchase Agreement. |

**ENDORSEMENTS**. Seller will take such action as needed to issue the Purchaser's requested endorsements as is (1) required under the Purchase Agreement; and/or (2) as agreed in this response. With respect to the forms of the endorsements and their availability, Seller refers Purchaser to the Title Company.

**SURVEY**. With respect to the Update Survey, Purchaser references encroachments into building setback lines and heights in excess of 35 feet. Seller has previously provided Purchaser with a copy of a Standard Zoning Report prepared by JLL Valuation & Advisory dated June 18, 2024. Section 5.1 of such report addresses these concerns with the statement "The subject property was legally constructed in 1999, prior to the adoption of the current City of San Antonio Zoning Code in 2006. As such, the existing nonconformities are considered to be pre-existing, grandfathered Legal Nonconforming."

**<u>CONCLUSION</u>**:

For the avoidance of doubt: (a) Seller has only agreed to take such actions as set forth in the Purchase Agreement and in this response; and (b) no statements made in the Original Notice, the Supplemental Notice or in this response will deem to waive or limit any of Seller's rights, remedies or options contained in the Purchase Agreement, nor shall the Original Notice or the Supplemental Notice be deemed to modify in any respect the terms of the Agreement.

Sincerely,

Natalie H. Rauf

Natalie H. Rauf

cc: Alex Sibilsky
Dakota Hoffman

Exhibit D

Vanessa Sunshine
Direct: (310) 576-2181
vanessa.sunshine@bclplaw.com

November 4, 2024

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS OVERNIGHT DELIVERY**

Reserve at Canyon Creek TIC 1, LLC
10510 Springboro Pike
Miamisburg, Ohio 45342
Attn: Brock Wright and Kevin Hyland
Email: bwright@connorgroup.com
Email: khyland@connorgroup.com

Chicago Title Insurance Company
One Dayton Centre
One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com

**TERMINATION NOTICE**

Re: Agreement of Sale and Purchase dated September 17, 2024 (the "Original PSA"), executed by and between Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), and STEADFAST ASSET HOLDINGS, INC., a California corporation ("Purchaser"), as amended by that certain First Amendment to Agreement of Sale and Purchase dated as of October 9, 2024 ("First Amendment"), and that certain Second Amendment to Agreement of Sale and Purchase dated as of October 16, 2024 ("Second Amendment", and collectively with the Original PSA and the First Amendment, the "Purchase Agreement"), for the contemplated sale and purchase of all Seller's right, title and interest in and to that certain land located at 12235 Vance Jackson Road, San Antonio, Texas 78230 (the "Property") together with all improvements located on the Property. Capitalized terms not defined in this Termination Notice shall have the respective meanings assigned to such terms in the Purchase Agreement.

Ladies & Gentlemen:

As you know, this law firm represents Purchaser with respect to the Purchase Agreement.

We are in receipt of Seller's response to Purchaser's Supplemental Title Disapproval Notice delivered on November 1, 2024, pursuant to which Seller did not agree to cure or eliminate certain of Purchaser's title and survey objections. Accordingly, pursuant to Section 3.3 of the Purchase Agreement (as amended by the terms and provisions of the Second Amendment), Purchaser is hereby electing to terminate the Purchase Agreement and this letter shall constitute Purchaser's notice of the same in accordance with the terms of Section 3.3 of the Purchase Agreement. Accordingly, Purchaser hereby instructs Escrow Agent to immediately return the Earnest Money (together with any interest accrued thereon) to Purchaser in accordance with the terms of the Purchase Agreement.

Please feel free to contact me with any questions.

Very truly yours,

Vanessa A. Sunshine

cc: Bill Stoll (via email Bill.Stoll@steadfastco.com)
Ana Marie del Rio (via email AnaMarie.delRio@steadfastco.com)
Taylor Thornburgh (via email Taylor.Thornburch@bclplaw.com)
Talia Housik (via email Talia.Housik@bclplaw.com)
Sherrie Courtney (via email Sherrie.Courtney@bclplaw.com)

Exhibit E

## HAVE A COMPLAINT OR NEED HELP?

If you have a problem with a claim or your premium, call your insurance company or HMO first. If you can't work out the issue, the Texas Department of Insurance may be able to help.

Even if you file a complaint with the Texas Department of Insurance, you should also file a complaint or appeal through your insurance company or HMO. If you don't, you may lose your right to appeal.

**Chicago Title Insurance Company**

To get information or file a complaint with your insurance company or HMO:

**Call: Intake Supervisor at 402-498-7000**

**Toll-free: 888-453-4095**

Online: www.ctic.com
Email: claimsinquiries@fnf.com
Mail:
2533 North 117th Avenue
Omaha, NE 68164

**The Texas Department of Insurance**

To get help with an insurance question or file a complaint with the state:

Call with a question: 1-800-252-3439
File a complaint: www.tdi.texas.gov
Email: ConsumerProtection@tdi.texas.gov
Mail:
Consumer Protection, MC: CO-CP
Texas Department of Insurance
P.O. Box 12030
Austin, TX 78711-2030

## ¿TIENE UNA QUEJA O NECESITA AYUDA?

Si tiene un problema con una reclamación o con su prima de seguro, llame primero a su compañía de seguros o HMO. Si no puede resolver el problema, es posible que el Departmento de Seguros de Texas (Texas Department of Insurance, por su nombre en inglés) pueda ayudar.

Aun si usted presenta una queja ante el Departmento de Seguros de Texas, también debe presentar una queja a través del proceso de quejas o de apelaciones de su compañía de seguros o HMO. Si no lo hace, podría perder su derecho para apelar.

**Chicago Title Insurance Company**

Para obtener información o para presentar una queja ante su compañía de seguros o HMO:

**Llame a: Intake Supervisor al 402-498-7000**

**Teléfono gratuito: 888-453-4095**

En línea: www.ctic.com
Correo electrónico: claimsinquiries@fnf.com
Dirección postal:
2533 North 117th Avenue
Omaha, NE 68164

**El Departmento de Seguros de Texas**

Para obtener ayuda con una pregunta relacionada con los seguros o para presentar una queja ante el estado:

Llame con sus preguntas al: 1-800-252-3439
Presente una queja en: www.tdi.texas.gov
Correo electrónico: ConsumerProtection@tdi.texas.gov
Dirección postal:
Consumer Protection, MC: CO-CP
Texas Department of Insurance
P.O. Box 12030
Austin, TX 78711-2030

# OWNER'S POLICY OF TITLE INSURANCE (T-1)

Issued By:

**Chicago Title Insurance Company**

Policy Number:

**PROFORMA**

**Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.**

COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, CHICAGO TITLE INSURANCE COMPANY, a Florida corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from:
   (a) A defect in the Title caused by:
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land. [This coverage is deleted by Schedule B. Exceptions From Coverage. Paragraph 2, unless a survey of the Land acceptable to Company is timely provided and the applicable premium is paid to amend the exception to "shortages in area."]
   (d) Any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or materials having its inception on or before Date of Policy.
3. Lack of good and indefeasible Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:
   (a) the occupancy, use or enjoyment of the Land;
   (b) the character, dimensions or location of any improvement erected on the Land;
   (c) subdivision of land; or

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

(continued)

(d) environmental protection

if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.
7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.
8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.
9. Title being vested other than as stated in Schedule A or being defective:
   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws; or
   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws by reason of the failure of its recording in the Public Records:
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or a judgment or lien creditor.
10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

**Chicago Title Insurance Company**
By:

**Issued By:**

**Chicago Title Insurance Company**

PROFORMA
Michael J. Nolan, President

Attest:

PROFORMA
Authorized Signatory

PROFORMA
Marjorie Nemzura, Secretary

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

(continued)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions or location of any improvement erected on the Land;
   (iii) subdivision of land; or
   (iv) environmental protection;

   or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is:
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.
6. The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A because of Unmarketable Title.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

# OWNER'S POLICY OF TITLE INSURANCE (T-1)

## SCHEDULE A

Name and Address of Title Insurance Company:
Chicago Title Insurance Company
P.O. Box 45023
Jacksonville, FL 32232-5023

| | |
|---|---|
| GF No.: | CTD-13-470013240131 |
| Policy No.: | PROFORMA |
| Address for Reference only: | 12235 Vance Jackson Road, San Antonio, TX 78230 |
| Amount of Insurance: | PROFORMA |
| Premium: | PROFORMA |
| Date of Policy: | Date and time of recording |

1. Name of Insured:

   Steadfast Asset Holdings, Inc., a California corporation

2. The estate or interest in the Land that is insured by this policy is:

   Fee Simple

3. Title is insured as vested in:

   Steadfast Asset Holdings, Inc., a California corporation

4. The land referred to in this policy is described as follows:

   Tract 1:

   Lot 10, Block 1, New City Block 16093, HAVERHILL II, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas.

   Tract 2:

   Lot 9, Block 1, New City Block 16093, WOODLAND HILLS, UNIT 4, City of San Antonio, Bexar County, Texas, according to plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas.

   FOR REFERENCE ONLY: CAD TAX ACCOUNT NO. 605360

**END OF SCHEDULE A**

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE

Policy No.: PROFORMA GF No.: CTD-13-470013240131

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of the leases and easements, if any, shown in Schedule A, and the following matters:

1. Item 1, Schedule B is hereby deleted in its entirety.

2. Shortages in area.

3. Homestead or community property or survivorship rights, if any, of any spouse of any Insured.

4. Any title or rights asserted by anyone, including, but not limited to, persons, the public, corporations, governments or other entities,

   a. to tidelands, or lands comprising the shores or beds or navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or

   b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or

   c. to filled-in lands, or artificial islands, or

   d. to statutory water rights, including riparian rights, or

   e. to the area extending from the line of mean low tide to the line of vegetation, or the rights of access to that area or easement along and across that area.

5. Standby fees, taxes and assessments by any taxing authority for the year 2024 and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax years.

6. The following matters and all terms of the documents creating or offering evidence of the matters (The Company must insert matters or delete this exception):

   a. Rights of tenants, as residential tenants only, under unrecorded leases and/or agreements, with no options to purchase, rights of first refusal, or rights of first offer.

   b. Deleted.

   c. All leases, grants, exceptions or reservations of coal, lignite, oil, gas and other minerals, together with all rights, privileges, and immunities relating thereto, appearing in the Public Records whether listed in Schedule B or not. There may be leases, grants, exceptions or reservations of mineral interest that are not listed.

   d. Deleted.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

**SCHEDULE B**
**EXCEPTIONS FROM COVERAGE**
(continued)

e. 25 foot building setback line as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas, and shown on survey prepared by David M. Henderson, RPLS# 4489, dated October 10, 2024, last revised October 27, 2024 (the "Survey"). (Tract 1)

f. 14 foot electric, gas, telephone and cable television easement as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas, and shown on the Survey. (Tract 1)

g. Variable width drainage easement as shown on plat recorded in Volume 9542, Page 103, Deed and Plat Records, Bexar County, Texas, and shown on the Survey. (Tract 1)

h. 25 foot building setback line as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas, and shown on the Survey. (Tract 2)

i. 14 foot electric, gas, telephone and cable television easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas. As affected by the terms and conditions of that Consent and Indemnity Agreement executed August 2, 2000, filed for record on August 7, 2000, in Volume 8521, Page 1042, Real Property Records, Bexar County, Texas, and shown on the Survey. (Tract 2)

j. Variable width drainage easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas, and shown on the Survey. (Tract 2)

k. 16 foot sanitary sewer easement as shown on plat recorded in Volume 9542, Page 102, Deed and Plat Records, Bexar County, Texas and recorded in Volume 7459, Page 314, Deed Records, Bexar County, Texas, and shown on the Survey. (Tract 2)

l. Electric and Gas Lines Right-of-Way Agreement executed September 7, 1999, filed for record on October 20, 1999, in Volume 8174, Page 1612, Real Property Records, Bexar County, Texas, and shown on the Survey. (Tracts 1 and 2)

m. Electric Line Right-of-Way Agreement executed December 3, 1999, filed for record on December 9, 2002, in Volume 9715, Page 831, Real Property Records, Bexar County, Texas, and shown on the Survey. (Tract 2)

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

n. An unrecorded lease by and between Palermo Apartments, Ltd. and Coinmach Corporation as evidenced by that Coinmach Corporation Memorandum of Lease executed December 9, 1999, filed for record on January 31, 2000, in Volume 8290, Page 1023, Real Property Records, Bexar County, Texas, and noted on the Survey. (Tract 1)

o. Terms and conditions of that Memorandum of Agreement executed August 18, 2011, filed for record on October 18, 2012 in Volume 15751, Page 2069, Real Property Records, Bexar County, Texas, and noted on the Survey. (Tracts 1 and 2)

To be deleted upon a statement in the title affidavit that the underlying service agreement in Easement and Memorandum Agreement recorded in Book 15751, Page 2069 has been terminated and superseded by the service agreement in Document No. 20210257224, Schedule B, item 10r.

p. Terms and conditions of that Application and Agreement for Service Effective September 16, 1999, filed for record on October 20, 1999, in Volume 8174, Page 2029, Real Property Records, Bexar County, Texas, and noted on the Survey. (Tracts 1 and 2)

Title will require a recordable affidavit of termination to remove this exception.

q. Terms and conditions of that Memorandum of Contract executed October 1, 1999, filed for record on November 8, 1999 in Volume 8197, Page 1421, Real Property Records, Bexar County, Texas, and noted on the Survey. (Tract 1)

Title will require a recordable affidavit of termination to remove this exception.

r. Matters contained in that Grant of License:

Granted to: Spectrum Gulf Coast, LLC
Purpose: telecommunications
Recording Date: September 15, 2021
Recording No.: Clerk's File No. 20210257224, Official Public Records of Bexar County, Texas, and noted on the Survey. (Tracts 1 and 2)

s. Overlap of boundaries along the west line of property noted and shown on the Survey.

t. Any rights, easements, interests or claims which may exist by reason of or reflected by encroachment/protrusion of fences shown on the Survey.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

## SCHEDULE B
## EXCEPTIONS FROM COVERAGE
(continued)

u. A deed of trust to secure an indebtedness in the amount shown below,

Amount: $
Dated:
Trustor/Grantor:
Trustee:
Beneficiary:
Loan No.:
Recording Date:
Recording No:

v. Section 14 of the Conditions of this policy is hereby deleted.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

## CONDITIONS

**1. DEFINITION OF TERMS.**

The following terms when used in this policy mean:

(a) "Amount of Insurance": the amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.

(b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.

(c) "Entity": A corporation, partnership, trust, limited liability company or other similar legal entity.

(d) "Insured": the Insured named in Schedule A..

(i) The term "Insured" also includes:

(A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives or next of kin;

(B) successors to an Insured by dissolution, merger, consolidation, distribution or reorganization;

(C) successors to an Insured by its conversion to another kind of Entity;

(D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title:

(1) If the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,

(2) If the grantee wholly owns the named Insured,

(3) If the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or

(4) If the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.

(ii) With regard to (A), (B), (C) and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.

(e) "Insured Claimant": an Insured claiming loss or damage.

(f) "Knowledge" or "Known": actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.

(g) "Land": the land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.

(h) "Mortgage": mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.

(i) "Public Records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.

(j) "Title": the estate or interest described in Schedule A.

(k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease or lend if there is a contractual condition requiring the delivery of marketable title.

**2. CONTINUATION OF INSURANCE.**

The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3. NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**

The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) below, or (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

When, after the Date of the Policy, the Insured notifies the Company as required herein of a lien, encumbrance, adverse claim or other defect in Title insured by this policy that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect or other matter is valid and not barred by law or statute. The Company shall notify the Insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the Insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall specifically advise the Insured of the reasons for its determination. If the Company concludes that the lien, encumbrance, adverse claim or defect is valid, the Company shall take one of the following actions: (i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect from the Title as insured; (ii) indemnify the Insured as provided in this policy; (iii) upon payment of appropriate premium and charges therefore, issue to the Insured Claimant or to a subsequent owner, mortgagee or holder of the estate or interest in the Land insured by this policy, a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect, said policy to be in an amount equal to the current value of the Land or, if a loan policy, the amount of the loan; (iv) indemnify another title insurance company in connection with its issuance of a policy(ies) of title insurance without exception for the lien, encumbrance, adverse claim or defect; (v) secure a release or other document discharging the lien, encumbrance, adverse claim or defect; or (vi) undertake a combination of (i) through (v) herein.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

(continued)

**4. PROOF OF LOSS.**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

**5. DEFENSE AND PROSECUTION OF ACTIONS.**

(a) Upon written request by the Insured, and subject to the options contained in Sections 3 and 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Sections 3 and 7, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction and it expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

**6. DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, emails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**7. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay.

Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**8. DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

(continued)

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of:
  (i) the Amount of Insurance; or
  (ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 3 or 5 and is unsuccessful in establishing the Title, as insured:
  (i) the Amount of Insurance shall be increased by 10%; and
  (ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9. LIMITATION OF LIABILITY.**

(a) If the Company establishes the Title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the Land, all as insured, or takes action in accordance with Section 3 or 7, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the Amount of Insurance by the amount of the payment.

**11. LIABILITY NONCUMULATIVE.**

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

**12. PAYMENT OF LOSS.**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT.**

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies. If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

**14. ARBITRATION.**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim, shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. Each Commitment, endorsement or other form, or provision in the Schedules to this policy that refers to a term defined in Section 1 of the Conditions shall be deemed to refer to the term regardless of whether the term is capitalized in the Commitment, endorsement or other form, or Schedule.

Each Commitment, endorsement or other form, or provision in the Schedules that refers to the Conditions and Stipulations shall be deemed to refer to the Conditions of this policy.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

(continued)

**16. SEVERABILITY.**
In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid and all other provisions shall remain in full force and effect.

**17. CHOICE OF LAW; FORUM.**

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies or enforcement of policies of title insurance of the jurisdiction where the Land is located.
Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured, and in interpreting and enforcing the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of laws principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**18. NOTICES, WHERE SENT.**
Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company at National Claims Administration, P.O. Box 45023, Jacksonville, FL 32232-5023.

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

| Office File Number | Policy Jacket Number | Date of Endorsement | Amount of Insurance | Type | Premium | Code | Rule |
|---|---|---|---|---|---|---|---|
| 1 470013240131 | 2 PROFORMA SPECIMEN | 3 PROFORMA SPECIMEN | 4 PROFORMA SPECIMEN | 5 EN | 6 PROFORMA SPECIMEN | 9 0806_O | n/a |

# ENDORSEMENT -T-25.1 CONTIGUITY

Issued By:

**Chicago Title Insurance Company**

Attached to Policy Number:

**PROFORMA SPECIMEN**

The Company insures against loss or damage sustained by the insured by reason of the presence of any gaps, strips, or gores lying between Tracts 1 and 2.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated: PROFORMA SPECIMEN

Issued By:

**Chicago Title Insurance Company**

PROFORMA SPECIMEN

Authorized Officer or Agent

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

| Office File Number | Policy Jacket Number | Date of Endorsement | Amount of Insurance | Type | Premium | Code | Rule |
|---|---|---|---|---|---|---|---|
| 1 470013240131 | 2 PROFORMA SPECIMEN | 3 PROFORMA SPECIMEN | 4 PROFORMA SPECIMEN | 5 EN | 6 PROFORMA SPECIMEN | 9 0890_O | R-30 |

# ENDORSEMENT -T-23 ACCESS

Issued By:

**Chicago Title Insurance Company**

Attached to Policy Number:

**PROFORMA SPECIMEN**

The Company insures against loss or damage sustained by the insured if, at Date of Policy: (i) the land does not abut and have both actual vehicular and pedestrian access to and from Vance Jackson Road (Tracts 1 and 2) (the "Street"), or (ii) the Street is not physically open.

This endorsement is made a part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated: PROFORMA SPECIMEN

Issued By:

**Chicago Title Insurance Company**

PROFORMA SPECIMEN

Authorized Officer or Agent

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

| Office File Number | Policy Jacket Number | Date of Endorsement | Amount of Insurance | Type | Premium | Code | Rule |
|---|---|---|---|---|---|---|---|
| 1 470013240131 | 2 PROFORMA SPECIMEN | 3 PROFORMA SPECIMEN | 4 PROFORMA SPECIMEN | 5 EN | 6 PROFORMA SPECIMEN | 9 0890_O | R-30 |

# ENDORSEMENT -T-23 ACCESS

Issued By:

**Chicago Title Insurance Company**

Attached to Policy Number:

**PROFORMA SPECIMEN**

The Company insures against loss or damage sustained by the insured if, at Date of Policy: (i) the land does not abut and have both actual vehicular and pedestrian access to and from Woodstone Drive (Tract 2) (the "Street"), or (ii) the Street is not physically open.

This endorsement is made a part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated: PROFORMA SPECIMEN

Issued By:

**Chicago Title Insurance Company**

PROFORMA SPECIMEN
Authorized Officer or Agent

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

| Office File Number | Policy Jacket Number | Date of Endorsement | Amount of Insurance | Type | Premium | Code | Rule |
|---|---|---|---|---|---|---|---|
| 1 470013240131 | 2 PROFORMA SPECIMEN | 3 PROFORMA SPECIMEN | 4 PROFORMA SPECIMEN | 5 EN | 6 PROFORMA SPECIMEN | 9 0801_24 | R-29.1 |

# ENDORSEMENT - T-19.2 MINERALS AND SURFACE DAMAGE

Issued By:

**Chicago Title Insurance Company**

Attached to Policy Number:

**PROFORMA SPECIMEN**

Applies to Parcel(s) All

The Company insures the insured against loss which the insured shall sustain by reason of damage to improvements (excluding crops, landscaping, lawn, shrubbery, or trees) located on the Land on or after Date of Policy resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of coal, lignite, oil, gas or other minerals or any other subsurface substances excepted or excluded on Schedule A, Item 2, or excepted in Schedule B.

This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

1. contamination, explosion, fire, fracturing, vibration, earthquake, flood, or subsidence; or
2. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated: PROFORMA SPECIMEN

Issued By:

**Chicago Title Insurance Company**

PROFORMA SPECIMEN

Authorized Officer or Agent

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

| Office File Number | Policy Jacket Number | Date of Endorsement | Amount of Insurance | Type | Premium | Code | Rule |
|---|---|---|---|---|---|---|---|
| 1 470013240131 | 2 PROFORMA SPECIMEN | 3 PROFORMA SPECIMEN | 4 PROFORMA SPECIMEN | 5 EN | 6 PROFORMA SPECIMEN | 9 0897_24 | R-29C |

# ENDORSEMENT - T-19.1

# RESTRICTIONS, ENCROACHMENTS, MINERALS - OWNER'S POLICY

Issued By:

**Chicago Title Insurance Company**

Attached to Policy Number:

**PROFORMA SPECIMEN**

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.
2. For the purposes of this endorsement only:
   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.
   b. "Improvement" means a building, structure, road, walkway, driveway, or curb, affixed to either the Land or adjoining land and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.
   c. "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.
3. The Company insures against loss or damage sustained by the Insured by reason of:
   a. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;
   b. Enforced removal of an Improvement located on the Land at Date of Policy as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation;
   c. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation; or
   d. Enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy that causes a loss of the Insured's Title.
4. The Company insures against loss or damage sustained by reason of:
   a. An encroachment of:
      i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or
      ii. an Improvement located on adjoining land onto the Land at Date of Policy

      unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i. or 4.a.ii.; or
   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

c. Damage to an Improvement located on the Land, at Date of Policy that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

d. Damage to Improvements located on the Land on or after Date of Policy, resulting from the future exercise of any right existing at Date of Policy to use the surface of the Land for the extraction or development of coal, lignite, oil, gas or other minerals or any other subsurface substances excepted or excluded on Schedule A, Item 2, or excepted in Schedule B.

5. This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a. any Covenant contained in an instrument creating a lease;

   b. any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c. except as provided in Paragraph 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

   d. contamination, explosion, fire, fracturing, vibration, earthquake, flood, or subsidence; or

   e. negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Dated: PROFORMA SPECIMEN

Issued By:

**Chicago Title Insurance Company**

PROFORMA SPECIMEN
Authorized Officer or Agent

This is a Pro Forma Policy furnished to or on behalf of the party proposed to be insured for discussion only. It does not reflect the present status of title and is not a commitment to insure the estate or interest as shown herein, nor does it evidence the willingness of the Company to provide any coverage shown herein. Any such commitment must be an express written undertaking issued on the appropriate forms of the Company.

Exhibit F

BCLP.
Bryan Cave Leighton Paisner

BRYAN CAVE LEIGHTON PAISNER LLP
120 Broadway Suite 300
Santa Monica CA 90401 2386
T: +1 310 576 2100
F: +1 310 576 2200
bclplaw.com

Vanessa Sunshine
Direct: (310) 576-2181
vanessa.sunshine@bclplaw.com

November 25, 2024

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS OVERNIGHT DELIVERY**

Reserve at Canyon Creek TIC 1, LLC
10510 Springboro Pike
Miamisburg, Ohio 45342
Attn: Brock Wright and Kevin Hyland
Email: bwright@connorgroup.com
Email: khyland@connorgroup.com

Chicago Title Insurance Company
One Dayton Centre
One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com

**SUPPLEMENTAL TERMINATION NOTICE**

Re: Agreement of Sale and Purchase dated September 17, 2024 (the "Original PSA"), executed by and between Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), and STEADFAST ASSET HOLDINGS, INC., a California corporation ("Purchaser"), as amended by that certain First Amendment to Agreement of Sale and Purchase dated as of October 9, 2024 ("First Amendment"), and that certain Second Amendment to Agreement of Sale and Purchase dated as of October 16, 2024 ("Second Amendment", and collectively with the Original PSA and the First Amendment, the "Purchase Agreement") for the contemplated sale and purchase of all Seller's right, title and interest in and to that certain land located at 12235 Vance Jackson Road, San Antonio, Texas 78230 (the "Property") together with all improvements located on the Property, which Purchase Agreement was terminated pursuant to that certain Termination Notice sent by Purchaser to Seller on November 4, 2024 (the "Termination Notice"). Capitalized terms not defined in this notice ("Supplemental Notice") shall have the respective meanings assigned to such terms in the Purchase Agreement; CTT Commitment No. CTD-13-470013240131-AM

Ladies & Gentlemen:

As you are aware, the Purchase Agreement was terminated on November 4, 2024, pursuant to the Termination Notice. Purchaser has yet to receive a refund of the Earnest Money in accordance with the terms and conditions of the Purchase Agreement.

We are in receipt of email correspondence from Alex Sibilsky to Vanessa Sunshine dated November 11, 2024, implying that Purchaser is not entitled to a refund of the Earnest Money under the Purchase Agreement. Purchaser disagrees with that implication and is entitled to the immediate return of the Earnest Money.

The purpose of this Supplemental Notice is to restate Purchaser's termination of the Purchase Agreement effective as of November 4, 2024. Pursuant to the Termination Notice, Purchaser notified Seller that Purchaser elected to terminate the Purchase Agreement pursuant to, and in accordance with, the terms and provisions of Section 3.3 of the Purchase Agreement as a result of Seller's response to Purchaser's Supplemental Title Disapproval Notice delivered on November 1, 2024, wherein Seller did not agree to cure or eliminate certain of Purchaser's title and survey objections relating to a property line overlap, stating that Seller believed Purchaser's surveyor had "made an error," and that Seller had "insufficient information to commit to a specific course of action." Thereafter, Seller advised that Seller was investigating the asserted boundary line overlap. Notwithstanding the termination of the Purchase Agreement, Purchaser advised Seller that Purchaser intended to temporarily leave the Earnest Money in escrow as a good faith showing of its willingness to await the results of Seller's investigation of the boundary line overlap and that Purchaser would consider reinstating the Purchase Agreement if warranted under the circumstances.

On November 18, 2024, Mr. Sibilisky conceded that there was a boundary line overlap and proposed a course of action. Specifically, Seller's proposed cure was to convey only a portion of the Property that Purchaser agreed to purchase pursuant to the Purchase Agreement (leaving ownership and control of the overlap area unresolved). Purchaser was under no obligation to accept such proposal, as the Purchase Agreement had terminated 14 days earlier on November 4th. Further, Purchaser does not find the proposal an acceptable resolution of its property line overlap objection, so a reinstatement of the Purchase Agreement is not warranted.

Accordingly, Purchaser demands that Seller immediately execute the Release of Escrow Funds attached hereto as Schedule 1 and return the executed document to the Escrow Agent (copying Purchaser) as contemplated in Section 13.3 of the Purchase Agreement. Purchaser reserves all rights and remedies at law and in equity, including but not limited to those relating to the Purchase Agreement, the Property, and the Earnest Money held with the Escrow Agent.

Please feel free to contact me with any questions.

Very truly yours,

Vanessa A. Sunshine

cc: Natalie H. Rauf (via email Natalie.Rauf@DINSMORE.COM)
Alexander J. Sibilsky (via email asibilsky@connorgroup.com)
Dakota Hoffman (via email dhoffman@connorgroup.com)
Bill Stoll (via email Bill.Stoll@steadfastco.com)
Ryan Stottlemyer (via email Ryan.Stottlemyer@steadfastco.com)

Ana Marie del Rio (via email AnaMarie.delRio@steadfastco.com)
Taylor Thornburgh (via email Taylor.Thornburgh@bclplaw.com)
Talia Housik (via email Talia.Housik@bclplaw.com)
Sherrie Courtney (via email Sherrie.Courtney@bclplaw.com)

SCHEDULE 1

Release of Escrow Funds

[Attached]

# RELEASE OF ESCROW FUNDS

Traci Walker, Escrow Officer
Chicago Title Insurance Company
1 S. Main St., Suite 250
Dayton, OH 45402
Phone: (937)223-8378 Fax: 937-963-0843

**Order No.:** 38240365-TW
**Buyer(s):** Steadfast Asset Holdings, Inc., a California corporation
**Seller(s):** Reserve at Canyon Creek TIC 1, LLC, a Delaware limited liability company
Reserve at Canyon Creek TIC 2, LLC, a Delaware limited liability company, et al.
**Property:** 12235 Vance Jackson Road
San Antonio, TX 78230
**Escrow Agreement Dated:** September 17, 2024

We, the undersigned Seller and Buyer, in the referenced transaction do hereby authorize Chicago Title Insurance Company to release the funds held in connection in the following manner:

Escrow Funds in the amount of $1,000,000.00.

Pay $ 1,000,000.00 ______________ To: ______________

Pay $ ______________ To: ______________

Pay $ ______________ To: ______________

Pay $ ______________ To: ______________

We understand that unless and until Chicago Title Insurance Company has received identical instructions from all parties, it will continue to hold said escrowed funds under the terms of the agreement until such time as they become eligible for escheat to the State.

IN WITNESS WHEREOF, the undersigned have executed this document on the date(s) set forth below.

**BUYER(S):**

Steadfast Asset Holdings, Inc., a California corporation

______________________ ______________
By: Rodney F. Emery Date

# RELEASE OF ESCROW FUNDS
(continued)

**SELLER(S):**

Reserve at Canyon Creek TIC 1, LLC
Reserve at Canyon Creek TIC 2, LLC
Reserve at Canyon Creek TIC 2, LLC
Reserve at Canyon Creek TIC 4, LLC
Reserve at Canyon Creek TIC 5, LLC
Reserve at Canyon Creek TIC 6, LLC

____________________
Date

______________________________
By: Brock Wright
Its: Vice President

______________________________
By: Kevin Hyland
Its: Vice President

**SELLER(S):**

Reserve at Canyon Creek TIC 1, LLC
Reserve at Canyon Creek TIC 2, LLC
Reserve at Canyon Creek TIC 2, LLC
Reserve at Canyon Creek TIC 4, LLC
Reserve at Canyon Creek TIC 5, LLC
Reserve at Canyon Creek TIC 6, LLC

____________________
Date

______________________________
By: Brock Wright
Its: Vice President

______________________________
By: Kevin Hyland
Its: Vice President

# RELEASE OF ESCROW FUNDS
(continued)

Exhibit G

BCLP
Bryan Cave Leighton Paisner

BRYAN CAVE LEIGHTON PAISNER LLP
120 Broadway Suite 300
Santa Monica CA 90401 2386
T +1 310 576 2100
F +1 310 576 2200
bclplaw.com

Vanessa Sunshine
Direct: (310) 576-2181
vanessa.sunshine@bclplaw.com

November 27, 2024

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS OVERNIGHT DELIVERY**

Chicago Title Insurance Company
One Dayton Centre
One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com

**ESCROW INSTRUCTION**

Re: Agreement of Sale and Purchase dated September 17, 2024 (the "Original PSA"), executed by and between Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), and STEADFAST ASSET HOLDINGS, INC., a California corporation ("Purchaser"), as amended by that certain First Amendment to Agreement of Sale and Purchase dated as of October 9, 2024 ("First Amendment"), and that certain Second Amendment to Agreement of Sale and Purchase dated as of October 16, 2024 ("Second Amendment", and collectively with the Original PSA and the First Amendment, the "Purchase Agreement") for the contemplated sale and purchase of all Seller's right, title and interest in and to that certain land located at 12235 Vance Jackson Road, San Antonio, Texas 78230 (the "Property") together with all improvements located on the Property.
CTT Commitment No. CTD-13-470013240131-AM

Dear Ms. Pensyl:

Section 3.3 of the Purchase Agreement provides that "Purchaser shall have the right to elect to terminate [the Purchase Agreement] within five Business Days of receipt of written notice from Seller that Seller cannot or will not cure or eliminate" any of Purchaser's objections in Purchaser's Title Disapproval Notice, and "upon such election, all Earnest Money shall be immediately refunded to Purchaser." There is no requirement that Seller consent to the release of the Earnest Money under such circumstances.

On November 1, 2024, Seller sent written notice to Purchaser that Seller did not agree to cure or eliminate certain of Purchaser's title and survey objections relating to a property line overlap, stating that Seller believed Purchaser's surveyor had "made an error," and that Seller had "insufficient information to commit to a specific course of action." In response, Purchaser delivered to Seller that certain Termination Notice sent by Purchaser to Seller and Chicago Title Insurance Company ("CTT") on November 4, 2024 (the "Initial Termination Notice"). The Initial Termination Notice terminated the Purchase Agreement and instructed CTT to immediately release the Earnest Money (together with any interest accrued thereon) to Purchaser, in accordance with Section 3.3 of the Purchase Agreement.

On November 25, 2025, Purchaser sent a Supplemental Termination Notice reaffirming the termination that occurred on November 4, 2024, and memorializing Purchaser's intention not to reinstate the Purchase Agreement.

Accordingly, Purchaser hereby again instructs CTT to immediately release the Earnest Money (and all accrued interest thereon) to Purchaser in accordance with the terms of the Purchase Agreement. Wiring instructions are attached hereto as Schedule 1.

Purchaser reserves all rights and remedies at law and in equity, including but not limited to those relating to the Purchase Agreement and the Earnest Money held with the CTT.

Please feel free to contact me with any questions.

Very truly yours,

Vanessa A. Sunshine

cc:

Brock Wright (via email bwright@connorgroup.com)
Kevin Hyland (via email: khyland@connorgroup.com)
Natalie H. Rauf (via email Natalie.Rauf@DINSMORE.COM)
Alexander J. Sibilsky (via email asibilsky@connorgroup.com)
Dakota Hoffman (via email dhoffman@connorgroup.com)
Bill Stoll (via email Bill.Stoll@steadfastco.com)
Ryan Stottlemyer (via email Ryan.Stottlemyer@steadfastco.com)
Ana Marie del Rio (via email AnaMarie.delRio@steadfastco.com)
Taylor Thornburgh (via email Taylor.Thornburgh@bclplaw.com)
Talia Housik (via email Talia.Housik@bclplaw.com)
Sherrie Courtney (via email Sherrie.Courtney@bclplaw.com)

SCHEDULE 1

Purchaser's Wiring Instructions

[redacted]

Exhibit H

**From:** McGargill, Phil
**To:** Vanessa.Sunshine@bclplaw.com
**Cc:** Walker, Traci; Pensyl, Michelle; Brock Wright; Rauf, Natalie; Alex Sibilsky; Dakota Hoffman; Bill Stoll; Ryan Stottlemyer; Ana Marie del Rio; Taylor Thornburgh; Talia Housik; Sherrie Courtney; Kevin Hyland
**Subject:** RE: Reserves at Canyon Creek - Escrow Instruction (CTT No. 470013240131)
**Date:** Monday, December 2, 2024 3:20:05 PM
**Attachments:** image001.png

You don't often get email from phil.mcgargill@fnf.com. Learn why this is important

**External e-MAIL**

This message was sent securely using Zix®

Vanessa;
My apologies for the late response to your 11/27 e-mail. I am the manager for Chicago Title here in Ohio and as such, all issues like this come to me.
I am not reading paragraph 3.3 the same way you are. Paragraph 3.3 states: "...within five Business Days of receipt of written notice from Seller that Seller cannot or will not cure or eliminate such items..." My understanding is that we are not in receipt of any written notice from Seller that it cannot or will not cure or eliminate any issues. Alex's e-mail confirms that Seller is not taking the position that it cannot or will not cure or eliminate any issues you may have.
In addition, paragraph 13.3 requires authorization from both Seller and Purchaser prior to us being able to release the Earnest Money. The only exception listed is for paragraph 3.1, which involves the Inspection Period. We will continue to hold the Earnest Monday until such time as we have joint authorization to release.
Please let me know if I can address any other concerns or questions. Thank you.

**Phil McGargill**
Vice President, Manager

**Kentucky/Cincinnati/Dayton – National Commercial Services**
812 Lyndon Lane #205, Louisville, KY 40222
312 Walnut #2250, Cincinnati, OH 45202
One S. Main St. #250, Dayton, OH 45402
Direct: 513-337-5493 | Mobile: 402-779-5352 | phil.mcgargill@fnf.com

**From:** Vanessa A. Sunshine <Vanessa.Sunshine@bclplaw.com>
**Sent:** Wednesday, November 27, 2024 1:18 PM
**To:** Pensyl, Michelle <Michelle.Pensyl@CTT.com>
**Cc:** Kevin Hyland <khyland@connorgroup.com>; Brock Wright <bwright@connorgroup.com>; Rauf, Natalie <Natalie.Rauf@DINSMORE.COM>; Alex Sibilsky <asibilsky@connorgroup.com>; Dakota Hoffman <dhoffman@connorgroup.com>; Bill Stoll <Bill.Stoll@Steadfastco.com>; Ryan Stottlemyer <Ryan.Stottlemyer@steadfastco.com>; Ana Marie del Rio (AnaMarie.delRio@SteadfastCo.com) <AnaMarie.delRio@SteadfastCo.com>; Taylor Thornburgh <taylor.thornburgh@bclplaw.com>; Talia Housik <Talia.Housik@bclplaw.com>; Sherrie Courtney <sherrie.courtney@bclplaw.com>; Walker, Traci <Traci.Walker@ctt.com>
**Subject:** Reserves at Canyon Creek - Escrow Instruction (CTT No. 470013240131)

Michelle- attached please find escrow instructions regarding the above-referenced order.
Please call me with any questions.
Thanks,
Vanessa

Vanessa Sunshine
Practice Group Leader - Real Estate Finance US
vanessa.sunshine@bclplaw.com
M: +1 949 842 6238

Bryan Cave Leighton Paisner LLP

Exhibit H

120 Broadway, Suite 300, Santa Monica, CA 90401-2386
T: +1 310 576 2181

1920 Main Street, Suite 1000, Irvine, CA 92614-7276
T: +1 949 223 7122
**bclplaw.com**

Pronouns: She - Her - Hers

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

We may monitor and record electronic communications in accordance with applicable laws and regulations. Where appropriate we may also share certain information you give us with our other offices (including in other countries) and select third parties. For further information (including details of your privacy rights and how to exercise them), see our updated Privacy Notice at www.bclplaw.com.

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

---

This message was secured by Zix®.

---

**This message is from an external sender**
If you suspect this message is malicious, please use the "**Report Message**" add in function to report the message and refrain from opening any attachments or clicking on any links.

Exhibit I

**From:** Vanessa A. Sunshine
**To:** Phil.McGargill@fnf.com
**Cc:** AnaMarie.delRio@SteadfastCo.com; Michelle.Pensyl@CTT.com; Bill Stoll; Cc: Dakota Hoffman; Kevin Hyland; natalie.rauf@dinsmore.com; Brock Wright; Sherrie Courtney; Taylor Thornburgh; McGargill, Phil
**Subject:** RE: Reserve at Canyon Creek, Seller''s Notice to Escrow
**Attachments:** image001.png
image250464.png
image374507.png
image138712.png
image317280.png
Escrow Instructions 11-27-24.pdf

---

Phil,
Per our instructions attached, you are hereby instructed by Purchaser NOT to release the Deposit. Doing so would be in violation of the PSA. We have engaged litigation counsel and are preparing a complaint now against Seller to be filed shortly. If the Deposit is released to anyone but Purchaser, you will be in breach of your duties and we will be adding Fidelity as a named defendant in that suit.

Thanks,
Vanessa

Vanessa Sunshine
Practice Group Leader - Real Estate Finance US
Bryan Cave Leighton Paisner LLP - Santa Monica, CA USA / Irvine, CA USA
vanessa.sunshine@bclplaw.com
T: +1 310 576 2181 T: +1 949 223 7122 M: +1 949 842 6238

Pronouns: She - Her - Hers

**From:** McGargill, Phil <Phil.McGargill@fnf.com>
**Sent:** Tuesday, December 10, 2024 10:12 AM
**To:** Alex Sibilsky <asibilsky@connorgroup.com>; Ana Marie del Rio <AnaMarie.delRio@SteadfastCo.com>; Pensyl, Michelle <Michelle.Pensyl@CTT.com>; Bill Stoll <Bill.Stoll@Steadfastco.com>; Vanessa A. Sunshine <Vanessa.Sunshine@bclplaw.com>
**Cc:** Dakota Hoffman <dhoffman@connorgroup.com>; Kevin Hyland <khyland@connorgroup.com>; natalie.rauf@dinsmore.com; Brock Wright <bwright@connorgroup.com>; Sherrie Courtney <sherrie.courtney@bclplaw.com>; Taylor Thornburgh <taylor.thornburgh@bclplaw.com>; Walker, Traci <Traci.Walker@ctt.com>
**Subject:** RE: Reserve at Canyon Creek, Seller's Notice to Escrow

You don't often get email from phil.mcgargill@fnf.com. Learn why this is important

**External e-MAIL**

This message was sent securely using Zix

All:

Pursuant to the PSA and Seller's letter we will be dispersing the Earnest Monday today. Thank you.

Phil

**Phil McGargill**
Vice President, Manager

**Kentucky/Cincinnati/Dayton – National Commercial Services**
812 Lyndon Lane #205, Louisville, KY 40222
312 Walnut #2250, Cincinnati, OH 45202
One S. Main St. #250, Dayton, OH 45402

Direct: 513-337-5493 | Mobile: 402-779-5352 | phil.mcgargill@fnf.com

**From:** Alex Sibilsky <asibilsky@connorgroup.com>
**Sent:** Tuesday, December 10, 2024 8:39 AM
**To:** Ana Marie del Rio <AnaMarie.delRio@SteadfastCo.com>; Pensyl, Michelle <Michelle.Pensyl@CTT.com>; Bill Stoll <Bill.Stoll@Steadfastco.com>; Vanessa A. Sunshine <Vanessa.Sunshine@bclplaw.com>
**Cc:** Dakota Hoffman <dhoffman@connorgroup.com>; Kevin Hyland <khyland@connorgroup.com>; natalie.rauf@dinsmore.com; Brock Wright <bwright@connorgroup.com>; Sherrie Courtney <sherrie.courtney@bclplaw.com>; Taylor Thornburgh <taylor.thornburgh@bclplaw.com>; McGargill, Phil <Phil.McGargill@fnf.com>
**Subject:** Reserve at Canyon Creek, Seller's Notice to Escrow

Good morning,

On behalf of Seller, see the Notice to Escrow, attached.

Best,

AJS

Alexander J. Sibilsky, **Corporate Counsel**

Office: 937-350-3312 | asibilsky@connorgroup.com

---

**From:** Alex Sibilsky
**Sent:** Wednesday, December 4, 2024 3:59 PM
**To:** Ana Marie del Rio <AnaMarie.delRio@SteadfastCo.com>; Pensyl, Michelle <Michelle.Pensyl@CTT.com>; Bill Stoll <Bill.Stoll@Steadfastco.com>; Vanessa A. Sunshine <Vanessa.Sunshine@bclplaw.com>
**Cc:** Dakota Hoffman <dhoffman@connorgroup.com>; Kevin Hyland <khyland@connorgroup.com>; natalie.rauf@dinsmore.com <Natalie.Rauf@DINSMORE.COM>; Brock Wright <bwright@connorgroup.com>; Sherrie Courtney <sherrie.courtney@bclplaw.com>; Taylor Thornburgh <taylor.thornburgh@bclplaw.com>; McGargill, Phil <Phil.McGargill@fnf.com>
**Subject:** Reserve at Canyon Creek, Seller's Notice of Purchaser Default

Good afternoon,

On behalf of Seller, see the Notice of Purchaser Default, attached.

Regards,

AJS

Alexander J. Sibilsky, **Corporate Counsel**

Office: 937-350-3312 | asibilsky@connorgroup.com

---

NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

This message was secured by Zix®.

**This message is from an external sender**

If you suspect this message is malicious, please use the "**Report Message**" add in function to report the message and refrain from opening any attachments or clicking on any links.

BCLP
Bryan Cave Leighton Paisner

BRYAN CAVE LEIGHTON PAISNER LLP
120 Broadway Suite 300
Santa Monica CA 90401 2386
T: +1 310 576 2100
F: +1 310 576 2200
bclplaw.com

Vanessa Sunshine
Direct: (310) 576-2181
vanessa.sunshine@bclplaw.com

November 27, 2024

**VIA ELECTRONIC MAIL AND FEDERAL EXPRESS OVERNIGHT DELIVERY**

Chicago Title Insurance Company
One Dayton Centre
One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com

**ESCROW INSTRUCTION**

Re: Agreement of Sale and Purchase dated September 17, 2024 (the "Original PSA"), executed by and between Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), and STEADFAST ASSET HOLDINGS, INC., a California corporation ("Purchaser"), as amended by that certain First Amendment to Agreement of Sale and Purchase dated as of October 9, 2024 ("First Amendment"), and that certain Second Amendment to Agreement of Sale and Purchase dated as of October 16, 2024 ("Second Amendment", and collectively with the Original PSA and the First Amendment, the "Purchase Agreement") for the contemplated sale and purchase of all Seller's right, title and interest in and to that certain land located at 12235 Vance Jackson Road, San Antonio, Texas 78230 (the "Property") together with all improvements located on the Property.
CTT Commitment No. CTD-13-470013240131-AM

Dear Ms. Pensyl:

Section 3.3 of the Purchase Agreement provides that "Purchaser shall have the right to elect to terminate [the Purchase Agreement] within five Business Days of receipt of written notice from Seller that Seller cannot or will not cure or eliminate" any of Purchaser's objections in Purchaser's Title Disapproval Notice, and "upon such election, all Earnest Money shall be immediately refunded to Purchaser." There is no requirement that Seller consent to the release of the Earnest Money under such circumstances.

On November 1, 2024, Seller sent written notice to Purchaser that Seller did not agree to cure or eliminate certain of Purchaser's title and survey objections relating to a property line overlap, stating that Seller believed Purchaser's surveyor had "made an error," and that Seller had "insufficient information to commit to a specific course of action." In response, Purchaser delivered to Seller that certain Termination Notice sent by Purchaser to Seller and Chicago Title Insurance Company ("CTT") on November 4, 2024 (the "Initial Termination Notice"). The Initial Termination Notice terminated the Purchase Agreement and instructed CTT to immediately release the Earnest Money (together with any interest accrued thereon) to Purchaser, in accordance with Section 3.3 of the Purchase Agreement.

On November 25, 2025, Purchaser sent a Supplemental Termination Notice reaffirming the termination that occurred on November 4, 2024, and memorializing Purchaser's intention not to reinstate the Purchase Agreement.

Accordingly, Purchaser hereby again instructs CTT to immediately release the Earnest Money (and all accrued interest thereon) to Purchaser in accordance with the terms of the Purchase Agreement. Wiring instructions are attached hereto as Schedule 1.

Purchaser reserves all rights and remedies at law and in equity, including but not limited to those relating to the Purchase Agreement and the Earnest Money held with the CTT.

Please feel free to contact me with any questions.

Very truly yours,

Vanessa A. Sunshine

cc:

Brock Wright (via email bwright@connorgroup.com)
Kevin Hyland (via email: khyland@connorgroup.com)
Natalie H. Rauf (via email Natalie.Rauf@DINSMORE.COM)
Alexander J. Sibilsky (via email asibilsky@connorgroup.com)
Dakota Hoffman (via email dhoffman@connorgroup.com)
Bill Stoll (via email Bill.Stoll@steadfastco.com)
Ryan Stottlemyer (via email Ryan.Stottlemyer@steadfastco.com)
Ana Marie del Rio (via email AnaMarie.delRio@steadfastco.com)
Taylor Thornburgh (via email Taylor.Thornburgh@bclplaw.com)
Talia Housik (via email Talia.Housik@bclplaw.com)
Sherrie Courtney (via email Sherrie.Courtney@bclplaw.com)

SCHEDULE 1

**Purchaser's Wiring Instructions**

[redacted]

Exhibit J

BCLP
Bryan Cave Leighton Paisner

**December 10, 2024**

Kyle Hirsch
Partner
Direct: +1 602 364 7170
Fax: +1 602 716 8170
kyle.hirsch@bclplaw.com

BRYAN CAVE LEIGHTON PAISNER LLP
Dallas Arts Tower
2200 Ross Avenue Suite 4200W
Dallas TX 75201 7965
T: +1 214 721 8000
F: +1 214 721 8100
bclplaw.com

Chicago Title Insurance Company
One Dayton Centre
One South Main, Suite 250
Dayton, Ohio 45402
Attn: Michelle Pensyl, Esq.
Email: michelle.pensyl@ctt.com

Fidelity National Title
One Dayton Centre
One S. Main St. #250
Dayton, Ohio 45402
Attn: Phil McGargill
Email: phil.mcgargill@fnf.com

**Re: Demand Letter; CTT Commitment No. CTD-13-470013240131-AM**

Dear Ms. Pensyl and Mr. McGargill,

Reference is hereby made to that certain Agreement of Sale and Purchase dated September 17, 2024 (the "Original PSA"), executed by and between Reserve at Canyon Creek TIC 1, LLC, Reserve at Canyon Creek TIC 2, LLC, Reserve at Canyon Creek TIC 3, LLC, Reserve at Canyon Creek TIC 4, LLC, Reserve at Canyon Creek TIC 5, LLC, and Reserve at Canyon Creek TIC 6, LLC, each a Delaware limited liability company (collectively and jointly and severally, "Seller"), and STEADFAST ASSET HOLDINGS, INC., a California corporation ("Purchaser"), as amended by that certain First Amendment to Agreement of Sale and Purchase dated as of October 9, 2024 ("First Amendment"), and that certain Second Amendment to Agreement of Sale and Purchase dated as of October 16, 2024 ("Second Amendment", and collectively with the Original PSA and the First Amendment, the "Purchase Agreement") for the contemplated sale and purchase of all Seller's right, title and interest in and to that certain land located at 12235 Vance Jackson Road, San Antonio, Texas 78230 (the "Property") together with all improvements located on the Property. All capitalized terms used herein shall have the meaning ascribed to such terms in the Purchase Agreement.

This law firm represents Purchaser. We are in receipt of Seller's correspondence this morning demanding that the Earnest Money be released to Seller. We are also in receipt of Mr. McGargill's response to that email wherein he advised that the Earnest Money would be disbursed today to Seller. Please be reminded that my firm, on behalf of Purchaser, previously sent Ms. Pensyl correspondence on November 27, 2024 demanding that the Earnest Money be disbursed to Purchaser. Section 13.3 of the Purchase Agreement requires Escrow Agent to release the Earnest Money to the "party entitled thereto." However, it is apparent from the adverse instructions delivered to Escrow Agent that both Purchaser and Seller believe the terms of the Purchase Agreement entitle it to a release of the Earnest Money. Thus, there is a disagreement between Purchaser and Seller as to who should receive the Earnest Money. In such circumstances, Section 13.4(c) of the Purchase Agreement provides that Escrow Agent may deposit the Earnest Money with a court of competent jurisdiction.

You are hereby instructed not to release the Earnest Money to any party other than Purchaser or a court of competent jurisdiction. Please be advised that if Escrow Agent releases the Earnest Money to Seller without a court order, such conduct is contrary to the express terms of the Purchase Agreement and, in

BCLP.
Bryan Cave Leighton Paisner

such circumstance, Purchaser intends to pursue claims for breach of contract, negligence, tortious interference, a breach of the covenant of good faith and fair dealing, and any and all other causes of action that Purchaser deems appropriate against, among others, Chicago Title Insurance Company, Fidelity National Title, and Seller. Purchaser further reserves all rights and remedies at law and in equity, including but not limited to those relating to the Purchase Agreement, the Property, and the Earnest Money held with the Escrow Agent.

Sincerely,

Kyle Hirsch

Cc: Brock Wright (via email bwright@connorgroup.com)

Kevin Hyland (via email: khyland@connorgroup.com)

Natalie H. Rauf (via email Natalie.Rauf@DINSMORE.COM)

Alexander J. Sibilsky (via email asibilsky@connorgroup.com)

Dakota Hoffman (via email dhoffman@connorgroup.com)

Bill Stoll (via email Bill.Stoll@steadfastco.com)

Ryan Stottlemyer (via email Ryan.Stottlemyer@steadfastco.com)

Ana Marie del Rio (via email AnaMarie.delRio@steadfastco.com)

Taylor Thornburgh (via email Taylor.Thornburgh@bclplaw.com)

Talia Housik (via email Talia.Housik@bclplaw.com)

Sherrie Courtney (via email Sherrie.Courtney@bclplaw.com)

Vanessa Sunshine (via email Vanessa.Sunshine@bclplaw.com)

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Leticia Espinosa on behalf of Natalie Wilson
Bar No. 24076779
lespinosa@langleybanack.com
Envelope ID: 95853029
Filing Code Description: Petition
Filing Description:
Status as of 1/6/2025 8:16 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Natalie FWilson | | nwilson@langleybanack.com | 1/3/2025 5:29:34 PM | SENT |
| Leticia Espinosa | | lespinosa@langleybanack.com | 1/3/2025 5:29:34 PM | SENT |